## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE, *et al.*,

                Plaintiffs,

    v.

THE ISLAMIC REPUBLIC OF IRAN,
*et al.*

                Defendants.

Civil Action No.

## PLAINTIFFS' *EX PARTE* MOTION FOR LEAVE TO FILE A COMPLAINT OMITTING THE PLAINTIFFS' REAL NAMES AND ADDRESSES

Plaintiffs, by and through their undersigned counsel, hereby request that the Chief Judge grant them leave to file a pseudonymous complaint against the Islamic Republic of Iran and The Iranian Ministry of Information and Security ("MOIS"). As set forth more fully in the memorandum in support of this motion, plaintiffs fear possible death or physical and/or mental harm in retaliation for proceeding with this suit and thus seek to protect themselves and their family members by shielding their identities. Because of the nature of this case and the particular circumstances surrounding the plaintiffs, their families and friends, each possess a well-founded fear of retaliation by the defendants and their agents in the event that their identities and the identities of their witnesses are made known to the public. A memorandum in support of this motion is attached.

WHEREFORE, Plaintiffs respectfully request the Chief Judge grant them leave to file a Complaint in this case omitting their real names and addresses.

Respectfully submitted,

_[signature]_

Stuart H. Newberger, D.C. Bar No. 294793
Michael L. Martinez, D.C. Bar No. 347310
Laurel Pyke Malson, D.C. Bar No. 317776
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Phone:        (202) 624-2500
Facsimile:    (202) 628-5116

*Attorneys for Plaintiffs*

March 27, 2008

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN DOE, *et al.*, <br><br>          Plaintiffs, <br><br>    v. <br><br> THE ISLAMIC REPUBLIC OF IRAN, *et al.* <br><br>          Defendants. | Civil Action No. |

## O R D E R

Upon consideration of the Plaintiffs' *Ex Parte* Motion for Leave to File a Complaint Omitting the Plaintiffs' Real Names and Addresses, it is by the Court this _____ day of _____, 2008, hereby:

ORDERED, that the motion be and hereby is GRANTED, and that Plaintiffs may file their complaint without submitting their real names and addresses.

_____
CHIEF JUDGE THOMAS F. HOGAN
UNITED STATES DISTRICT JUDGE

Stuart H. Newberger
Michael L. Martinez
Laurel P. Malson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THE ISLAMIC REPUBLIC OF IRAN, *et al.* <br><br> Defendants. | Civil Action No. |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' *EX PARTE* MOTION FOR LEAVE TO FILE A COMPLAINT OMITTING THE PLAINTIFFS' REAL NAMES AND ADDRESSES

Plaintiffs, by and through their undersigned counsel, all seek leave to file a pseudonymous complaint against the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS"). As explained more fully below, such action is necessary due to Plaintiffs' credible fear of death or bodily harm to them or members of their family by the Defendants or agents acting on the behalf of Defendants.

### I. Factual Summary

This is an action brought by victims of terrorism against Iran – a well-known state sponsor of terrorism – pursuant to recent amendments to the "terrorism exception" to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(A).

This case arises out of two separate terrorist attacks in Beirut, Lebanon – the April 18, 1983 bombing of the U.S. Embassy, and the September 20, 1984 bombing of the U.S. Embassy Annex. Both terrorist attacks have been the subject of prior litigation and decisions in this court in cases brought by citizens of the United States. In those earlier cases, judges of this Court determined, as a matter of law, that Iran – through the Iranian funded terrorist group Hizbollah – was responsible for the bombings and the resulting deaths and injuries to people on site at the time. *See Dammarell v. Islamic Republic of Iran,* 281 F. Supp. 2d 105, 108-113 (D.D.C. 2003) (Bates, J.) (finding Iran responsible for the April 1983 embassy bombing);[1] *Salazar v. Islamic Republic of Iran,* 370 F. Supp. 2d 105, 109-111 (D.D.C. 2005) (Bates. J.) (same); *Wagner v. Islamic Republic of Iran,* 172 F. Supp. 2d 128, 130-33 (D.D.C. 2001) (Jackson, J.) (finding Iran responsible for the September 1984 embassy annex bombing).

On January 28, 2008, the President signed into law the National Defense Authorization Act for Fiscal Year 2008, Pub. L. 100-181. Section 1083 of that Act, to be codified at 28 U.S.C. § § 1605(A), 1610, amends the FSIA's terrorism exception in several important ways. Among other things, the recent amendments provide that "employees" of the United States or their "legal representative" may bring an action "for personal injury or death" caused by the acts of a foreign state sponsor of

---

[1]    There were several subsequent memorandum opinions issued by Judge Bates in *Dammarell*, but none altered the Court's conclusion that Iran was responsible. Final judgment was entered in Plaintiffs' favor against Iran and MOIS in that case on September 7, 2006.



terrorism. This has the effect of expanding the pool of plaintiffs in such cases to selected people who are not United States citizens.

The instant case is an action brought by: (1) the estates of U.S. employees who were killed the April 1983 and September 1984 terrorist attacks; (2) U.S. employee victims who survived the attacks, but were injured; and (3) the "immediate family" members of those U.S. employee victims who were killed or injured in one of the two terrorist attacks. Because many of the Plaintiffs either still reside in Lebanon or have family members in Lebanon, and because Lebanon has been and remains a hotbed of political unrest and danger in which Hizbollah and Iran remain active overtly and covertly, Plaintiffs genuinely fear for their lives by taking the step of participating in this lawsuit.

## II. **Legal Standard**

The Federal Rules of Civil Procedure and the Court's Local Civil Rules require that complaints state the names and addresses of parties. The rules make no explicit provision for pseudonymous litigation. Fed.R.Civ.P. 10(a); LCvRs 5.1(e)(1), 11.1. However, this Court has stated that litigants seeking to proceed under a pseudonym may ask the Chief Judge, *ex parte*, for leave to file a complaint omitting the litigant's real name and full address. *Qualls v. Rumsfeld*, 228 F.R.D. 8, 10 (D.D.C. 2005). "Leave is generally granted if the litigant makes a colorable argument in support of the request. If the Chief Judge grants leave to file, the litigant may then file a pseudonymous complaint and the case will be assigned to a judge just like any ordinary case." *Id.*



Reciting the law of other circuits, this Court has held that the "'rare dispensation' of allowing parties to proceed pseudonymously is only justified in the 'critical' . . . or the 'unusual case' . . . [s]uch critical or unusual cases may include those in which 'identification creates a risk of retaliatory physical or mental harm.'" *Id.* at 10-11. (citations omitted).

### III. Argument

The Court can and should take judicial notice of the fact that violent discord still grips Lebanon, imperiling the lives of all Lebanese citizens, sometimes on a daily basis. Specifically, Hizballah continues to operate freely within the country, thus threatening the lives of the plaintiffs, their family members, friends, and all potential third party witnesses willing to participate in this suit. *See* Attached 2007 United States Department of State Country Report on Human Rights Practices in Lebanon. Plaintiffs are certain and duly concerned that their pursuit of a legal action against Hizballah's sponsors, Iran and MOIS, could lead to retaliation by Hizballah that would result in death, or physical and/or mental harm.

This is indeed the unusual case contemplated by this Court's precedent. Not only has this Court decided three prior cases in which judges here have deemed Iran and MOIS directly responsible for the terrorist attacks that underlie this case, this is a situation where Iran and its agent Hizbollah remain active in Lebanon – a country that appears from the outside to be constantly in a state of unrest. Moreover, although the prior cases – *Dammarell, Salazar, and Wagner* – all were conducted with the real names of the Plaintiffs on the public record, this case is

4

different. Unlike those cases where all of the plaintiffs were U.S. citizens with no apparent continuing relationship with Lebanon, this case is brought pursuant to the recent statutory amendments which permit, for the first time, non-U.S. citizens who were employed by the United States to sue for such terrorist acts. This has created a situation where many of the Plaintiffs reside or have family members who reside in Lebanon, and thus are fearful of the consequences of participating in this case, were their participation publicly known.[2]

Plaintiffs, therefore, submit that the reasons for proceeding psuedonymously are compelling and hence they request that the Court grant their motion for leave to file a complaint omitting their real names and addresses. A full and complete Complaint detailing the names and address of the Plaintiffs is being filed under seal with the Clerk at the same time as a parallel "John Doe" Complaint, this motion, and other related papers are being filed.

---

[2]    Indeed at least one of the Plaintiffs has reported to the undersigned counsel that Lebanese television is already reporting that some Lebanese citizens will be filing a claim against Iran for the embassy bombings. Additionally, several Plaintiffs, notwithstanding the possibility of proceeding pseudonymously, have declined participation, due to concerns for the security of their persons and families.

## Conclusion

WHEREFORE, Plaintiffs respectfully request the Court grant them leave to file a

complaint omitting their real names and addresses.

Respectfully submitted,

Stuart H. Newberger, D.C. Bar No. 294793
Michael L. Martinez, D.C. Bar No. 347310
Laurel Pyke Malson, D.C. Bar No. 317776
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Phone:        (202) 624-2500
Facsimile:    (202) 628-5116

*Attorneys for Plaintiffs*

March 27, 2008

## CERTIFICATE OF SERVICE

I hereby certify this 27th day of March, 2008, that service was not made on
Defendants in this action as they are located in Iran.


Michael L. Martinez

# U.S. DEPARTMENT *of* STATE

# Lebanon

Country Reports on Human Rights Practices - 2007
Released by the Bureau of Democracy, Human Rights, and Labor
March 11, 2008

Lebanon, with a population of approximately 4 million, is a parliamentary republic in which the president is a Maronite Christian, the prime minister a Sunni Muslim, and the speaker of the chamber of deputies a Shi'a Muslim. Parliament elected President Emile Lahoud, who is the head of state, in 1998 for a six-year term; however, in 2004 the Syrian regime pressured parliamentarians to pass a constitutional amendment that extended Lahoud's term until November 2007. President Lahoud stepped down on November 23 at the end of his term, and, as stipulated in the constitution, the powers of the presidency were transferred to the cabinet, led by Prime Minister (PM) Fouad Siniora, until the election of a new president. On September 25, parliament was scheduled to meet and begin the process of choosing a new president; however, the speaker subsequently rescheduled the session eleven times, and parliament was unable to elect a president by year's end. According to international observers, the 2005 legislative elections were considered generally free and fair, although most political observers considered the boundaries of the electoral districts to be unfair.

The May 20 to September 2 conflict involving the Lebanese Armed Forces (LAF) and militant Islamic fundamentalist group Fatah al-Islam (FAI) erupted in Nahr al-Barid, a Palestinian refugee camp in the north of the country. The Lebanese Army took control of the camp. The death toll during the conflict was 168 LAF soldiers and an estimated 42 civilians. During the fighting, security forces forced some 30,000 Palestinians living in Nahr al-Barid to leave their homes and detained and reportedly physically abused some Palestinian men who were suspected of collaborating with FAI. Palestinian authorities retained control of the other eleven refugee camps in the country.

Despite the deployment of the LAF and the expansion of the United Nations Interim Forces (UNIFIL) in the south in August 2006, Hizballah retained significant influence over parts of the country. UN Security Council (UNSC) resolutions 1559 and 1701 call upon the government to take effective control of all Lebanese territory and disarm militia groups operating there. Due to several factors, including internal political differences and a lack of capacity in the security forces, the government did not take the necessary steps to disarm extralegal armed groups, including Hizballah.

There were limitations on the right of citizens to peacefully change their government. In a climate of impunity, there were instances of arbitrary or unlawful deprivation of life, torture, and other abuses. Security forces arbitrarily arrested and detained individuals, while poor prison conditions, lengthy pretrial detention and long delays in the court system remained serious problems. The government violated citizens' privacy rights, and there were some restrictions on freedoms of speech and press, including intimidation of journalists. Government corruption and a lack of transparency remained problems. There were limitations on freedom of movement for unregistered refugees, while widespread, systematic discrimination against Palestinian refugees continued. Domestic violence and societal discrimination against women continued. Violence against children and child labor also remained problems.

## RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were reports that the government or its agents committed arbitrary or unlawful killings during the year.

On June 29, Reuters reported that security forces killed three Palestinian protesters during a demonstration in Al-Baddawi refugee camp. Palestinian protesters were demanding to return to their homes in Nahr al-Barid.

During the year, the UN International Independent Investigation Commission (UNIIIC), established under UNSC resolution 1595, continued its investigation into the 2005 assassination of former PM Rafiq Hariri. While preliminary reports pointed to possible linkages to Syrian intelligence services, they did not reach a firm conclusion by year's end.

Militant groups continued efforts to terrorize the public and political figures, including through a series of car bombings during the year. On June 13, a car bomb explosion killed Member of Parliament (MP) Walid Eido and his elder son Khaled, along with nine others. On September 19, a car bomb explosion killed MP Antoine Ghanem and eight others. Both MPs were part of the pro-government "March 14" coalition, and several political allies of the two MPs charged that the Syrian government was responsible for the assassinations, which Syria strongly denied. On December 12, a car bomb killed LAF Chief of Operations Brigadier General Francois el-Hajj along with his bodyguard. El-Hajj was in charge of the Nahr al-Barid operations. Investigations into the three incidents continued at year's end.

On March 12, authorities detained four suspected members of the terrorist group FAI for the February 2006 Ain Alaq twin bus bombings that reportedly killed three and injured more than 20.

On June 22, the news Web site Al-Mustaqbal reported that Judge Sa'id Mirza brought charges against Lebanese citizen Ibrahim Hasan Awadah and Syrian citizens Firas Abd al-Rahman, Mahmoud Abd al-Karim Imran, and Izzat Muhamad Tartusi for the 2005 attempted

assassination of the defense minister and incoming deputy prime minister Elias Murr, which injured Murr and killed one person. The suspects allegedly remained outside of the country at year's end.

On July 5, according to the news Web site Elaph, security authorities arrested alleged FAI official Walid al-Bustani for his connections with the assassination of deputy and former industry minister Pierre Gemayal, who was assassinated in November 2006 in the Judaydat al-Matn area near Beirut. Al-Bustani remained detained at year's end.

There were no further developments in the May 2006 killings of Islamic Jihad member Mahmoud Majzoub and his brother or the September 2006 roadside bombs in Rmeileh that injured Internal Security Forces (ISF) Lieutenant Colonel Samir Shehade and killed four of his bodyguards.

During the year there were reports of killings by unknown actors. For example, on June 24, six soldiers in the Spanish contingent of UNIFIL were killed and another three were injured when two IED devices exploded near their vehicle in southern Lebanon. While no organization claimed credit for the attack, it was widely viewed as an effort by actors who oppose UNIFIL and its efforts to prevent attacks against Israel launched from southern Lebanon.

The UN Mine Action Coordination Center in southern Lebanon (UNMACC) estimated that 40 percent of Israeli cluster munitions fired during the July–August 2006 conflict failed to explode,

leaving an estimated 560,000 to 1.1 million unexploded munitions in southern Lebanon. As of December UNMACC stated that 138,750 pieces of munitions and mines had been removed and estimated that 430,000 unexploded munitions remained.

On December 4, UNMACC stated that approximately 15 square miles of land in southern Lebanon remained infested. According to the UNMACC, as of December 4, the munitions have killed 30 people and injured dozens of others since the end of the July-August 2006 conflict.

There were reports of killings of civilians during the year in connection with the conflict in the Nahr al-Barid refugee camp (see Section 1.g.).

b. Disappearance

On April 26, security forces found the bodies of two youths affiliated with Progressive Socialist Party leader Walid Jumblatt, a Druze Muslim allied with the government, after they went missing a few days earlier. Security forces arrested five suspects, four Lebanese and one Syrian, and charged them with planning the kidnapping. At year's end the suspects remained in detention.

In July 2006 Hizballah kidnapped two Israeli soldiers on Israeli territory, which prompted Israeli retaliation leading to the July-August 2006 conflict. Hizballah had yet to allow access or communications with the two soldiers at year's end.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law does not specifically prohibit torture, and security forces abused detainees and in some instances used torture. Human rights groups, including Amnesty International (AI) and Human Rights Watch (HRW), reported that torture was common.

On May 11, HRW and the Lebanese Center for Human Rights (CLDH) called for an investigation into allegations of torture and ill-treatment of nine detainees whose trial before a military court began on April 21. Authorities accused the nine individuals of forming an illegal group; conspiring to commit crimes against the state with the aim of inciting sectarian strife; possession and transfer of weapons and explosive material; and planning to assassinate the leader of Hizballah, Hassan Nasrallah. HRW and CLDH interviewed seven of the nine detainees and monitored their trial on April 21. Four detainees alleged that interrogators tortured them during their detention at the Ministry of Defense in order to force confessions, while other detainees say they were ill-treated and intimidated. According to HRW and CLDH, the remaining five detainees reported that interrogators blindfolded and frequently punched them during questioning. Three of the nine detainees were released on bail. The trial was ongoing at year's end.

On May 13, the Lebanese daily *Al-Diyar* reported that the Information Section of the ISF called Muhammad Abd-al-Amir Salhab in for questioning following the 2005 assassination of former PM Rafiq Hariri. According to *Al-Diyar*, security forces detained Salhab for three days, during which he "was subjected to all types of torture." Salhab was in France seeking political asylum at year's end.

In October 2006 the nongovernmental human rights organization Support of Lebanese in Arbitrary Detention (SOLIDA) issued a report documenting the various types of torture allegedly practiced at the Ministry of Defense between 1992 and 2005. Torture methods included physical abuse, sleep deprivation, and prolonged isolation. On April 26, the army released a statement dismissing news reports that detainees suspected of belonging to armed groups were subjected to torture during interrogation. According to the *Daily Star*, the statement denied that any detainees had undergone "any sort of physical or psychological torment in order to force them to give false testimonies."

However, the government acknowledged that violent abuse of detainees sometimes occurred during preliminary investigations conducted at police stations or military installations, in which suspects were interrogated without an attorney. Such abuse occurred despite national laws that prevent judges from accepting confessions extracted under duress.

For example, the press reported that on June 20, security forces arrested five dual Australian-Lebanese citizens, Hussein Elomar, Omar al-Hadba, Ibrahim Sabbough, Ahmed Elomar, and Mohammed Bassel, during a raid on al-Habda's workshop in Tripoli. Security forces arrested Al-Hadba on suspicion of supplying weapons to FAI. Security forces reportedly broke Elomar's jaw in detention and forced his nephew, Ahmed Elomar, to stand for long periods of time and beat him severely if he tried to rest. Ahmed's injuries included damage to his knee. Police dropped charges against Ahmed Elomar and Mohammed Bassel. The other individuals remained in custody at year's end.

Abuses also occurred in areas outside the government's control, including in Palestinian refugee camps. During the year there were reports that members of the various Palestinian groups that controlled specific camps detained their rivals during clashes over territorial control of the camps.

Prison and Detention Center Conditions

Prison conditions were poor and did not meet minimum international standards. Prisons were overcrowded, and sanitary conditions in the women's prison, in particular, were very poor. There were no serious threats to health, but indirect threats existed. For example, physical and mental stress caused by cramped conditions was especially noteworthy in the Yarze prison in southeast Beirut. The government did not consider prison reform a high priority. The number of inmates was estimated to be 5,870, including pretrial detainees and remand prisoners. The government made a modest effort to rehabilitate some inmates through education and training programs.

While there were no government reports on juveniles held in the same prison facilties as adults during the year, it could not be confirmed that the situation did not occasionally happen due to limited prison facilities. Despite some effort to keep pretrial detainees separate from convicted prisoners, overcrowding often prevented such separation. Due to the limited space, prisoners convicted of terrorist crimes were placed in the same prison facilities but on a separate floor.

The police institution in charge of border posts and internal security, the Surete Generale (SG), operated a detention facility for detainees pending deportation. According to SG, detention is to be for one to two months, pending the regularization of their status. However, some persons, primarily asylum seekers, were detained for more than a year before being eventually deported.

The government permitted independent monitoring of prison conditions by local and international human rights groups and the International Committee of the Red Cross (ICRC). On February 20, ICRC and judicial and security authorities signed a protocol enabling ICRC to visit all prisons in the country in accordance with decree 8800.

d. Arbitrary Arrest or Detention

Although the law requires judicial warrants before arrests, except in immediate pursuit situations, the government arbitrarily arrested and detained persons.

Role of the Police and Security Apparatus

The security forces consist of the LAF under the Ministry of Defense, which may arrest and detain suspects on national security grounds; the ISF under the Ministry of the Interior (MOI), which enforces laws, conducts searches and arrests, and refers cases to the judiciary; the State Security Apparatus, which reports to the prime minister; and the SG under the MOI. Both the State Security Apparatus and the SG collect information on groups deemed a possible threat to state security.

Laws against bribery and extortion by government security officials and agencies also apply to the police force. In practice, however, a lack of strong enforcement limited their effectiveness. The government acknowledged the need to reform law enforcement, but the lack of political stability and security hampered these efforts. The ISF maintained a hotline for complaints.

Arrest and Detention

Military intelligence personnel made arrests without warrants in cases involving military personnel and those involving espionage, treason, weapons possession, and draft evasion. According to ISF statistics, out of the 5,870 persons held in prison, 3,669 had not been convicted of crimes. Also, there were reports that security forces arrested civilians without warrants.

The law provides the right to a lawyer, a medical examination, and referral to a prosecutor within 48 hours of arrest. If a detainee is held more than 48 hours without formal charges, the arrest is considered arbitrary, and the detainee must be released. In such cases officials responsible for the prolonged arrest may be prosecuted on charges of depriving personal freedom. A suspect caught in hot pursuit must be referred to an examining judge, who decides whether to issue an indictment or order the release of the suspect. Bail is available in all cases regardless of the charges. While there was no state-funded public defender's office, the bar association operated an office for those who could not afford a lawyer, and a lawyer was often provided for indigent defendants.

Many provisions of the law were not observed in practice, and security forces continued the practice of arbitrary arrest and detention.

On January 23 and 25, according to security sources, security forces arrested approximately 450 individuals following clashes at the Beirut Arab University and protests by the political opposition. Following investigations, security forces detained more than 15 individuals because they had former arrest warrants. Others were sentenced to between three days and three months imprisonment, and some were fined.

On February 1, authorities released on bail three journalists from New TV after 44 days in prison without a trial date. In December 2006 authorities arrested the journalists following a broadcast of their investigative report depicting the home of Mohammad Siddiq, a witness in the assassination of former PM Rafiq Hariri. At year's end, the journalists had freedom to travel within and outside the country but were expected to appear before investigators when required.

On June 13, HRW reported that the Lebanese army and ISF arbitrarily detained and physically abused some Palestinian men fleeing the fighting in the Nahr al-Barid refugee camp (see Section 1.g.).

At year's end four Lebanese generals, who in 2005 the UNIIIC arrested and declared as suspects in the assassination of former PM Rafiq Hariri, remained in custody. According to an August 28 *Daily Star* report, one of the detainees, General Security Major General Sayyed,



reported that State Prosecutor Said Mirza informed UN Chief Investigator Brammertz that "local political considerations" were the cause for their continued detention without charges.

Also in relation to the case, on September 13, Justice Minister Charles Rizk appointed Judge Saqr Saqr as the new investigative magistrate, replacing Magistrate Eid Eid, who was handling the 2005 Hariri assassination. Eid was replaced following a request filed by lawyer Mohammed Mattar, who represented the heirs of four victims in the Hariri assassination, claiming that Eid was going to release the four generals. In November a working group of the UN Commission for Human Rights cited the case as an example of arbitrary detention. There were no new developments in their cases during the year, and the suspects remained imprisoned at year's end.

In February 2006, according to an international human rights organization, authorities arrested and detained more than 400 individuals in the wake of violent protests outside the Danish Embassy in Beirut related to the Danish cartoon controversy. Six days following their arrest, approximately 250 of these individuals were brought before the Military Court in Beirut and were ordered released. The remaining detainees were imprisoned for a time period of two weeks to nine months.

Palestinian refugees were subject to arrest, detention, and harassment by state security forces and rival Palestinian factions.

Human rights activists believed that there were numerous Lebanese, Palestinians, and Jordanians in prolonged and often secret detention in Syria. According to SOLIDA, the estimated number of remaining Lebanese prisoners in Syria is between 200 and 250. During the year there were no reports of Syrian forces operating in the country carrying out searches, arrests, or detentions of citizens outside any legal framework.

e. Denial of Fair Public Trial

While the constitution provides for an independent judiciary, in practice the judiciary was subject to political pressure, particularly in the appointments of key prosecutors and investigating magistrates. With the support of the UNIIIC, however, the judiciary continued judicial proceedings against once-powerful security and intelligence chiefs who had cooperated with Syria's occupation. The law provides for a fair public trial; however, influential politicians as well as Syrian and Lebanese intelligence officers at times intervened and protected their supporters from prosecution. Despite intimidation generated by a series of unresolved political assassinations committed by unidentified assailants beginning in 2004, the aftermath of the 2005 assassination of Rafiq Hariri led to gradual progress in eliminating political and security influence over the judiciary.

The judicial system consists of a constitutional council to determine the constitutionality of newly adopted laws upon the request of 10 members of parliament; the civilian courts; the Military Court, which tries cases involving military personnel and civilians in security-related issues; and the Judicial Council, which tries national security cases. There are also tribunals of the various religious affiliations, which adjudicate matters of personal status, including marriage, divorce, inheritance, and child custody. The religious Shari'a courts are often used by both the Shi'a and Sunni religious communities to resolve family legal matters. There are also religious courts in the various Christian sects and Druze communities; these tribunals were also restricted to family legal matters.

The Judicial Council is a permanent tribunal of five senior judges that adjudicates threats to national security and some high-profile cases. Upon the recommendation of the minister of justice, the cabinet decides whether to try a case before this tribunal. Verdicts from this tribunal may not be appealed. For example, the cabinet referred the assassination cases of MP Walid Eido, MP Antoine Ghanem, and MP Pierre Gemayel to the Judicial Council.

The Ministry of Justice appoints all other judges, taking into account the sectarian affiliation of the prospective judge. A shortage of qualified judges impeded efforts to adjudicate cases backlogged during the years of internal conflict. Trial delays were aggravated by the government's inability to conduct investigations in areas outside of its control, specifically in the Hizballah-controlled areas in the south and in the 11 Palestinian-controlled refugee camps in the country.

Trial Procedures

There is no trial by jury; trials were generally public, but judges had the discretion to order a closed court session. Defendants have the right to be present at trial and the right of timely consultation with an attorney. While defendants do not have the presumption of innocence, they have the right to confront or question witnesses against them, but they must do so through the court panel, which decides whether or not to permit the defendant's question. Defendants and their attorneys have access to government-held evidence relevant to their cases and the right of appeal. These rights generally were observed. While there was no state-funded public defender's office, the bar association operated an office for those who could not afford a lawyer, and a lawyer was often provided for indigent defendants.

Defendants on trial for security cases, which were heard before the Judicial Council, have the same procedural rights as other defendants; however, there was no right to appeal in such cases. Trials for security cases were generally public; however, judges had the discretion to order a closed court session.

The Military Court has jurisdiction over cases involving the military as well as those involving civilians in espionage, treason, weapons possession, and draft evasion cases. Civilians may be tried for security issues, and military personnel may be tried for civil issues. The Military Court has two tribunals: the permanent tribunal and the cassation tribunal. The latter hears appeals from the former. A civilian judge chairs the higher court. Defendants on trial under the military tribunal have the same procedural rights as defendants in ordinary courts.

Palestinian groups in refugee camps operated an autonomous and arbitrary system of justice not under the control of the state. For example, local popular committees in the camps attempted to solve disputes using tribal methods of reconciliation. If the case involved a killing, the committees occasionally handed over the perpetrator to state authorities for trial.

Political Prisoners and Detainees

During the year there were no reports of political prisoners or detainees.

Civil Judicial Procedures and Remedies

While there is an independent judiciary in civil matters, in practice it was seldom used for bringing civil lawsuits for seeking damages for human rights violations committed by the government. During the year there were no examples of a civil court awarding an individual compensation for human rights violations committed against them by the government.

f. Arbitrary Interference with Privacy, Family, Home, or

Correspondence

While the law prohibits such actions, authorities frequently interfered with the privacy of persons regarded as enemies of the government. The law requires that prosecutors obtain warrants before entering homes, except when the security forces are in close pursuit of armed attackers; these rights were generally observed.

The Army Intelligence Service monitored the movements and activities of members of opposition groups. Although the law regulates eavesdropping, security services continued to eavesdrop without prior authorization.

Militias and non-Lebanese forces operating outside the area of central government authority frequently violated citizens' privacy rights. Various factions also used informer networks and monitoring of telephones to obtain information regarding their perceived adversaries.

There were no developments in the 2005 decree to create an independent judicial committee to receive complaints from parties who believe their phones are tapped and provide permission for security services to monitor telephones of criminals. Similarly, there were no developments in the 2005 decree to create a centralized unit to supervise tapping phones related to military personnel only.

g. Use of Excessive Force and Other Abuses in Internal Conflicts

Killings

An estimated 42 civilians in the Nahr al-Barid refugee camp and 168 LAF soldiers were killed during the May 20 to September 2 conflict between the LAF and FAI. Some human rights groups criticized the LAF's disproportionate use of heavy weapons during the conflict, claiming that the army shelled the camp in an indiscriminate manner once the camp had been evacuated.

Physical Abuse, Punishment, and Torture

On June 13, HRW reported that LAF and ISF forces arbitrarily detained and physically abused some Palestinian men fleeing the fighting in Nahr al-Barid refugee camp. During the conflict, the LAF interrogated many men as they left the camp and detained those suspected of supporting or having information about FAI. The LAF interrogated some Palestinian detainees at the Kobbeh military base near Tripoli, about 16 kilometers from Nahr al-Barid. HRW reported that other interrogations took place at checkpoints and private houses near the camp.

In one case documented by HRW on June 13, the Lebanese military detained a Palestinian man from Nahr al-Barid for interrogation at different locations for four days. During the interrogations, army interrogators reportedly punched and slapped him and gave him food only twice in four days. HRW also reported that during interrogation, members of the Lebanese military intelligence allegedly subjected detainees to kicks, punches, and beatings with rifle butts.

Other Conflict-related Abuses

The Nahr al-Barid conflict caused other humanitarian concerns. Residents were reportedly without running water, sewage, or electricity for weeks. Refugees who left the camp were treated for dehydration, diarrhea, and stomach illnesses, and the regular health care clinics in the camp, including those run by UNRWA, were not fully functioning because of the fighting.

Members of international humanitarian organizations were attacked by FAI when attempting to enter the Nahr al-Barid camp. On May 23, UN High Commissioner for Human Rights Louise Arbour condemned an attack by FAI on a UN aid convoy at Nahr al-Barid during the conflict, which claimed the lives of two Palestinian refugees.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech and of the press, and the government generally respected these rights in practice. The law permitted censoring of pornographic, political opinion, and religious materials when they were considered a threat to national security. Despite a general increase in media freedom since 2005, due to the tense political atmosphere and a weak judiciary, journalists continued to exercise some self-censorship. Although there were no reported killings of journalists during the year, journalists continued to experience intimidation due to the 2005 killings of prominent journalists Samir Kassir and Gibran Tueni, and the failure to apprehend those responsible. In part due to the political divisions in the country, several journalists received threats from parties, politicians, or other fellow journalists.

The government utilized several legal mechanisms to control freedom of expression. The SG reviews and censors all foreign newspapers, magazines, and books before they enter the country. The SG must also approve all plays and films. The law prohibits attacks on the dignity of the head of state or foreign leaders. The government may prosecute offending journalists and publications in the Publications Court. The 1991

Case 1:08-cv-00540-JDB    Document 1-2    Filed 03/28/2008    Page 13 of 21

security agreement between the government and Syria, still in effect, contains a provision that prohibits the publication of any information deemed harmful to the security of either state. The 2005 withdrawal of Syrian troops and a decrease in Syrian influence, however, encouraged Lebanese journalists to be open in their criticism of Syrian and Lebanese authorities alike.

Dozens of newspapers and hundreds of periodicals were published throughout the country and were financed by and reflected the views of various local, sectarian, and foreign interest groups. There was very limited state ownership of newspapers and periodicals.

On February 22, authorities fined the editor in chief of the daily Lebanese newspaper *Al-Mustaqbal*, Tawfiq Khattab, and a staff reporter, Fares Khasan, $33,000 (50 million pounds) each for charges of libel and damaging the reputation of President Lahoud. In February 2006, according to the Committee to Protect Journalists, Beirut prosecutor Joseph Me'mari had filed criminal charges against Khattab and Khassan for defaming President Lahoud. The prosecutor filed the charges four days after *Al-Mustaqbal* published an interview with the former Lebanese ambassador to France and former army intelligence chief Johnny Abdo, who criticized Lahoud's performance. Khattab and Khashan lodged an appeal, and the case remained pending at year's end.

In June 2006 the Lebanese Broadcasting Corporation (LBC) broadcast an episode of weekly political satire Basmat Wattan that ridiculed Hizballah Secretary General Hassan Nasrallah. The program prompted violent demonstrations in Beirut. The National Media Council, which falls under the Ministry of Information and is responsible for monitoring television programs, ruled the next day that LBC was guilty of broadcasting offensive material and forwarded the case to the cabinet. The case remained pending at year's end.

There was no update in the October 2006 case in which the minister of justice filed a complaint in the Publications Court against *Al-Akhbar* daily, naming specifically director Ibrahim Awad and reporter Antoine Al-Khoury Harb, for alleging that two members of the Judicial Council had met with the head of the ISF Intelligence Department to discuss judicial appointments.

Judicial cases launched in previous years against journalists were not pursued during the year. Investigations into the 2005 killings of Samir Kassir and Gebran Tueni, and into the 2005 attack on May Chidiac continued at year's end. There were no developments in the 2005 case against *Al-Mustaqbal* reporter and Future TV anchor Zahi Wehbe.

Films that offended religious or social sensitivities were prohibited. In May 2006 the SG prohibited the film "The Da Vinci Code" from being shown because of religious sensitivities. Filmmakers, as well as festival organizers, consistently practice self-censorship.

In May 2006 the SG obliged Lebanese playwright Lina Khoury to make numerous revisions to her adaptation of the play "Hakeh Niswan" ("Women's Talk") inspired by the "Vagina Monologues" before it could be performed in Beirut because of the sensitivity of the topics in the play.

There were seven television stations and 33 radio stations. The government owned one television and one radio station; the remaining stations were owned privately. Inexpensive satellite television was widely available.

Internet Freedom

There were no government restrictions on access to the Internet or reports that the government monitored e-mail or Internet chat rooms, and the government promoted Internet usage. Individuals and groups could engage in the peaceful expression of views via the Internet, including by e-mail and Internet discussion groups. Internet providers are sometimes contacted by the SG and Ministry of Justice to block pornographic and religiously provocative sites.

Academic Freedom and Cultural Events

There were no government restrictions on academic freedom or cultural events.

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law provides for freedom of assembly; however, the government sometimes restricted this right. The MOI required prior approval to hold rallies, and groups opposing government positions sometimes were not granted permits.

On January 23, protestors from the parliamentary opposition (Hizballah, the Amal Movement, the Free Patriotic Movement, and Marada) effectively caused a general strike in Beirut by burning tires and cars on major roads in and around the capital. The riots and violent clashes the demonstrations provided left three dead and 133 injured.

On January 25, Sunni and Shi'a students clashed violently at the Beirut Arab University, which later escalated into civil unrest in parts of Beirut. Four people were killed and more than 150 were injured. As a result, the LAF declared an overnight curfew for one day.

On June 29, Reuters reported that security forces fired at Palestinian civilians demanding to return to their homes in Nahr al-Barid, killing three protesters and wounding 50. Witnesses reported that soldiers opened fire first into the air as hundreds of refugees, including women and children, tried to storm through an army checkpoint and into the Nahr al-Barid camp. When the crowd did not disperse and attacked soldiers with stones and sticks, the troops fired automatic rifles at the protesters.

The "sit-in" that began in December 2006 in Beirut with a few thousand demonstrators of Shi'a loyal to Hizballah and the allied Amal movement and Christian supporters of Michel Aoun was ongoing throughout the year. However, a very small number of protestors remained at year's end. Isolated violence between Sunnis and Shi'a occurred during the period of the demonstration. In December 2006 one incident resulted in the death of protester Ahmad Mahmoud. The opposition called for the protests in an attempt to force the government to resign or expand the

number of cabinet seats belonging to Amal, Hizballah, and Michel Aoun's Free Patriotic Movement to a one-third-plus-one minority, which would be sufficient to block legislation or force the cabinet's dissolution.

Coinciding with the protests, a number of pro-government rallies were held in several areas around the country. For example, on February 14, a generally peaceful mass rally in Beirut to mark the second anniversary of the killing of former PM Rafiq Hariri took place.

Freedom of Association

The law provides for freedom of association, and the government did not interfere with most organizations; however, it imposed limits on this right. The law requires every new organization to submit a notification of formation to the MOI, which issues a receipt. However, the MOI imposed on organizations additional restrictions and requirements that were not enforced consistently. For example, the MOI in some cases sent notification of formation papers to the security forces to conduct inquiries on an organization's founding members, the results of which the MOI may use in deciding whether to approve the group. The ministry at times withheld the receipt, essentially transforming the notification procedure into an approval process. For example, in October 2006 the Lebanese Center for Human Rights applied for a notification of formation. However, at year's end, they had not received approval of their notification request.

Organizations must invite MOI representatives to any association's general assembly where votes are held for by-law amendments or elections are held for positions on the board of directors. The MOI also required every association to obtain its approval for any change in by-laws; failure to do so could result in the dissolution of the association.

The cabinet must license all political parties. The government scrutinized requests to establish political movements or parties and to some extent monitored their activities. The Army Intelligence Service monitored the movements and activities of members of some opposition groups.

c. Freedom of Religion

The constitution provides for freedom of belief and guarantees the freedom to practice all religious rites, provided that the public order is not disturbed. The constitution declares equality of rights and duties for all citizens without discrimination or preference but stipulates a balance of power distributed among the major religious groups. The government generally respected these rights; however, there were some restrictions. The government subsidized all religions and appointed and paid the salaries of Muslim and Druze judges.

Although there is no state religion, politics were based on the principle of religious representation, which has been applied to nearly every aspect of public life.

A group seeking official recognition must submit its principles for government review to ensure that such principles do not contradict "popular values" and the constitution. The group must ensure the number of its adherents is sufficient to maintain its continuity.

Alternatively, religious groups may apply for recognition through existing religious groups. Official recognition conveys certain benefits, such as tax-exempt status and the right to apply the recognized religion's codes to personal status matters. Each recognized religious group has its own courts for family law matters, such as marriage, divorce, child custody, and inheritance. State recognition is not a legal requirement for religious worship or practice. For example, although the government did not recognize officially some Baha'i, Buddhists, Hindus, and some protestant Christian groups, they were allowed to practice their faith without government interference; however, their marriages, divorces, and inheritances in the country were not recognized under the law.

Protestant evangelical churches are required to register with the Evangelical Synod, which represents those churches to the government. Representatives of some churches complained that the Synod has refused to accept new members since 1975, thereby preventing their clergy from ministering to adherents in accordance with their beliefs. The Pentecostal Church applied for recognition from the Evangelical Sect, but the leadership of the Evangelical Sect, in contravention of the law, refused to register new groups. The Pentecostal Church pursued recourse through the MOI; however, at years end, it had not been registered.

The unwritten "National Pact" of 1943 stipulates that the president, the prime minister, and the speaker of parliament be a Maronite Christian, a Sunni Muslim, and a Shi'a Muslim, respectively. The 1989 Taif Accord, which ended the country's 15-year civil war, reaffirmed this arrangement, but also codified increased Muslim representation in parliament and reduced the power of the Maronite president.

Religious affiliation is encoded on national identity cards and indicated on civil status registry documents but not on passports.

The law provides that only religious authorities may perform marriages; however, civil marriage ceremonies performed outside the country were recognized by the government.

There were no legal barriers to proselytizing; however, traditional attitudes and edicts of the clerical establishment strongly discouraged such activity. Religious authorities appointed the clerical establishments to which they are affiliated.

Although the law stipulates that any one who "blasphemes God publicly" may face imprisonment for up to one year, no prosecutions were reported under this law during the year.

Societal Abuses and Discrimination

Lebanese media outlets regularly directed strong rhetoric against Israel and its Jewish population and commonly characterized events in the region as part of a Zionist conspiracy.

For example, on October 22, Lebanon's NBN TV aired a program based on the anti-Semitic forgery the *Protocols of the Elders of Zion*. The

program's narrator stated that "Jews are annihilating the peoples of the world using drugs," and that "Jews use drug trafficking to control the world and subjugate other nations." The program's narrator also accused the Jews of playing a part in the Holocaust.

In another Lebanese television program aired on January 30, Lebanese poet Marwan Chamoun promoted anti-Semitic false accusations of blood libel in which Jews are accused of murder and using blood for religious purposes.

The country's legislation does not specifically designate or address hate crimes.

For a more detailed discussion, see the *2007 International Religious Freedom Report.*

d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The law provides for freedom of movement within the country, foreign travel, emigration, and repatriation, and the government generally respected these rights with some limitations. The law prohibits direct travel to Israel. All men between 18 and 21 years of age are required to obtain a travel authorization document from the government before leaving the country.

The government maintained security checkpoints, primarily in military and other restricted areas. There were few police checkpoints on main roads or in populated areas. The security services used checkpoints to conduct warrantless searches for smuggled goods, weapons, narcotics, and subversive literature.

The law prohibits forced exile, and it was not used.

Internally Displaced Persons (IDPs)

As a result of the May-September Nahr al-Barid conflict, an estimated 35,000 Palestinian refugees were displaced. The majority sought shelter with host families in the neighboring Beddawi camp in northern Lebanon, while several hundred families sought shelter in UNRWA as well as government-run schools throughout the north of the country. In October refugees began returning to the "new camp" along the periphery of Nahr al-Barid. At year's end, UNRWA estimated that approximately 6,000 refugees returned to the new camp.

Following the August 2006 cessation of hostilities between Israel and Hizballah, the government encouraged the return to their homes of hundreds of thousands of internally displaced persons. According to the Internal Displacement Monitoring Center, at the height of the conflict, up to one million persons fled their homes; approximately 735,000 were internally displaced, while some 230,000 fled to neighboring countries. In addition, some 16,000 Palestinian refugees in Lebanon were displaced. According to the government's Higher Relief Council, more than 700,000 displaced persons and refugees returned to their homes. While the office of the UN High Commissioner for Refugees (UNHCR) believes there is no official and reliable figure, according to its data on the number of houses completely destroyed and damaged, UNHCR reported that 80,000 persons remain displaced.

During the year there were no substantiated reports that the government deliberately attacked IDPs or made efforts to obstruct access of international humanitarian organizations from assisting IDPs in returning to their residence. Similarly, there were no reports that the government forcibly resettled IDPs.

According to international humanitarian organizations, a significant number of people still remain displaced from the 1975-90 civil war and as a result of the Israeli invasions and occupation of part of southern Lebanon that ended in 2000. No updated reliable survey exists to determine the current number, and estimates varied hugely, ranging between 16,750 and 600,000.

The government continued to encourage IDPs displaced during the 1975-90 civil war to return, reclaim their property, and rebuild their homes. Despite this encouragement, many have not attempted to reclaim and rebuild their property due to the hazardous social and economic situation in some areas.

Protection of Refugees

The law does not provide for the granting of asylum or refugee status in accordance with the 1951 UN Convention Relating to the Status of Refugees and its 1967 protocol, but the government has mechanisms to provide assistance. The government cooperated with the office of the UNHCR and other humanitarian organizations in assisting refugees and asylum seekers. The government provided temporary protection to individuals who may not qualify as refugees under the 1951 Convention/1967 protocol.

A 2003 agreement between the SG and the UNHCR recognizes and grants protection to non-Palestinian refugees, providing temporary relief for those seeking determination of refugee status. Those wishing to claim refugee status do so within two months of arriving in the country. The SG issues residence permits, valid for three months, during which time UNHCR must make a refugee status determination. The SG extended residency permits for up to 12 months for those accorded refugee status by UNHCR. The government granted admission and temporary (six months) refuge to asylum seekers but not permanent asylum.

Most refugees were Palestinians. The UN Relief and Works Agency (UNRWA) reported that the number of Palestinian refugees in the country registered with the UNRWA was 394,532. This figure, which represented refugees who arrived in 1948 and their descendants, was presumed to include many thousands who resided outside of the country. According to UNRWA, during the year there were 409,714 Palestinian refugees in its 12 refugee camps throughout the country. According to SG records, the number of registered Palestinian refugees was approximately 427,000.

Most Palestinian refugees were unable to obtain citizenship and were subject to governmental and societal discrimination, particularly in the area of employment; however, Palestinian women who married Lebanese men could obtain citizenship. According to a credible international

human rights group, Palestinian refugees faced severe restrictions in their access to work opportunities and diminished protection of their rights at work. Very few Palestinians received work permits, and those who found work usually were directed into unskilled occupations. Some Palestinian refugees worked in the informal sector, particularly in agriculture and construction. Palestinian incomes continued to decline. In 2005 the minister of labor issued a memorandum authorizing Palestinian nationals born in the country and duly registered with the MOI to work in 50 (out of 72) professions banned to foreigners. However, there were no indications that this memorandum was implemented consistently.

The law does not explicitly target Palestinian refugees but bars those who are not bearers of nationality of a recognized state from owning property. Under this law, Palestinians may not purchase property, and those who owned property prior to the 2001 issuance of this law are prohibited from passing it on to their children. The parliament justified these restrictions on the grounds that it was protecting the right of Palestinian refugees to return to the homes they fled after the creation of the state of Israel in 1948. Other foreigners may own a limited-size plot of land but only after obtaining the approval of five different district offices. The law applies to all foreigners.

Most Palestinian refugees lived in overpopulated camps that suffered repeated heavy damage as a result of fighting during the 1975-1990 civil war, the 1980s Israeli invasion of the country, continuing camp feuds, the July-August 2006 conflict between Israel and Hizballah, and the May-September Nahr al-Barid conflict. The government generally prohibited the construction of permanent structures in the camps on the grounds that such construction encouraged refugee settlement in the country. Refugees frequently feared that the government might reduce the size of the camps or eliminate them completely.

During and after the fighting in Nahr al-Barid in September, the government provided emergency relief, with assistance from UNRWA, the international donor community, and relief nongovernmental organizations (NGOs), to the Palestinian refugees who had fled Nahr al-Barid. The government provided temporary housing by opening school buildings and started efforts to begin removing the rubble in preparation for new camp housing to be built. At year's end, the LAF had started the process of clearing the UXOs inside the camp, but had not given UNRWA and its partners permission to enter the main camp to begin rubble clearance and reconstruction.

Children of Palestinian refugees faced discrimination in birth registration and access to adequate housing, social security, and education. The government did not provide health services or education to Palestinian refugees, who relied on UNRWA for these services. Many Palestinian children reportedly had to leave school at an early age to help earn income. Other reasons for dropouts were marriage (especially for minor girls), frustration, and hopelessness. Poverty, drug addiction, prostitution, and crime reportedly prevailed in the camps, although reliable statistics were not available.

At year's end the MOI had not yet rendered a decision on the legal status of approximately 4,000 persons who stood to lose their Lebanese citizenship due to the 2003 decision by the State Consultative Council to invalidate the 1994 naturalization decree, which naturalized several thousand Palestinians.

The government issued travel documents to Palestinian refugees to enable them to travel and work abroad. The government did not issue visitors visas to Jordanian nationals who were born in the country and were of Palestinian origin.

According to the UNHCR there were 8,300 Iraqi refugees registered with the UNHCR, as well as 241 non-Iraqi refugees and 522 non-Iraqi asylum seekers residing in the country. However, this number did not include Palestinian refugees and asylum seekers or a substantial number of refugees from Iraq who entered the country illegally in search of jobs, education, and security. According to the UN, an estimated 20,000 to 40,000 Iraqis were living in the country. During the year the government provided very limited services for them and no process for regularizing their status. At year's end the government failed to institute a temporary protection regime for Iraqi asylum seekers, as advocated by UNHCR, and it regularly deported Iraqis who may well have had valid persecution claims. According to a December 4 HRW report, authorities during the year arrested Iraqi refugees without valid visas and detained them indefinitely to coerce them to return to Iraq. According to the Surete Generale, there were 360 detained Iraqis in the country by year's end. During the year, 513 Iraqis were deported back to Iraq for illegal immigration into Lebanon.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens the right to change their government in periodic, free, and fair elections; however, lack of control over parts of the country, defects in the electoral process, and corruption in public office significantly restricted this right.

Elections and Political Participation

The law provides that elections for the parliament must be held every four years, and the parliament elects the president every six years. The president and the parliament nominate the prime minister, who, with the president, chooses the cabinet. According to the unwritten National Pact of 1943, the president must be a Maronite Christian, the prime minister a Sunni Muslim, and the speaker of parliament a Shi'a Muslim.

The last presidential election was conducted in 1998. In 2004, amid evidence of heavy Syrian manipulation and coercion, parliament voted for a constitutional amendment extending the term of President Emile Lahoud to November 2007. Many citizens considered this amendment to violate the constitution. On September 25, parliament was scheduled to meet to begin the process of choosing a new president; however, because two-thirds of the members were not present, the speaker cancelled the session and rescheduled the first presidential election session for October 23. On November 23, President Lahoud stepped down at the end of his term and, as stipulated in the constitution, the powers of the presidency were transferred to the cabinet, led by PM Fouad Siniora, until the election of a new president. The speaker rescheduled the session another ten times, and the parliament was unable to elect a new president before year's end.

On August 5, parliamentary by-elections in Metn and Beirut were held to replace two seats vacated by the assassinations of MPs Pierre Gemayel and Walid Eido. The Lebanese Association for Democratic Elections monitored the elections and reported a few incidents of voter fraud, including instances in which voters used fake identity cards or national identity cards instead of the voter identity cards.

Individual citizens and parties can freely declare their candidacy and stand for election. Parties may organize, seek votes, and publicize their views with limited government restriction. The political system is based on confessional lines, and all parliamentary seats are primarily allotted on a sectarian basis. The smallest recognized confessions are allotted at least one seat in parliament.

There are four major and numerous smaller political parties. The largest party in the parliamentary majority is the Future Movement, led by Saad Hariri. Its membership is predominantly Sunni, but Hariri's parliamentary bloc includes a number of members from other sects. The Progressive Socialist Party, led by Walid Jumblatt, predominantly represented Druze interests and allied itself with the Future Movement. The Free Patriotic Movement, led by Michel Aoun, represented a significant portion of the Christian community. The party's leadership decided to remain outside the cabinet. Two smaller Christian parties were the Lebanese Forces, led by Samir Geagea, and the Phalange party, led by former president Amine Gemeyal. The largest party representing the Shi'a community was Hizballah, a designated terrorist organization, led by Hassan Nasrallah. A smaller Shi'a party, Amal, was led by Speaker of Parliament Nabih Berri. While a number of smaller parties existed or were in the process of forming, the larger, sectarian-based parties maintained the greatest influence in the country's political system.

There were significant cultural barriers to women's participation in politics. Prior to 2005 no woman held a cabinet position; however, at year's end there was one woman in the cabinet.

Palestinian refugees had no political rights. An estimated 17 Palestinian factions operated in the country and were generally organized around prominent individuals. Most Palestinians lived in refugee camps controlled by one or more factions. Refugee leaders were not elected, but there were popular committees that met regularly with UNRWA and visitors.

Government Corruption and Transparency

The government provides criminal penalties for official corruption, but they were seldom enforced. According to the World Bank's Worldwide Governance Indicators, government corruption was a serious problem.

Public officials were required by law to disclose their financial assets to the Constitutional Council; however, the information was not open to the public.

There are no laws regarding public access to government documents. In practice the government did not respond to requests for documents.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A number of local and international human rights groups, including the Lebanese Association for Human Rights, the Foundation for Human and Humanitarian Rights-Lebanon, the National Association for the Rights of the Disabled, ICRC, and AI, generally operated freely without overt government restriction and investigated and published their findings. Unlike in previous years, human rights groups did not report harassment and intimidation by the government.

On August 29, HRW canceled a press conference scheduled to be held in Beirut to announce the release of its report on Hizballah's attacks on Israel during the July-August 2006 conflict due to reports from Hizballah-controlled media of planned demonstrations to prevent the press conference. The HRW report, later released, was critical of Hizballah as well as of Israel. Both Hizballah and PM Siniora criticized HRW over the report.

Government officials generally were cooperative with NGOs, except when groups sought to publicize the alleged detention in Syria of hundreds of Lebanese citizens. The bar association and other private organizations regularly held public events that included discussions of human rights issues.

The government cooperated with international governmental organizations and permitted visits by UN representatives and other organizations such as the ICRC.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The law provides for equality among all citizens; however, in practice, some aspects of the law and traditional beliefs discriminated against women. Although the law reserves a percentage of private sector and government jobs to persons with disabilities, there were few accommodations made for them. Discrimination based on race, language, or social status is illegal and was not widespread among citizens; however, foreign domestic servants often were mistreated, sometimes suffered physical abuse, had pay withheld or unfairly reduced, or were forced to remain locked within their employer's home for the duration of their contracts.

Women

The law prohibits rape, and the minimum prison sentence for a person convicted of rape is five years. The minimum sentence for a person convicted of raping a minor is seven years. The law was effectively enforced. Spousal rape was not criminalized.

The law does not specifically prohibit domestic violence, and domestic violence against women was a problem. There were no authoritative statistics on the extent of spousal abuse; however, most experts noted that it was a problem. Despite a law prohibiting battery with a maximum sentence of three years in prison for those convicted, some religious courts legally may require a battered wife to return to her home in spite of physical abuse. Women were sometimes compelled to remain in abusive marriages because of economic, social, and family pressures.

The government had no separate program to provide medical assistance to victims of domestic violence; however, it provided legal assistance to victims who could not afford it regardless of their gender. In most cases police ignored complaints submitted by battered or abused women. A local NGO, the Lebanese Council to Resist Violence against Women, worked actively to reduce violence against women by offering counseling

and legal aid and raising awareness about domestic violence.

Foreign domestic servants often were mistreated, abused, and in some cases, raped or placed in slavery-like conditions. Asian and African female workers had no practical legal recourse available to them because of their low status, isolation from society, and because labor laws do not protect them. Because of such abuse, the government prohibited foreign women from working if they were from countries that did not have diplomatic representation in the country.

The legal system was discriminatory in its handling of honor crimes. According to the penal code, a man who kills his wife or other female relative may receive a reduced sentence if he demonstrates that he committed the crime in response to a socially unacceptable sexual relationship conducted by the victim. For example, while the penal code stipulates that murder is punishable by either a life sentence or the death penalty, if a defendant can prove it was an honor crime, the sentence is commuted to one to seven years imprisonment. Several honor crimes were reported in the media that resulted in convictions.

Although the law on prostitution requires that brothels be licensed, including regular testing for disease, government policy was not to issue new licenses for brothels in an attempt to gradually eliminate legal prostitution in the country. In practice most prostitution was unlicensed and illegal. The SG reported issuing 4,210 visas in 2006 to mostly eastern European women to work in adult clubs as artists. Although unlicensed prostitution is illegal, virtually all women who engaged in prostitution did so with the implicit consent of the government.

The law prohibits sexual harassment; however, it was a widespread problem, and the law was not effectively enforced. Social pressure against women pursuing careers was strong in some parts of society. Men sometimes exercised considerable control over female relatives, restricting their activities outside the home or their contact with friends and relatives. Women may own property, but often ceded control of it to male relatives for cultural reasons and because of family pressure.

The law provides for equal pay for equal work for men and women, but in the private sector there was some discrimination regarding the provision of benefits.

Many family and personal status laws discriminated against women. For example, Sunni inheritance law provides a son twice the inheritance of a daughter. Although Muslim men may divorce easily, Muslim women may do so only with the concurrence of their husbands.

Only men may confer citizenship on their spouses and children. Accordingly, children born to citizen mothers and foreign fathers are not eligible for citizenship. Citizen widows may confer citizenship on their minor children.

Children

Education was free in public schools and compulsory until the completion of the elementary level at age 12. However, implementation decrees were not issued. Public schools generally were inadequate, lacking proper facilities, equipment and trained staff. Although private schools were widespread in the country, the cost of private education was a significant problem for the middle and lower classes. In its latest report, the UN Children's Fund reported that approximately 91 percent of children between the ages of three and five, and approximately 98 percent of children between the ages of six to 11 were enrolled in school. In some families with limited incomes, boys received more education than girls.

Boys and girls had equal access to medical care. The government provided vaccination and other pediatric health services in dispensaries operated by the Ministry of Health and the Ministry of Social Affairs. Boys and girls had equal access to hospitals.

Children of poor families often sought employment and took jobs that jeopardized their safety.

Children of Palestinian refugees were limited in their access to government services, including schools and health care.

Trafficking in Persons

The law does not specifically prohibit trafficking in persons, and although the government made progress in stemming some forms of trafficking in persons, it remained a problem. The penal code stipulates that "any person who deprives another of freedom either by abduction or any other means shall be sentenced to temporary hard labor." The country was a destination for eastern European and Russian women, who were contracted as dancers in adult clubs. Most of these women engaged in voluntary illegal prostitution, but some reported facing intimidation or coercion and having their movements restricted while others were at risk as targets of abuse.

The country was also a destination for women from Africa and Asia, usually contracted as household workers. Women are required by law to have valid work contracts and sponsors but often found themselves in situations of involuntary servitude with little practical legal recourse. Primary traffickers were the employers and employment agencies.

If forced prostitution or sexual exploitation occurred as a result of abduction, the penal code stipulates that the abductor be sentenced to at least one year in prison; however, this law was applied inconsistently. Many women became illegal workers because their employers did not renew their work and residency permits or because they ran away from their employer, therefore becoming subject to detention and deportation. Workers' illegal immigration status was also used by abusive sponsors as a tactic to intimidate employees and coerce them into labor. Unscrupulous employers sometimes falsely accused the employee of theft to relinquish responsibility for the employee as well as the taxes and a return airline ticket.

Employers often restricted foreign employees' movement and withheld passports. A small number of exploited foreign workers won cases against their employers, but nonjudicial action resolved the majority of these cases. As a result of that process, workers frequently were repatriated without further judicial action. A few cases were referred to the judiciary for further action, although the government took minimal steps to prosecute traffickers.

The Ministry of Labor (MOL) regulates local employment agencies that place migrant workers with sponsors. During the year the MOL closed 15 employment agencies for a specified period and warned a number of others for noncompliance with MOL regulations.

Unlike in previous years, there were no reports of any attempt to smuggle persons into the country. Eastern European and Syrian women continued to receive "artiste" visas and were vulnerable to trafficking for commercial sexual exploitation.

The government did not directly provide foreign workers with relief from deportation; shelter; or legal, medical, or psychological services. Social workers continued to be allowed to accompany victims during interviews by immigration authorities. The SG also allowed social workers from Caritas Lebanon Migrants Center unrestricted access to its retention center for foreign persons. These social workers provided detainees with counseling, assistance, and legal protection. In addition, the SG implemented screening and referral procedures for trafficking cases and during the year referred potential victims to Caritas, whose social workers conducted screening procedures and provided basic needs assistance and counseling. The SG sometimes granted out-of-visa status for workers who were victims of abuse and permission to stay up to two months to assist in the investigation of their cases and the prosecution of their abusers.

The SG allows migrant workers who do not wish to be repatriated to their home country to legally change their sponsor with a "release paper" from the original employer. A court may order an abusive employer to provide such a release paper as part of a decision, or this may be part of a negotiated out-of-court settlement.

NGOs indicated that the government did not have a zero-tolerance policy for physical abuse of domestic workers. However, according to Caritas/International Catholic Migration Commission, in December 2006 a judge awarded an Ethiopian migrant worker financial compensation to be paid by her abusive employer, which marked the first time a domestic worker was awarded compensation for physical abuse. The employer, however, was not criminally prosecuted for physical assault.

Two types of booklets explaining regulations governing migrant workers, including descriptions of their rights and responsibilities, were available upon request, or distributed as needed.

Persons with Disabilities

Discrimination against persons with disabilities continued. For example, the Civil Service Board, which is in charge of recruiting government employees, continued to refuse receiving applications from disabled persons. The law mandates disabled access to buildings; however, the government failed to take steps to amend building codes to conform to this law. Approximately 100,000 persons were disabled during the 1975-90 civil war. Families generally cared for their own family members with disabilities. Most efforts to assist persons with disabilities were made by approximately 100 relatively active, although poorly-funded private organizations.

Many persons with mental disabilities were cared for in private institutions, many of which were subsidized by the government.

The law on persons with disabilities stipulates that at least 3 percent of all government and private sector positions should be filled by persons with disabilities, provided that such persons fulfill the qualifications for the position. However, there was no evidence that the law was enforced in practice.

During the year the Ministry of Finance did not enforce its 2002 decision that it would not settle obligations with firms and domestic companies unless they proved that 3 percent of their workforce was composed of persons with disabilities.

National/Racial/Ethnic Minorities

There were reports that Syrian workers, usually employed in manual labor occupations, continued to suffer discrimination following the 2005 withdrawal of Syrian forces. Many Syrian laborers also reportedly left Lebanon out of fear of harassment. There had been no further data collected on this situation during the year, and the true extent of the problem was unknown.

Other Societal Abuses and Discrimination

Discrimination against homosexuals persisted during the year. The law prohibits what is termed unnatural sexual intercourse, which is punishable by up to one year in prison. The law was sometimes applied to homosexuals. There are no discriminatory laws against persons with HIV/AIDS.

Section 6 Worker Rights

a. The Right of Association

The law provides that all workers, except government employees, may establish and join unions with government approval, and workers exercised this right in practice. The formation of any union must be approved by the MOL. The MOL controlled all trade union elections, including the date of the election, election procedure, and the ratification of the results. The law permitted the administrative dissolution of trade unions and forbade them to engage in political activity.

The General Confederation of Labor (GCL) estimated that there were approximately 900,000 workers in the active labor force. Approximately 5 to 7 percent of workers were members of some 450 to 500 labor unions and associations, half of which were believed to be inactive. Most unions belonged to federations.

There are currently 43 federations that are voting members of the GCL, 5 of which were considered illegal by the judiciary. Many others are reportedly unrepresentative and created by political interest groups to offset the votes of the 13 established labor confederations that represent


workers. The GCL remained the only organization recognized by the government as an interlocutor that represented workers.

Antiunion discrimination by private employers was a common practice. While the government did not have a good mechanism for measuring such practices, it appeared prevalent in many sectors of the economy.

Palestinian refugees may organize their own unions; however, because of restrictions on their right to work, few Palestinians participated actively in trade unions.

b. The Right to Organize and Bargain Collectively

The right of workers to organize and to bargain collectively exists in law and practice, and the government supported this right. Most worker groups engaged in some form of collective bargaining with their employers. Stronger federations obtained significant gains for their members and on occasions assisted nonunion workers. No government mechanisms promoted voluntary labor-management negotiations, and workers had no protection against antiunion discrimination.

In the immediate aftermath of the July-August 2006 conflict, employers arbitrarily dismissed employees from a variety of sectors, including agriculture and tourism, without compensation. Some employees were rehired soon after but at lower wages. The GCL was not able to protect workers from such practices.

The law provides for the right to strike. On January 25, the GLC protested against the government's taxation policy, and on May 1, together with the Communist Party, protested the deterioration of living conditions. On August 23, the Communist Party also organized protests across the country against the government's economic and social policies.

There are no export processing zones.

c. Prohibition of Forced or Compulsory Labor

The law does not specifically prohibit forced or compulsory labor, including by children; however, articles within the law prohibit behavior that constitutes forced or compulsory labor. Nevertheless, children, foreign domestic workers, and other foreign workers sometimes were forced to remain in situations amounting to coerced or bonded labor.

Recruitment agencies and employers were required to have signed employment contracts with the foreign worker. According to NGOs assisting migrant workers, however, these agreements were often undermined by second contracts signed in the source countries that stipulated lower salaries. Employers and agencies used these changes to pay the migrant a lower salary. Anecdotal evidence suggested that some employers did not pay their workers on a regular basis, and some withheld the salary until the end of the contract, which was usually two years. Government regulations prohibited employment agencies from withholding foreign workers' passports for any reason. However, in practice employment agencies and household employers often withheld maids' passports.

d. Prohibition of Child Labor and Minimum Age for Employment

There are laws to protect children from exploitation in the workplace, but the government sometimes did not effectively enforce these laws. The minimum age for child employment is 14 years. Under the law juveniles are defined as children between 14 and 18 years of age. The law prohibits the employment of juveniles before they undergo a medical exam to ensure their fitness for the job for which they are hired. The labor code prohibits employment of juveniles under the age of 18 for more than six hours per day, and requires one hour of rest if work is more than four hours. The law entitles them to 21 days of paid annual leave.

Juveniles under the age of 17 are prohibited from working in jobs that jeopardize their health, safety, or morals, as well as working between the hours of 7 p.m. and 7 a.m. The law also prohibits the employment of juveniles under 16 in industrial jobs or jobs that are physically demanding or harmful to their health. The MOL is currently working on drafting an amendment to the labor code on what is considered hazardous child labor.

The MOL was responsible for enforcing these requirements. Although not very effective, MOL enforcement of the law has witnessed slight improvements in recent years. Juveniles were interrogated in the presence of a social worker at the Center for Juvenile Victims of Physical Abuse, which was equipped according to international norms.

According to 2005 UNICEF statistics, 7 percent of children aged 5 to 14 were involved in child labor. The International Labor Organization estimated around 100,000 child workers during the year. Out of these, 25,000 are thought to be in the tobacco industry. Child workers are predominantly concentrated in the informal sector of the economy, where MOL inspectors have difficult access. These include mechanical workshops, carpentry, construction, welding, agriculture, and fisheries.

A 2004 MOL study on working street children showed that the average street child was a boy (only nine percent were girls), foreign (only 15 percent were citizens, the others were most often Palestinian and Syrian), approximately 12 years of age, and poorly educated or illiterate. Street children were concentrated in large urban centers, where approximately 47 percent of them were forced to work long hours on the streets by adults. The most common types of work were selling goods, including lottery tickets; shoe polishing; and washing car windshields. The children earned between $2 and $15 (3,000 to 25,000 pounds) per day. Only 19 percent of the children interviewed reported that they kept their income.

e. Acceptable Conditions of Work

The legal minimum wage has been $200 (300,000 pounds) per month since 1997. Rarely is it found that employees are paid less than the

minimum wage. However, the minimum wage did not provide a decent standard of living for a worker and family.

The law prescribes a standard 48-hour workweek with a 24-hour rest period per week. In practice workers in the industrial sector worked an average of 35 hours per week, and workers in other sectors worked an average of 30 hours per week. The law includes specific occupational health and safety regulations. Labor regulations require employers to take adequate precautions for employee safety. The MOL was responsible for enforcing these regulations but did so unevenly. Labor organizers reported that workers did not have the right to remove themselves from hazardous conditions without jeopardizing their employment.

Some private sector firms failed to provide employees with family and transport allowances as stipulated under the law and to register them at the National Social Security Fund (NSSF). Employers sometimes registered their employees declaring lower salaries, in order to decrease their contribution to the NSSF and end-of-service pay to the employee himself. Some companies also did not respect occupational health and safety regulations stipulated by the law. Workers are permitted to complain about violations to the GCL, an umbrella organization for trade unions, the MOL and the NSSF. In most cases, however, they preferred to remain silent fearing arbitrary dismissal.

The law does not protect foreign domestic workers. Foreign domestic workers, mostly of Asian and African origin, were mistreated, abused, raped, or placed in situations of coerced labor or slavery-like conditions. Domestic workers often worked 18 hours per day and, in many cases, did not receive vacations or holidays. There was no minimum wage for domestic workers. Although official contracts stipulate a wage ranging from $100 to $300 (150,000 to 450,000 pounds) per month, depending on the nationality of the worker, the actual salary was often much less. Victims of trafficking or abusive labor may file civil suits or seek legal action, but most victims, often counseled by their embassies or consulates, settled for an administrative solution, which usually included monetary compensation and repatriation. The government did not release information on legal actions filed, but NGOs indicated that fewer than 10 legal actions were undertaken during the year.

During the year the MOL, which regulates the activities of employment agencies, closed 15 agencies for violations of workers' rights, including physical abuse. Perpetrators of the abuses, however, were not further prosecuted for a number of reasons, including the victims' refusal to press charges or a lack of evidence. The MOL, which also has jurisdiction in cases where the labor contract has been violated, reported adjudicating 57 such cases during the year. An unknown number of other cases of nonpayment of wages were settled through negotiation. According to source country embassies and consulates, many workers did not report violations of their labor contracts until after returning to their home countries.

🔝 BACK TO TOP

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| John Doe, et. al., individually and on behalf of all similarly situated plaintiffs | Islamic Republic of Iran and Iranian Ministry of Information and Security Ministry of Foreign Affairs |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888, 99999
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, D.C.  20004
(202) 624-2469

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

◉ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government Defendant

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A.** *Antitrust*

☐ 410 Antitrust

◉ **B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☒ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E.** *General Civil (Other)*    OR    ○ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○  **G.  Habeas Corpus/ 2255** | ○  **H.  Employment Discrimination** | ○  **I.  FOIA/PRIVACY ACT** | ○  **J.  Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○  **K.  Labor/ERISA (non-employment)** | ○  **L.  Other Civil Rights (non-employment)** | ○  **M.  Contract** | ○  **N.  Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A.  Defendants' actions caused Plaintiffs' personal injury or wrongful death.

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    DEMAND $ 12,000,000,000.00    Check YES only if demanded in complaint

JURY DEMAND:    YES ☐    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.