UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ESTATE OF JOHN DOE, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-540-JDB |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, | ) | |
| e*t al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT ON LIABILITY**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................ 1

FACTS ................................................................................................ 3

    A.    The 1983 Bombing of the U.S. Embassy in Beirut ................................ 3

    B.    The 1984 Bombing of the U.S. Embassy Annex in Beirut ..................... 6

    C.    Judgments Holding Iran and MOIS Liable for the 1983 and 1984 U.S. Embassy Bombings ................................................................. 7

BACKGROUND ................................................................................ 8

    A.    The FSIA and the Terrorism Exception ............................................ 8

    B.    The 2008 NDAA and the Lautenberg Amendments ......................... 10

    C.    The Doe Complaint ........................................................................ 12

ARGUMENT ..................................................................................... 15

PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THE ISSUE OF DEFENDANTS' LIABILITY ................................................................. 15

I.    THIS COURT HAS PERSONAL JURISDICTION OVER IRAN AND MOIS ........... 17

II.    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS UNDER 28 U.S.C. § 1605A ................................ 19

    A.    Iran Was Designated As a State Sponsor of Terrorism at the Time the Related Action Was Filed ........................................................ 21

    B.    Plaintiffs' Injuries Were Caused By Defendants' Acts of "Extrajudicial Killings" and Provision of "Material Support" to Their Agents ..................... 22

    C.    Plaintiffs' Claims Meet the Requirements of § 1605A(a)(2)(A)(ii) ................. 27

        1.    The U.S. Government Employee Plaintiffs Meet the Requirements of § 1605A(a)(2)(A)(ii) ................................................................. 27

        2.    The Immediate Family Members of the U.S. Employees Killed or Injured in the Attack Meet the Requirements of § 1605A(a)(2)(A)(ii) ................................................................. 28

    D.    Plaintiffs' Claims Are Timely ........................................................... 32

        1.    Plaintiffs Have Complied With the 60-day Filing Deadline Under § 1083(c)(3) of the 2008 NDAA ............................................. 32

        2.    The Claims of the Plaintiffs Added in the First and Second Amended Complaints "Relate Back" to the Initial Complaint Under Fed. R. Civ. P. 15(c) ................................................... 34

i

III.    PLAINTIFFS ARE ENTITLED TO JUDGMENT AGAINST DEFENDANTS
        ON THEIR CLAIMS ........................................................................................... 36

        A.    Claims of All Plaintiffs Under § 1605A(c) ......................................................... 36

        B.    Alternative Claims of Foreign National Immediate Family Members
              Under State and/or Foreign Law .......................................................................... 39

              1.    District of Columbia Law – The Law of the Forum ............................... 41

              2.    Lebanese Law – Lex Loci ....................................................................... 44

              3.    Law of the Domicile of Each Plaintiff ................................................... 45

IV.     THE HEIRS AT LAW OF THE DECEASED PLAINTIFFS ARE PROPER
        LEGAL REPRESENTATIVES OF THE DECEDENTS ........................................ 45

CONCLUSION .......................................................................................................................... 48

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Islamic Republic of Iran*,
574 F. Supp. 2d 15 (D.D.C. 2008) ................................................................. 31

*Agency Holding Corp. v. Malley-Duff & Assoc.*,
483 U.S. 143 (1987) ................................................................................... 46

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974) ................................................................................... 36

*Anderson v. Islamic Republic of Iran*,
90 F. Supp. 2d 107 (D.D.C. 2000) ................................................................ 31

*Argentine Rep. v. Amerada Hess Shipping Co.*,
488 U.S. 428 (1983) ................................................................................... 19

*Belkin v. Islamic Republic of Iran*,
667 F. Supp. 2d 8 (D.D.C. 2009) ................................................................. 40

*Ben-Rafael v. Islamic Republic of Iran*,
540 F. Supp. 2d 39 (D.D.C. 2008) ............................................................... 18

*Bettis v. Islamic Republic of Iran*,
315 F.3d 325 (D.C. Cir. 2003) ..................................................................... 29

*Blais v. Islamic Republic of Iran*,
459 F. Supp. 2d 40 (D.D.C. 2006) .......................................................... 17, 29

*Bodoff v. Islamic Republic of Iran*,
424 F. Supp. 2d 74 (D.D.C. 2006) ............................................................... 10

*Booth v. Fletcher*,
101 F.2d 676 (D.C. Cir. 1938) ..................................................................... 17

*Brewer v. Islamic Republic of Iran*,
664 F. Supp. 2d 43 (D.D.C. 2009) ........................................................ passim

*Calderon-Cardona v. Democratic People's Republic of Korea*,
Civil No. 08-1367(FAB), 2010 WL 2802209
(D.P.R. July 16, 2010) ...................................................................... 29, 38, 39

*Cicippio-Puleo v. Islamic Republic of Iran*,
353 F.3d 1024 (D.C. Cir. 2004) .......................................................... 9, 11, 39

*Dammarell v. Islamic Republic of Iran*,
No. 01-2224, 2006 WL 2382704 (D.D.C. August 17, 2006) ............................. 1

*Dammarell v. Islamic Republic of Iran*,
No. 01-2224, 2006 WL 2724788 (D.D.C. Sept. 1, 2006) .................................. 1

*Dammarell v. Islamic Republic of Iran*,
281 F. Supp. 2d 105 (D.D.C. 2003) ...................................................... passim

*Dammarell v. Islamic Republic of Iran,*
  370 F. Supp. 2d 218 (D.D.C. 2005)...................................................................................1

*Dammarell v. Islamic Republic of Iran,*
  404 F. Supp. 2d 261 (D.D.C. 2005).................................................................1, 3, 10, 43

*Dammarell v. Islamic Republic of Iran,*
  No. 01-2224 (JDB), 2006 WL 2583043 (D.D.C. Sept. 7, 2006)..............................1, 2, 7, 25

*Dammarell v. Islamic Republic of Iran,*
  No. 01-2224, 2005 WL 756090 (D.D.C. Mar. 29, 2005) ...............................................passim

*Elahi v. Islamic Republic of Iran,*
  124 F. Supp. 2d 97 (D.D.C. 2000) .....................................................................................16

*Estate of Botvin v. Islamic Republic of Iran,*
  510 F. Supp. 2d 101 (D.D.C. 2007) ...................................................................................16

*Fisher v. Socialist People's Libyan Arab Jamahiriya,*
  541 F. Supp. 2d 46 (D.D.C. 2008)......................................................................................29

*Flatow v. Islamic Republic of Iran,*
  999 F. Supp. 1 (D.D.C. 1998).................................................................................9, 39, 43

*Fleck v. Cablevision VII, Inc.,*
  799 F. Supp. 187 (D.D.C. 1992).........................................................................................35

*Gates v. Syrian Arab Republic,*
  580 F. Supp. 2d 53 (D.D.C. 2008).................................................................................16, 39

*Heiser v. Islamic Republic of Iran,*
  466 F. Supp. 2d 229 (D.D.C. 2006).................................................................................17, 41

*Holland v. Islamic Republic of Iran,*
  496 F. Supp. 2d 1 (D.D.C. 2005)........................................................................................41

*In re Air Crash Disaster Near Saigon, South Vietnam on April 4, 1975,*
  476 F. Supp. 21 (D.D.C. 1979).............................................................................43, 46, 47, 48

*In re Islamic Republic of Iran Terrorism Litig.,*
  659 F. Supp. 2d 31 (D.D.C. 2009).................................................................................16, 43, 46

*Kaiser-Georgetown Cmty. Health Plan v. Stutsman,*
  491 A.2d 502 (D.C. 1985) ...........................................................................................41, 43

*Kilburn v. Islamic Republic of Iran,*
  699 F. Supp. 2d 136 (D.D.C. 2010)....................................................................................38

*Kirschenbaum v. Islamic Republic of Iraq,*
  572 F. Supp. 2d 200 (D.D.C. 2008)....................................................................................29

*La Réunion Aérienne v. Socialist People's Libyan Arab Jamahiriya*
  477 F. Supp. 2d 131 35 (D.D.C. 2007)...........................................................................31, 32

*Leachman v. Beech Aircraft Corp.,*
  694 F.2d 1301 (D.C. Cir. 1982).....................................................................................34, 35

*Murphy v. Islamic Republic of Iran*,
   No. 06-cv-596, 2010 WL 3732024 (D.D.C. Sept. 24, 2010)..................................29, 38, 43

*Mutual Life Ins. Co. v. Armstrong*,
   117 U.S. 591 (1886).................................................................................................47

*Oveissi v. Islamic Republic of Iran*,
   573 F.3d 835 (D.C. Cir. 2009).............................................................................40, 41

*Page v. Pension Ben. Guar. Corp.*,
   130 F.R.D. 510 (D.D.C. 1990).................................................................................35

*Peterson v. Islamic Republic of Iran*,
   264 F. Supp. 2d 46 (D.D.C. 2003)...........................................................................36

*Peterson v. Islamic Republic of Iran*,
   515 F. Supp. 2d 25 (D.D.C. 2007)...............................................................10, 29, 30

*Peterson v. Islamic Republic of Iran*, Civil Action Nos. 01-2094 (RCL),
   01-2684 (RCL), 2007 WL 950080 (D.D.C. Mar. 28, 2007)...................................35

*Roeder v. Islamic Republic of Iran*,
   333 F.3d 228 (D.C. Cir. 2003).................................................................................16

*Salazar v. Islamic Republic of Iran*,
   370 F. Supp. 2d 105 (D.D.C. 2005)..................................................................passim

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993)................................................................................................19

*Simon v. Republic of Iraq*,
   529 F.3d 1187 (D.C. Cir. 2008),
   *rev'd on other grounds*, 129 S. Ct. 2183 (2009)............................................11, 39

*Stoppelman v. Owens*,
   580 F. Supp. 944 (D.D.C. 1983)..............................................................................35

*Strother v. Dist. of Columbia*,
   372 A.2d 1291 (D.C. 1977) ..........................................................................46, 47, 48

*Thomas v. Doyle*,
   187 F.2d 207 (D.C. Cir. 1951).............................................................................46, 47

*TMR Energy Ltd. v. State Property Fund of Ukraine*,
   411 F.3d 196 (D.C. Cir. 2005).................................................................................18

*USA Waste of Maryland, Inc. v. Love*,
   954 A.2d 1027 (D.C. Ct. App. 2008).......................................................................40

*Valore v. Islamic Republic of Iran*,
   700 F. Supp. 2d 52 (D.D.C. 2010)......................................................................17, 22

*Wagner v. Islamic Republic of Iran*,
   172 F. Supp. 2d 128 (D.D.C. 2001)...................................................................passim

*Weinstein v. Islamic Republic of Iran*,
   175 F. Supp. 2d 13 (D.D.C. 2001)...........................................................................17

*Welch v. Islamic Republic of Iran*,
  Civ. A. No. 01-863(CKK)(AK), 2007 U.S. Dist. LEXIS 99191
  (D.D.C. Sept. 20, 2007) (mag op.), *adopted by the district court in*
  2007 U.S. Dist. LEXIS 99192 (D.D.C. Oct. 15, 2007) ...................................................passim

*Williams v. United States*,
  405 F.2d 234 (5th Cir. 1968) .....................................................................................34

*Young v. Firemen's Ins. Co. of Washington, D.C.*,
  463 A.2d 675 (D.C. 1983) .........................................................................................47

## **Statutes**

Foreign Sovereign Immunities Act,
  28 U.S.C. §§ 1602, *et seq.* ..................................................................................passim

  *as amended by* Anti-terrorism and Effective Death Penalty Act of 1996.
  Pub. L. No. 104-132, § 221(a)(1)(C), 110 Stat. 1214, 1241 ...............................................8

  *as amended by* Omnibus Consolidated Appropriations Act of 1996,
  Pub. L. 104-208, § 589 (1996), 110 Stat. 3009-1, 3009-172
  (codified at 28 U.S.C. § 1605 note) ....................................................................................9

  *as amended by* National Defense Authorization Act for Fiscal Year 2008,
  Pub. L. No. 110-181, § 1083, 122 Stat. 341 (2008)
  (codified at 28 U.S.C. §1605A (2009)...........................................................................passim

    28 U.S.C. § 1605(a)(7)......................................................................................passim

    28 U.S.C. § 1605A note .....................................................................................1, 33

    28 U.S.C. § 1605A(a) ......................................................................................19, 36

    28 U.S.C. § 1605A(a)(1) ..........................................................................19, 20, 22, 37

    28 U.S.C. § 1605A(a)(2) ...................................................................................passim

    28 U.S.C. § 1605A(b) ............................................................................................33

    28 U.S.C. § 1605A(c) .....................................................................................passim

    28 U.S.C. § 1608 ............................................................................................17, 18

    28 U.S.C. § 1608(a) ..............................................................................................18

    28 U.S.C. § 1608(a)(3).......................................................................................14, 18

    28 U.S.C. § 1608(a)(4).......................................................................................14, 19

    28 U.S.C. § 1608(d) ..............................................................................................19

    28 U.S.C. § 1608(e) ..............................................................................................16

8 U.S.C. § 1101(22) .........................................................................................................20

10 U.S.C. §§ 101(a)(4)......................................................................................................20

22 U.S.C. § 2371..............................................................................................................20

22 U.S.C. § 2780...................................................................................................20

28 U.S.C. § 1330(b)...............................................................................................17

28 U.S.C. § 1350...................................................................................................22

28 U.S.C. § 1391(f)(4)...........................................................................................43

28 U.S.C. § 1604...................................................................................................19

50 U.S.C. app. § 2405(j)...................................................................................20, 21

D.C. Code § 12-101...............................................................................................46

## Other Authorities

154 Cong. Rec. S54 (daily ed. Jan. 22, 2008).............................................11, 12, 38

49 Fed. Reg. 2836-02.............................................................................................21

Restatement (Third) of Foreign Relations Law § 402(3) (1987)...............................42

## Rules

Fed. R. Civ. P. 4(j)(1)...........................................................................................18

Fed. R. Civ. P. 15(c)..............................................................................................34

Fed. R. Evid. 201(b)...............................................................................................17

## Regulations

31 C.F.R. § 250.4(b)..............................................................................................48

## <u>INTRODUCTION</u>

This case arises from the April 1983 terrorist attack on the United States Embassy and the

September 1984 terrorist attack on the United States Embassy Annex in Beirut, Lebanon, and is

brought pursuant to section 1083 of the National Defense Authorization Act for Fiscal Year 2008

("2008 NDAA" or "Act"), Pub. L. No. 110-181, § 1083, 122 Stat. 341 (2008) (codified at 28

U.S.C. §1605A (2009)), as a "Related Action" to *Dammarell v. Islamic Republic of Iran,* No. 01-

2224 (JDB), 2006 WL 2583043 (D.D.C. Sept. 7, 2006);[1] *Salazar v. Islamic Republic of Iran*, 370

F. Supp. 2d 105 (D.D.C. 2005), *Wagner v. Islamic Republic of Iran,* 172 F. Supp. 2d 128

(D.D.C. 2001), and *Welch v. Islamic Republic of Iran*, Civ. A. No. 01-863(CKK)(AK), 2007

U.S. Dist. LEXIS 99191 (D.D.C. Sept. 20, 2007) (mag op.), *adopted by the district court in* 2007

U.S. Dist. LEXIS 99192 (D.D.C. Oct. 15, 2007).[2]

Plaintiffs are 58 foreign national employees of the U.S. Government and one U.S.

national employee of the U.S. Government,[3] who were working in the U.S. Embassy in Beirut,

Lebanon, and were killed or injured as a result of the 1983 or 1984 terrorist attacks, and 255 of

---

[1]     The *Dammarell* findings are found at 281 F. Supp. 2d 105 (D.D.C. 2003) ("*Dammarell I*"); No. 01-2224, 2005 WL 756090 (D.D.C. Mar. 29, 2005) ("*Dammarell II*"); 370 F. Supp. 2d 218 (D.D.C. 2005) ("*Dammarell III*"); 404 F. Supp. 2d 261, 271-274 (D.D.C. 2005) ("*Dammarell IV*") (containing factual findings expressly incorporated into the final judgment); 2006 WL 2583043 (D.D.C. Sept. 7, 2006) ("*Dammarell V*") (final judgment). *See also* 2006 WL 2382704 (D.D.C. August 17, 2006) and 2006 WL 2724788 (D.D.C. Sept. 1, 2006).

[2]     All four cases involved either the April 1983 or the September 1984 terrorist attacks on the U.S. Embassy/Annex in Beirut. The claims of the victims of the 1984 terrorist attack on the Embassy Annex also relate to those asserted in *Brewer v. Islamic Republic of Iran,* 664 F. Supp. 2d 43 (D.D.C. 2009). However, unlike the other related "original actions," *Brewer* was not filed until after the Amendments to the FSIA were passed in January 2008. Thus, it was filed under the amended statute, § 1605A, not the prior statute, § 1605(a)(7), and therefore cannot serve as a related "original action" for this case. *See* 28 U.S.C. § 1605A note, 1083(c) (earlier action must be "timely commenced under section 1605(a)(7)").

[3]     The U.S. national employee of the U.S. Government is also a member of the U.S. armed services.

their immediate family members.  Plaintiffs bring their claims against the Islamic Republic of Iran and the Iranian Ministry of Information and Security (MOIS) (collectively "Defendants") pursuant to the 2008 NDAA, which amended the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602, *et seq.,* and, among other things, allowed *for the first time* foreign national employees of the United States Government killed or injured while acting within the scope of their employment, members of the armed services, and their family members, to sue a state sponsor of terrorism for injuries and damages resulting from an act of terrorism.  *See* 28 U.S.C. § 1605A(a)(2)(A)(ii)(II)&(III) (2009).

Defendants' liability for the 1983 and 1984 bombings of the U.S. Embassy is beyond dispute.  This Court and other courts in this district have held in at least five different cases that Defendants Iran and MOIS directed and facilitated the 1983 and 1984 attacks on the U.S. Embassy and therefore proximately caused the injuries sustained by the victims of those attacks. In each case, Iran and MOIS were held liable to the victims of these attacks and their immediate family members for compensatory damages.  *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 47 (D.D.C. 2009) (1984 attack); *Welch v. the Islamic Republic of Iran*, 2007 U.S. Dist. LEXIS 99191 (mag. op.), *adopted by the district court in* 2007 U.S. Dist. LEXIS 99192 (1984 attack); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d at 107-108 (1983 attack); *Dammarell v. Islamic Republic of Iran,* 2006 WL 2583043, at *1-2 (1983 attack); *Wagner v. Islamic Republic of Iran,* 172 F. Supp. at 133 (1984 attack).

In this Motion, Plaintiffs request the Court to enter judgment against Iran and MOIS on the issue of liability in favor of the Plaintiff U.S. Government employee victims of the 1983 and 1984 attacks on the U.S. Embassy and their immediate family members.  In this Memorandum, the attached Statement of Material Facts As to Which There Is No Genuine Issue (hereinafter

"Statement of Facts" or "SOF"), and the supporting evidence (Exhibits 1-50), Plaintiffs submit both the facts and the legal authorities upon which this Court may exercise jurisdiction over Plaintiffs' claims against Iran and MOIS and enter judgment on liability in favor of the Plaintiff victims and their immediate family members, pursuant to 28 U.S.C. § 1605A and other applicable laws.

<u>**FACTS**</u>

The facts supporting this Motion are set forth in detail in the accompanying Statement of Facts submitted pursuant to Local Civil Rule 7(h). A short summary of the events and evidence establishing liability is set forth below.

**A.    The 1983 Bombing of the U.S. Embassy in Beirut**

On Tuesday, April 18, 1983, at approximately 1:05 p.m., an unidentified driver crashed a vehicle laden with hundreds of pounds of explosives into the main entrance of the United States Embassy in Beirut, Lebanon ("the Embassy"). *See* SOF ¶ 38-51; *see also Dammarell IV,* 404 F. Supp. 2d at 271. At the time, the Embassy was full of staff and visitors, engaging in the routine functions of an embassy. Ten or fifteen visa applicants were in the building, the cafeteria on the ground floor was crowded with staff eating lunch, and there were pedestrians strolling past on the street outside. SOF ¶ 38. The vehicle struck the Embassy and exploded, completely destroying large sections of the building complex, including the Marine security guard post in the lobby, the cafeteria, the United States Information Service library, the personnel section, and the consular section (the "1983 Attack"). SOF ¶ 41; *Dammarell IV* , 404 F. Supp. 2d at 271. The explosion was so powerful that seven floors in the center section of the crescent-shaped building collapsed, or "pancaked." SOF ¶ 40; *Dammarell I*, 281 F. Supp. 2d at 111. According to U.S. Department of State reports, as a result of the explosion, 52 people were killed and at least 34 people were injured. SOF ¶ 42; *Dammarell IV*, 404 F. Supp. 2d at 271.

3

Although it was not immediately clear who was responsible for the 1983 Attack, by 1984, the U.S. Department of State had determined that radical Lebanese Shi'a, with support and encouragement from Iran and its intelligence ministry, MOIS, had carried out the bombing. Specifically, the U.S. Government publicly identified Hezbollah, a terrorist organization operating in Lebanon, as the entity behind the bombing – and identified Iran as directly involved in both the establishment and operation of Hezbollah.  SOF ¶¶ 43-49; *Dammarell I*, 281 F. Supp. 2d at 111.

Hezbollah was created by Iran during the Lebanese Civil War.  SOF ¶ 30-32, 34, 70. Following the 1979 Revolution in Iran, the fundamentalist Islamic regime of the Ayatollah Ruhollah Khomeni sought to extend Iranian influence in the Middle East.  SOF ¶¶ 70-71; *Dammarell I*, 281 F. Supp. 2d at 109.  Iran's new rulers viewed the Lebanese Civil War, which had begun in 1975, as an opportunity to assert Iran's influence in the Arab world and to drive Western powers out of the Middle East.  SOF ¶¶ 32, 70-71; *Dammarell I*, 281 F. Supp. 2d at 109. Iran therefore began promoting radicalism among Lebanese Shi'a, with whom Iran had traditionally had strong political ties, and also began sponsoring terrorist acts against Western interests.  SOF ¶¶ 20-21, 27, 30-32, 70-71.  The Iranian efforts were bolstered by the 1982 Israeli invasion of predominantly-Shi'a southern Lebanon, which led to greater radicalism and anti-Western sentiment among Lebanese Shi'a.  Exploiting these sentiments, Iran used its influence to form Hezbollah as a means to fight Western presence in Lebanon, to engage in armed struggle against the Israeli invaders, and to promote Islamic law in the region.  SOF ¶¶ 21-27, 30-32, 71.

In pursuit of these goals, Iran began pouring money and personnel into southern Lebanon to train the Lebanese Shi'a and to finance anti-Western terrorist attacks.  Iran sent members of its elite Republican Guard into Lebanon to support and train the Lebanese Shi'a.  SOF ¶¶ 19-20,

4

28-32.  Iran's MOIS, in particular, was responsible for providing financial assistance, weapons, and training to Lebanese Shiʻa groups, including Hezbollah.  SOF ¶¶  19-20, 33-34; *Dammarell I*, 281 F. Supp. 2d at 111.  After 1982, Hezbollah, in cooperation with Iran and MOIS, carried out a series of terrorist acts directed at Westerners, designed to drive the United States out of Lebanon.  These acts included the kidnapping of American officials, journalists, and academics living in Lebanon, who Iran and MOIS deemed to be symbols of Western influence in Lebanon. SOF ¶ 32 .

Despite these earlier activities, it was the 1983 Embassy bombing that led U.S. officials to formally identify Hezbollah and recognize its responsibility, and the responsibility of Iran and MOIS, for the series of terrorist attacks against U.S. interests in Lebanon.  SOF ¶¶ 34, 43-49. The process of determining who had been responsible for the 1983 Attack narrowed fairly quickly, with those involved determining early in the process that it had been a Shiʻa attack, and that Iran had been directly responsible.  SOF ¶¶ 43-49.

According to expert testimony, the complexity of the 1983 Attack on the U.S. Embassy in Beirut ultimately made it clear that Iran had played a central role in the Attack.  SOF ¶  47. There is no question that Iran was responsible for, among other things, selecting the target, providing instructions for carrying out the bombing, providing the expertise needed to build the bomb, and providing financial support for the attack.  SOF ¶ 47; *Dammarell I*, 281 F. Supp. 2d at 112.  Moreover, the 1983 Embassy Attack was consistent with the worldwide pattern of both Hezbollah and its Iranian supporters in carrying out terrorist bombings at embassies and similar installations.  SOF ¶ 48.

It was therefore universally agreed among members of the U.S. foreign policy establishment that Iran was responsible for the 1983 bombing of the U.S. Embassy in Beirut.

SOF ¶ 49. In fact, in January 1984, the U.S. Secretary of State designated Iran as a state sponsor

of terrorism; the designation was based, in part, on Iran's participation in the 1983 bombing.

SOF ¶ 50; *Dammarell I*, 281 F. Supp. 2d at 191.

>  B.    The 1984 Bombing of the U.S. Embassy Annex in Beirut

Following the 1983 Attack, the Embassy operations were temporarily transferred to a

building ("the Embassy Annex" or "the Annex") in what was believed to be a safer part of the

city. SOF ¶ 51. Despite this precaution, on September 20, 1984, shortly before noon, another

vehicle loaded with thousands of pounds of explosives was detonated just outside of the Annex

("the 1984 Attack"). *Id.*; *Wagner*, 172 F. Supp. at 131-32. The Annex was somewhat more

fortified than the previous Embassy, forcing the vehicle to swerve around several obstacles; the

vehicle was also under fire from guards on the Annex roof. SOF ¶¶ 51-52. As a result, the

vehicle was a short distance from the Annex and behind a concrete cistern when it exploded,

resulting in less damage to the Annex than might otherwise have occurred. SOF ¶ 53.

Nonetheless, the explosion severely damaged the Annex, killing eleven people and injuring at

least fifty-eight others. *Id.*; *Wagner*, 172 F. Supp. 2d at 132.

Once again, the evidence made clear that the 1984 Attack was directed, funded, and

planned by Iran and MOIS. The attack fit the pattern of Hezbollah and Iranian actions against

Western influence, and it coincided with threats that had been made by Hezbollah. SOF ¶¶ 54-

55. In particular, suicide vehicle-bombs were a trademark of Hezbollah, and Iranian Shiʻa

fundamentalists were the only terrorists then active in Lebanon who were likely to willingly

sacrifice their lives in such attacks on Western interests. SOF ¶ 54. Moreover, additional

evidence soon came to light showing the specific and direct involvement of Hezbollah, Iran, and

MOIS – most notably, satellite photos showing a replica of the U.S. Embassy Annex, constructed

as a training course for the suicide bomber, and located in the main area where Iranian

Revolutionary Guard were engaged in training and instructing Hezbollah members.  SOF ¶ 57-58; *Wagner*, 172 F. Supp. 2d at 132-33.

> **C.    Judgments Holding Iran and MOIS Liable for the 1983 and 1984 U.S. Embassy Bombings**

Defendants' liability for these terrorist attacks is beyond dispute. This Court already has held Iran and MOIS liable for the 1983 and 1984 attacks on the U.S. Embassy in Beirut, awarding damages to the U.S. national victims of those attacks and their immediate family members in the following cases:

**1983 Terrorist Attack on the U.S. Embassy**

- *Dammarell v. Islamic Republic of Iran,* No. 01-2224 (JDB), 2006 WL 2583043 (D.D.C. Sept. 7, 2006) ("*Dammarell V*") (Bates, J.): The evidence in *Dammarell*, briefly described above and presented more fully in the attached Statement of Facts, included (1) live testimony from Ambassador Robert Sherwood Dillon, U.S. Ambassador to Lebanon at the time of the 1983 Attack; (2) live testimony from Dr. Patrick Clawson, the Deputy Director of the Washington Institute for Near East Policy, who was qualified by the Court as an "expert on Iranian politics, the Iranian economy, and Iran's sponsorship of terrorism," SOF ¶ 5, n. 5; (3) videotaped testimony from Ambassador Robert B. Oakley, who had served, among other positions, as the coordinator of anti-terrorism efforts for the U.S. Department of State; and (4) U.S. Government intelligence reports and memoranda.  Based on the evidence presented, the Court found that "Iran and MOIS were indeed responsible for supporting, funding, and otherwise carrying out the unconscionable attack." *Dammarell I*, 281 F. Supp. 2d at 108.  The Court awarded the *Dammarell* plaintiffs compensatory damages in the amount of $315,919,657.

- *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105 (D.D.C. 2005) (Bates, J.): In *Salazar*, the widow of a soldier killed in the 1983 attack brought an action against Iran, MOIS, the Iranian Islamic Revolutionary Guard Corps ("IRGC"), Hezbollah, and several former Iranian functionaries.  This Court held "that Hizbollah had orchestrated and conducted the attack with the cooperation and support of Iran, MOIS, and the IRGC."  *Id.* at 111.  The Court awarded compensatory damages in the amount of $18,297,000.  *Id.* at 117.

**1984 Terrorist Attack on the U.S. Embassy Annex**

- *Wagner v. Islamic Republic of Iran,* 172 F. Supp. 2d 128 (D.D.C. 2001) (Jackson, J.): In *Wagner*, the family of a Navy officer killed in the 1984 bombing brought a wrongful death suit against Iran and MOIS.  The evidence in *Wagner* is also

presented more fully in the attached Statement of Facts, and included live testimony from Dr. Clawson, videotaped testimony from Ambassador Reginald Bartholomew, the U.S. Ambassador to Lebanon at the time of the 1984 Attack, and U.S. Government intelligence reports and memoranda.  Based on the evidence presented, Judge Jackson held that it was "apparent. . . that Hizballah, a terrorist organization substantially funded and supported by Iran and MOIS since 1979, perpetrated the September 20, 1984 terrorist bombing of the U.S. embassy." *Id.* at 134.  The court therefore found Iran and MOIS liable and assessed more than $16 million in compensatory damages and $300 million in punitive damages. *Id.* at 138.

- *Welch v. Islamic Republic of Iran*, Civ. A. No. 01-cv-00863-CKK (D.D.C. Oct. 15, 2007): In *Welch*, the relatives of an Army officer killed in the 1984 bombing brought suit against Iran, MOIS, the IRCG, Hezbollah, the Ayatollah Ali Hoseini Khamenei, Ali Akbar Hasemi-Fafsanjani, Ali Akbar Mohtashemi, and various John Does.  In an opinion later adopted by Judge Kollar-Kotelly, Magistrate Judge Kay held that "the Islamic Republic of Iran, utilizing its Ministry of Information and Security and the Revolutionary Guard Corps have provided material support to [Hizbollah] which enabled the September 20, 1984 terrorist attack."  2007 U.S. Dist. LEXIS 99191 (D.D.C.) (at *20).  The plaintiffs were awarded compensatory damages in the amount of $32,698,304.00.  *Welch*, 2007 U.S. Dist. LEXIS 99191, at *100.

- *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43 (D.D.C. 2009) (Huvelle, J.): In *Brewer*, a survivor of the 1984 bombing and his mother brought suit against Iran and MOIS.  Judge Huvelle held that Iran and MOIS "provided 'material support and resources' to Hezbollah in carrying out the September 20, 1984 attack on the Embassy Annex," and awarded plaintiffs $9.5 million in compensatory damages and $300 million in punitive damages.  *Id.* at 54, 57-59.

This evidence, including the Court's findings of fact in these previous decisions, proves Defendants' direct role in and liability for the April 1983 and September 1984 terrorist attacks on the U.S. Embassy in Beirut, Lebanon.

## BACKGROUND

### A.     The FSIA and the Terrorism Exception

The "state sponsor of terrorism" exception to sovereign immunity was first enacted as part of the Mandatory Victims Restitution Act of 1996, which was itself part of the larger Anti-terrorism and Effective Death Penalty Act of 1996.  Pub. L. No. 104-132, § 221(a)(1)(C), 110 Stat. 1214, 1241 (formerly codified at 28 U.S.C. § 1605(a)(7)).  The exception permitted claims

against foreign state sponsors of terrorism for acts of terrorism that resulted in personal injury or death, where either the claimant or victim was a United States citizen at the time of the terrorist act. *See* 28 U.S.C. § 1605(a)(7) (2007).

This provision, however, raised questions that became the subject of considerable debate, including whether § 1605(a)(7) itself created a federal cause of action against state sponsors of terrorism. Congress attempted to answer these questions when it passed the so-called "Flatow Amendment" in the Omnibus Consolidated Appropriations Act of 1996. *See* Pub. L. 104-208, § 589 (1996), 110 Stat. 3009-1, 3009-172 (codified at 28 U.S.C. § 1605 note).

Federal courts initially construed § 1605(a)(7) and the Flatow Amendment, read in tandem, as creating a federal cause of action against the foreign state sponsor of terrorism. *See, e.g., Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998). The U.S. Court of Appeals for the District of Columbia Circuit, however, ultimately concluded that neither § 1605(a)(7) nor the Flatow Amendment itself created a cause of action against the foreign state.[4] *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1027 (D.C. Cir. 2004). The court of appeals then remanded the case to the district court to allow the plaintiffs to amend their complaint to assert causes of action using "some other source of law, including state law." *Id.* at 1036.

Courts thus looked to other sources of law, in particular, state tort law, to determine the liability of foreign states sued under 28 U.S.C. § 1605(a)(7). *See, e.g., Dammarell II*, 2005 WL 756090, at *33 (considering plaintiffs' post-*Cicippio-Puleo* submissions and ordering that

---

[4]    The court held that the Flatow Amendment provided a private right of action against only individual officials, employees, and agents of foreign states, acting in their *individual* capacities, and did not apply to individual officials acting in their official capacities or against the foreign state itself. *Cicippio-Puleo,* 353 F.3d at 1027, 1034.

plaintiffs amend their complaint to state causes of action under the law of the state in which they were domiciled at the time of their injuries).  In this sense, the FSIA "terrorism exception" began to serve as a "pass through," *i.e.,* waiving immunity, to state law causes of action.  *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 83 (D.D.C. 2006).

However, applying relevant state law created a number of practical problems for litigants and the courts.  Under applicable choice of law principles, the district court often had no choice but to apply the state tort law of each individual plaintiff's domicile, which in many cases would involve several different states for the same terrorist incident.  *See, e.g., Dammarell IV*, 404 F. Supp. 2d at 275-324 (applying the law of six states and the District of Columbia).  This was not only a burdensome task, but resulted in different awards for similarly-situated plaintiffs.  For example, because the substantive tort law for intentional infliction of emotional distress claims of many states differs, some victims could recover damages for emotional distress while other similarly-situated victims were foreclosed from bringing the same causes of action.  *See, e.g., Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 44-45 (D.D.C. 2007) (denying and dismissing intentional infliction of emotional distress claims of those family members domiciled in Pennsylvania and Louisiana, whose laws required the claimant to be present at the site of the event causing emotional distress).

### B.    The 2008 NDAA and the Lautenberg Amendments

To remedy the problem, in January 2008, Congress enacted section 1083 of the National Defense Authorization Act for Fiscal Year 2008 ("NDAA" or "Act"), Pub. L. No. 110-181, 122 Stat. 3, 41 § 1083, which amended the "terrorism exception" and other related FSIA provisions.  Significantly, the Act repealed § 1605(a)(7) of Title 28 and replaced it with a separate section, § 1605A, which, among other things: (1) broadened the jurisdiction of federal court to include claims by members of the U.S. armed forces and employees or contractors of the U.S.

10

Government injured while performing their duties on behalf of the U.S. Government; and

(2) created a federal statutory cause of action for those victims and their legal representatives

against state sponsors of terrorism for terrorist acts committed by the State, its agents, or

employees, effectively displacing *Cicippio-Puleo*.[5]  *See Simon v. Republic of Iraq*, 529 F.3d

1187, 1190 (D.C. Cir. 2008), *rev'd on other grounds*, 129 S. Ct. 2183 (2009).

The legislative history of these amendments reflects a clear and definite intent by

Congress to strengthen the tools available to all victims of terrorism directed at U.S. targets to

hold the state sponsors of such activity accountable.  As Senator Lautenberg, the bill's co-

sponsor, stated, the "legislation is essential to providing justice to those who have suffered at the

hands of terrorists and is an important tool designed to deter future state-sponsored terrorism."

154 Cong. Rec. S54 (daily ed. Jan. 22, 2008) (statement by Sen. Lautenberg).  In particular,

Senator Lautenberg explained Congress's interest in allowing *non*-U.S. nationals who are

employed by the U.S. Government to be compensated for personal injury and wrongful death

suffered as the result of such a terrorist attack:

> [I]n several cases the courts have prevented non-U.S. nationals who work for the
> U.S. Government and were injured in a terrorist attack during their official duties
> from pursuing claims for their personal injuries.  My provision fixes this inequity
> by creating an explicit cause of action for non-U.S. nationals who were either

---

[5]    The new statute also (1) expanded the range of monetary damages available against terrorist states to include punitive damages and damages for certain collateral property loss; (2) codified and clarified the applicable statute of limitations for such cases; (3) established vicarious liability of the terrorist state for the actions of its agents/officials; (4) limited the availability of interlocutory appeals in cases brought under this section; (5) permitted automatic establishment of a lien of *lis pendens* upon any real or personal property subject to attachment in aid of execution when a complaint under §1605A is filed; and (6), together with the amendments to § 1610, broadened the provisions allowing judgment creditors to attach the property of agencies and instrumentalities of state sponsors of terrorism in aid of execution on those judgments.  *See* Pub. L. No. 110-181, 122 Stat. 3, § 1083 (codified at 28 U.S.C. §§ 1605A, 1610).

working as an employee of the U.S. Government or working pursuant to a U.S.
Government contract.

*Id.*

With respect to the new federal cause of action, Senator Lautenberg made clear that the

statutory cause of action was intended to provide uniformity and fairness in the judgments in

favor of victims of terrorism:

> [Following the enactment of the state-sponsored terrorism exception,]
> Congress . . . passed the Flatow Amendment to the FSIA, which allows victims of
> terrorism to seek meaningful damages, such as punitive damages, from state
> sponsors of terrorism for the horrific acts of terrorist murder and injury committed
> or supported by them.
>
> Congress's original intent behind the 1996 legislation has been muddied
> by numerous court decisions.  For example, the courts decided in *Cicippio-Puleo
> v. Islamic Republic of Iran* that there is no private right of action against foreign
> governments – as opposed to individuals – under the Flatow Amendment.  Since
> this decision, judges have been prevented from applying a uniform damages
> standard to all victims in a single case because a victim's right to pursue an action
> against a foreign government depends upon State law.  My provision in this bill
> fixes this problem by reaffirming the private right of action under the Flatow
> Amendment against the foreign state sponsors of terrorism themselves.

*Id.*  In short, the Act both expanded and strengthened the rights of victims of terrorism to recover

against "state sponsors" of terrorism by, *inter alia*, permitting claims to be filed by certain non-

U.S. nationals and providing for uniformity and fairness in the judgments awarded to all victims

of state sponsored terrorism.

### C.    The *Doe* Complaint

Shortly after the Amendments were enacted, on March 28, 2008, Plaintiffs filed their

initial Complaint, complying with the 60-day statutory deadline for the filing of new cases under

the NDAA's Amendments to the FSIA.  *See* Complaint (Mar. 28, 2008), Dkt. # 3.  The initial

Complaint was filed on behalf of 250 Plaintiffs, who were killed or injured in the 1983 or 1984

Embassy attacks and their family members.  However, because of the large number of additional

potential victims and family members in this case who had not yet been notified of the lawsuit, and because there are common issues of fact and law among all of the Plaintiffs, Plaintiffs filed the initial Complaint as a putative class action on behalf of all foreign national victims of the 1983 and 1984 terrorist attacks on the U.S. Embassy in Beirut and their immediate family members. *Id.* ¶¶ 306-11.

With the assistance of the U.S. Department of State, however, after filing the initial Complaint, Plaintiffs were able to identify and contact many other employees working at the Embassy at the time of the attacks, and their family members, and notify them of the opportunity to participate in the lawsuit. *See* Notice of Filing Amended Complaint Dismissing Class Action Allegations (May 22, 2009), Dkt No. 12 & attached Declaration of Timothy Foden (Foden Decl.) (May 22, 2009) (describing efforts in identifying and contacting potential plaintiffs). Thus, additional victims of the 1983 and 1984 attacks, and their family members, who were otherwise unknown to Plaintiffs' counsel came forward and sought to participate in this action. Foden Decl. ¶ 7.

By late 2008, fewer and fewer potential plaintiffs were coming forward. *Id.* ¶ 8. On May 22, 2009, Plaintiffs filed a First Amended Complaint, adding 71 new plaintiffs. *See* First Amended Complaint (May 22, 2009). Given that extensive efforts were made by the U.S. Department of State to assist counsel in contacting and notifying Embassy employees and their families of the lawsuit, (Foden Decl. ¶ 8-9), a class action was no longer necessary. Those plaintiffs who were interested in participating were added as named Plaintiffs and a Notice of Dismissal of Class Allegations was filed. *See* Notice of Dismissal of Class Allegations (May 22, 2009).

Following the filing of their First Amended Complaint, Plaintiffs commenced formal service of process under the FSIA on Iran and MOIS.  On June 24, 2009, Plaintiffs, in accordance with the steps required by 28 U.S.C. § 1608(a)(3), attempted service upon Iran and MOIS through international mail.  *See* Dkt. #15, 16, 17.  More than 30 days after Plaintiffs attempted service pursuant to 28 U.S.C. § 1608(a)(3), there was still no indication that either of the defendants had accepted service of process.  Therefore, pursuant to 28 U.S.C. § 1608(a)(4), on August 5, 2009, Plaintiffs, with the aid of the U.S. District Court Clerk and the U.S. Department of State, initiated service of process through diplomatic channels.  *See* Dkt. #18, 19, 20.  According to a letter the U.S. Department of State filed with the Clerk of the District Court, service was deemed effective upon Iran on November 18, 2009.  *See* Dkt. #23.

On January 28, 2010, after the requisite 60-day period for Defendants to file a response to the Amended Complaint had passed, Plaintiffs requested the Clerk of the District Court to enter default against Defendants.  *See* Dkt. #24.  On the following day, the Clerk of the District Court entered default against the Islamic Republic of Iran and its Ministry of Information and Security.  *See* Dkt. #25.

Simultaneous with filing this Motion, Plaintiffs also moved for leave to file a Second Amended Complaint.  This Amendment is necessary to: clarify that all Plaintiffs' claims are brought pursuant to 28 U.S.C. §1605A; clarify the "employee" status of certain Plaintiffs, and which bombing incidents give rise to their injuries; and update the list of Plaintiffs and, where necessary, their Legal Representatives.  *See* Plaintiffs' Motion for Leave to File Second Amended Complaint (Nov. 19, 2010).  The Second Amended Complaint adds as Plaintiffs three immediate family members of U.S. employee victims and removes the claims of eight Plaintiff immediate family members who no longer wish to participate in this Action.  *See* Notice of

14

Voluntary Dismissal Pursuant to Fed. R. Civ. P. 41(a)(1) (Nov. 19, 2010).   Plaintiffs attach as

Exhibit 2 to this Memorandum a "Key Information Chart"[6] prepared by counsel, listing each

Plaintiff, the nature of the Plaintiff's claim, the relevant incident giving rise to the claim

(1983/1984 attack), the Plaintiff's pseudonym, whether the Plaintiff was a U.S. Employee at the

Time of the Attack, the Plaintiff's citizenship at the time of the Attack, domicile at the time of

the attack, and current citizenship.

       The U.S. Government employee Plaintiffs assert claims for wrongful death and/or

personal injury pursuant to 28 U.S.C. § 1605A(c) and seek damages for economic loss, pain and

suffering, and emotional distress.  *See* Second Amended Complaint, p. 97-98 (Nov. 19, 2010).

Plaintiffs who are the immediate family members of these U.S. Government employees assert

claims for emotional distress and solatium/consortium pursuant to 28 U.S.C. § 1605A(c), or, in

the alternative, pursuant to D.C. law (the law of the forum), Lebanese law (*lex loci*), or the law of

the domicile of the Plaintiff at the time of the attack.  *Id.*, pp. 98-100.  The U.S. Government

employees and family members who are deceased are each represented by a Legal

Representative, who is an heir-at-law for the decedent.  *Id.*, pp. 2-91, 98-99.

## ARGUMENT

### PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THE ISSUE OF DEFENDANTS' LIABILITY

       This Court, and others in this district, have found Defendants Iran and MOIS liable for

the 1983 and 1984 U.S. Embassy bombings in Beirut in at least five different cases.  *Brewer v.

Islamic Republic of Iran*, 664 F. Supp. 2d at 47 (1984 attack); *Welch v. Islamic Republic of Iran*,

2007 U.S. Dist. LEXIS, at * 200, *adopted by the district court in* 2007 U.S. Dist. LEXIS 99192

---

[6]    Because the Chart lists the names of the Plaintiffs, a redacted version is submitted for the
public record and an unredacted version is submitted under seal.

(1984 attack); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d at 107-108 (1983 attack); *Dammarell v. Islamic Republic of Iran,* 2006 WL 2583043, at *1-2 (1983 attack); *Wagner v. The Islamic Republic of Iran,* 172 F. Supp. at 133 (1984 attack). This case presents the same factual and legal issues regarding Defendants' role in the attacks – only the identities of the Plaintiffs differ.

In this case, as in the other cases against Iran, default judgment may be entered against a foreign state where "the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court still has an obligation to satisfy itself that plaintiffs have established a right to relief."). Thus, plaintiffs may prevail on a motion for default where plaintiffs present a "legally sufficient *prima facie* case, *i.e.,* 'a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff.'" *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008). In evaluating the evidence, a court may "accept as true the plaintiffs' uncontroverted evidence," *Estate of Botvin v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007), and a plaintiff may establish proof by affidavit, deposition, or trial testimony. *See Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000).

Here, where Plaintiffs' claims are related to the same claims (and arise from the same facts) that were presented and adjudicated in prior related cases in this district – *i.e.*, *Dammarell, Wagner, Salazar, Welch,* and *Brewer* – the Court "'may take judicial notice of related proceedings and records in cases before the same court.'"[7] *Valore v. Islamic Republic of Iran*,

---

[7]     Collateral estoppel is not available here because the legal context has changed since these earlier rulings. *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 85 (D.D.C. 2009) (noting that, because the "legal analysis in [actions under § 1605A] will now be determined by a uniform federal standard – rather than the laws of numerous state and territorial

(continued...)

700 F. Supp. 2d 52, 59 (D.D.C. 2010) (citing Fed. R. Evid. 201(b) and *Booth v. Fletcher,* 101

F.2d 676, 679 n.2 (D.C. Cir. 1938) ("A court may take judicial notice of, and give effect to, its

own records in another but interrelated proceeding . . . .")).  However, where the prior findings

regarding Iran's role in the 1983 and 1984 terrorist attacks in Beirut were based on default

judgment proceedings, this Court may judicially notice those findings, but afford them preclusive

effect *only* where the prior findings have "some particular indicia of indisputability."  *Id.*

(collecting cases); *Weinstein v. Islamic Republic of Iran,* 175 F. Supp. 2d 13, 20 (D.D.C. 2001).

As a general rule, where the findings of fact to be noticed are based on *ex parte*

proceedings, courts will make renewed findings of fact based on the evidence submitted in the

prior proceeding along with any additional submissions by the parties.[8]  Accordingly, in support

of their claims, Plaintiffs here submit *both* the findings of fact in *Dammarell, Wagner*, and other

related proceedings, *and* relevant evidence submitted in those proceedings – including

documents, testimony, and U.S. Government records – upon which the Court relied in finding

Iran and MOIS liable for the 1982 and 1984 bombings of the U.S. Embassy.

I.    **THIS COURT HAS PERSONAL JURISDICTION OVER IRAN AND MOIS**

Courts may exercise personal jurisdiction over a foreign state where the defendant is

properly served in accordance with 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b); *TMR Energy*

---

(continued…)

jurisdictions – the collateral estoppel doctrine should not be invoked in any of the new actions
proceeding under § 1605A(c)").

[8]    *See Valore,* 700 F. Supp. 2d at 60; *see also Heiser v. Islamic Republic of Iran,* 466 F.
Supp. 2d 229, 264 (D.D.C. 2006) (reconsidering evidence presented in *Blais v. Islamic Republic
of Iran,* 459 F. Supp. 2d 40 (D.D.C. 2006) (Lamberth, J.)); *Salazar,* 370 F. Supp. 2d at 109
(noting that a court may take judicial notice of its own records of a related proceedings and
reviewing and relying on findings of *Dammarell*); *Brewer,* 664 F. Supp. 2d at 54 (reviewing
submission of testimony from *Wagner* and *Welch* and finding that the acts constituted
"extrajudicial killing").

*Ltd. v. State Property Fund of Ukraine*, 411 F.3d 196, 199 (D.C. Cir. 2005).  *See also* Fed. R.

Civ. P. 4(j)(1) (stating that "a foreign state or its political subdivision, agency, or instrumentality

must be served in accordance with 28 U.S.C. § 1608").  The FSIA prescribes four methods of

service, in descending order of preference.  Plaintiffs must attempt service by the first method (or

determine that it is unavailable) before proceeding to the second method, and so on.  *See* 28

U.S.C. § 1608(a).  As the court explained in *Ben-Rafael*:

> The preferred method of service is delivery of the summons and complaint "in accordance with any special arrangement for service between the plaintiff and the foreign state." 28 U.S.C. § 1608(a)(1).  If no such arrangement exists, then delivery is to be made "in accordance with an applicable international convention on service of judicial documents."  *Id.* § 1608(a)(2).  If neither of the first two methods is available, plaintiffs may send the summons, complaint, and a notice of suit (together with a translation of each into the official language of the foreign state) "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."  *Id.* § 1608(a)(3).  Finally, if mailed service cannot be accomplished within thirty days, then the statute permits plaintiffs to request that the clerk of the court dispatch two copies of the summons, complaint, and notice of suit (together with a translation of each into the foreign state's official language) to the Secretary of State, who then "shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted."  *Id.* § 1608(a)(4). "Strict adherence to the terms of 1608(a) is required." *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148, 154 (D.C. Cir. 1994).

*Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008).

The first two methods of service are inapplicable to this case because there is no "special

arrangement for service" between the U.S. and Iran, § 1608(a)(1), and Iran is not a party to any

"international convention on service of judicial documents." 28 U.S.C. § 1608(a)(2).

On June 23, 2009, Plaintiffs requested the Clerk of the Court to effect service upon

Defendants pursuant to § 1608(a)(3), and the Clerk certified that she performed the requested

mailing on June 24, 2009.  *See* Dkt. #15, 16, 17.  However, as no certification of service was

received within 30 days, Plaintiffs, on July 31, 2009, requested the Clerk to transmit the proper

18

documents to the U.S. Department of State for diplomatic service pursuant to § 1608(a)(4).  *See* Dkt. #18, 19.  On August 5, 2009, the Clerk certified that she had complied with Plaintiffs' request by mailing the proper documents to the U.S. Department of State and requesting that they attempt service upon Defendants through diplomatic channels.  *See* Dkt. #20.  On December 31, 2009, the U.S. Department of State informed the Court that service had been properly effected upon both defendants, effective November 18, 2009. *See* Dkt. #23.  Defendants did not respond or make an appearance within sixty days, and thus, pursuant to § 1608(d), the Clerk entered default on January 29, 2010.  *See* Dkt. No. 25.  Accordingly, Defendants having been properly served in accordance with § 1608, this Court has personal jurisdiction over them.

## II.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS UNDER 28 U.S.C. § 1605A

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, provides the exclusive basis for subject matter jurisdiction over all civil actions against foreign state defendants.  28 U.S.C. §§ 1330, 1602-1611.  *See also Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993); *Argentine Rep. v. Amerada Hess Shipping Co.¸* 488 U.S. 428, 434-35 (1983).  While foreign states are generally immune from jurisdiction of U.S. courts, *see* 28 U.S.C. § 1604, a federal district court may obtain jurisdiction over a foreign sovereign where one of the FSIA's enumerated exceptions applies.  *See* 28 U.S.C. §§ 1330(a), 1604.

The provisions relating to the waiver of immunity for claims alleging state-sponsored terrorism, *as amended*, are set forth at 28 U.S.C. § 1605A(a).  Section 1605A(a)(1) provides that a foreign state shall not be immune from the jurisdiction of U.S. courts in cases where

> money damages are sought against [it] for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

19

28 U.S.C. § 1605A(a)(1).

For a claim to be heard in the case such as this – filed as a "Related Action" under § 1605A(b) – the foreign state defendants must have been designated by the U.S. Department of State[9] as a "state sponsor of terrorism" when the original action under § 1605(a)(7) was filed. 28 U.S.C. § 1605A(a)(2)(A)(i)(II)).

Finally, subsection (a)(2)(A)(ii) requires that the "*claimant or the victim* [has been], at the time [the act] occurred":

    (1)    a national of the United States,[10]

    (2)    a member of the armed forces,[11] or

    (3)    an employee of the Government of the United States . . .acting within the scope of the employee's employment.

28 U.S.C. § 1605A(a)(2)(A)(ii)(1)-(3) (emphasis added).[12]

Plaintiffs satisfy each of the requirements for subject matter jurisdiction. First, Defendant Iran was designated as a state sponsor of terrorism at the time the *Dammarell* and *Wagner* cases

---

[9]    Countries determined by the U.S. Secretary of State to have repeatedly provided support for acts of international terrorism are designated as state sponsors of terrorism pursuant to three laws: section 6(j) of the Export Administration Act, 50 U.S.C. app. § 2405(j); section 40 of the Arms Export Control Act, 22 U.S.C. § 2780; and section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371.

[10]    The FSIA defines a "national of the United States" as a "citizen of the United States[] or . . . a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(22); 28 U.S.C. § 1605(h)(5).

[11]    The FSIA defines "armed forces" to mean the "Army, Navy, Air Force, Marine Corps, and Coast Guard." 10 U.S.C. §§ 101(a)(4); 28 U.S.C. § 1605(h)(4).

[12]    The statute also requires that where "the act occurred in the foreign state against which the claim has been brought, the claimant [has] afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration." 28 U.S.C. § 1605A(a)(2)(A)(iii). Because the 1983 and 1984 attacks took place in Lebanon and not Iran, the arbitration requirement does not apply.

were filed.  Second, Plaintiffs' injuries were caused by Defendants acts of "extrajudicial killing"

and provision of "material support" to their agents.  Third, all Plaintiffs were either *themselves*

U.S. Government employees at the time of the attacks *or* their claims are derived from claims

where the *victims* were U.S. Government employees at the time of the attack as required by

§ 1605A(a)(2)(A)(ii)(1)-(3).

### A.    Iran Was Designated As a State Sponsor of Terrorism at the Time the Related Action Was Filed

Plaintiffs comply with 28 U.S.C. § 1605A(a)(2)(A)(i)(II), because Iran was designated as

a state sponsor of terrorism when the underlying "related" actions were filed pursuant to 28

U.S.C. § 1605(a)(7).  Iran was formally declared a "state sponsor of terrorism" on January 19,

1984, by U.S. Secretary of State George P. Schultz in accordance with section 6(j) of the Export

Administration Act of 1979, 50 U.S.C. App. 2405(j), *see also* 49 Fed. Reg. 2836-02 (statement

of Secretary of State George P. Schultz), and continues to this day be designated as a state

sponsor of terrorism.   All of the related cases were filed after 1984.  *See supra* n. 2.  Thus, the

requirements set forth in § 1605A(a)(2)(A)(i)(II) are satisfied.[13]

---

[13]    In a case that is not brought as a "Related Action," a plaintiff must demonstrate that the "foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this subsection."  28 U.S.C. § 1605(a)(2)(A)(i)(I).  Here, Iran was designated as a state sponsor of terrorism in response to Iran's role in sponsoring a number of terrorist acts in Lebanon, including the April 18, 1983, Embassy bombing.  *See Dammarell I*, 281 F. Supp. 2d at 113.  As noted above, Iran was designated as a state sponsor of terrorism on January 23, 1984, eight months before the bombing of the U.S. Embassy Annex in September 1984.  *See Wagner*, 172 F. Supp. 2d at 133.  Thus, this case satisfies those requirements as well.

**B.      Plaintiffs' Injuries Were Caused By Defendants' Acts of "Extrajudicial Killings" and Provision of "Material Support" to Their Agents**

The FSIA, as amended, strips immunity "in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act if such an act or provision of material support or resources is engaged in by an official, employee, or agent or such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1).  The FSIA refers to the Torture Victim Protection Act of 1991 ("TVPA") for the definition of "extrajudicial killing."  *See* 28 U.S.C. § 1605A(h)(7).  The TVPA provides that

> the term "extrajudicial killing" means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all of the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note.  *See also Valore*, 700 F. Supp. 2d at 74 (adopting the TVPA definition of "extrajudicial killing" in bombing of U.S. Marine barracks in Beirut, Lebanon).

Here, as in *Dammarell, Wagner,* and the other related cases, the 1983 and 1984 bombings clearly were acts of "extrajudicial killing." *Dammarell I,* 281 F. Supp. 2d at 192 (finding that "the evidence is conclusive that [the victims of the 1983 bombing] were deliberately targeted for death and injury without authorization by a previous court judgment . . . . and [the 1983 bombing] constitutes an act of 'extrajudicial killing'"); *Wagner*, 172 F. Supp. 2d at 134 (the September 1984 bombing was a "deliberate and premeditated act" that killed 14 people and "[t]here is no evidence that it was judicially sanctioned by any lawfully constituted tribunal."); *Brewer*, 664 F. Supp. 2d at 52-53 (same); *Welch*, 2007 U.S. Dist. LEXIS 99191, at *26 (finding that the attack "clearly qualifies as an extrajudicial killing").   Iran and MOIS, through their

agent Hezbollah, deliberately killed and/or attempted to kill individuals on site in both the 1983 U.S. Embassy bombing and the 1984 U.S. Embassy Annex bombing. They in no way acted as a regularly constituted court and had no authority to authorize such killings. These acts of terrorism were in fact contrary to those guarantees recognized as indispensable by civilized persons. *Dammarell I,* 281 F. Supp. 2d at 192. In short, the 1983 and 1984 Embassy bombings both qualify as an "extrajudicial killing."

Additionally, the evidence makes clear that Iran and MOIS directed and facilitated the 1983 and 1984 Attacks on the U.S. Embassy and its Annex in Beirut and provided "material support" to their agent Hezbollah in carrying out the attacks. "Material support" is defined as follows:

> "[M]aterial support or resources" means any property, tangible or intangible, or service including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. §§ 2339A(b)(1); 28 U.S.C. § 1605(h)(3).

Iran's involvement in both the establishment of Hezbollah as a terrorist organization and the on-going activities of Hezbollah is beyond question, *see, e.g.,* SOF, ¶¶ 30-34, 60, 70. The United States Government identified Hezbollah as the perpetrator of the 1983 Attack, and further noted that Hezbollah was operating with direct Iranian Government support. *See* Ex. 27, U.S. Department of State, *Patterns of Global Terrorism: 1983*, at 11 ("radical Lebanese Shi'a using the nom-de-guerre Islamic Jihad, operat[ing] with Iranian support . . . were responsible for the suicide bombing attacks against the U.S. Embassy" in Lebanon) (*Dammarell* Ex. 20); SOF, ¶ 49. In fact, in January 1984, following the 1983 Embassy Attack, the U.S. Department of State designated Iran as a state sponsor of terrorism; the designation was based, in part, on Iran's

participation in the 1983 bombing.  *Dammarell I,* 281 F. Supp. 2d at 191; Ex. 23, U.S. Dep't of

State Secretarial Determination 84-3 Designating Iran as a State Sponsor of Terrorism, Jan. 23,

1984 (*Wagner* Ex. 3); SOF ¶ 50.

      Iran and MOIS were *directly* involved in the financing, planning, and carrying out of both

the 1983 and the 1984 Embassy attacks.  In *Dammarell I,* this Court found Iran's role in the 1983

attack to be "central."  281 F. Supp. 2d at 112.  As Dr. Patrick Clawson, the Deputy Director of

the Washington Institute for Near East Policy, testified at the *Dammarell* hearing:

> [T]here's no question that Iran was responsible for the selection of the target,
> provided much of the information for how to carry out the bombing, the expertise
> for how to build the bomb, the political direction that said that this was an
> important target to bomb, provided financial support for the bombers.  It has the
> Iranians' fingerprints all over it. . . .

Ex. 17, *Dammarell* Tr. Vol. II at 20-21; quoted in *Dammarell I*, 281 F. Supp. 2d at 112; SOF,

¶ 47.  Dr. Clawson noted that the 1983 attack was too sophisticated to have been carried out by

the Lebanese groups without significant financial support and technical assistance from Iran and

MOIS.  Ex. 17, *Dammarell* Tr. Vol. II at 20-21; *Dammarell I*, 281 F. Supp. 2d at 112; SOF ¶ 47.

      Likewise, Ambassador Robert Oakley, an expert with extensive knowledge of the

Embassy attacks through his role as the coordinator of anti-terrorism efforts of the U.S.

Department of State at the time, also testified "that the [G]overnment of Iran was involved

*directly* in the Hezbollah organization, which was created, armed, trained, protected, provided

technical assistance by the Iranian Revolutionary Guard[]."  *Id.* (emphasis added); *see also*

*Dammarell I*, 281 F. Supp. 2d at 111-12.  Ambassador Oakley noted that the 1983 Embassy

attack was consistent with "the types of terrorist weapons that Hezbollah and its Iranian sponsors

were using in Lebanon," and with their "worldwide pattern of using bombings at embassies and

other installations of this kind as a terrorist weapon."  Ex. 15, Oakley Dep. Tr. at 48-49; SOF

¶¶ 48, 65.  Ambassador Oakley's assessment that Hezbollah was behind the 1983 bombing of the

U.S. Embassy in Beirut is universally shared by senior and career members of the United States foreign policy establishment. *See* Ex. 15, Oakley Dep. Tr. at 21-22; SOF ¶¶ 48-49, 54.

Based on these statements and the other evidence presented, this Court previously found that Iran and MOIS proximately caused the 1983 Attack. *See Dammarell V*, 2006 WL 2583043, at *1 & n.2, *3. This Court concluded that the evidence presented at trial "show[ed] unquestionably that Iran and MOIS provided material support to Hezbollah, and that this support was the *proximate cause* of the 1983 Beirut embassy bombing and the deaths and injuries that resulted." *Dammarell II,* 2005 WL 756090, at *6 (emphasis added).

Evidence produced in the *Wagner* trial also demonstrated that the 1984 attack on the U.S. Embassy Annex was directed by Iran. Specifically, as both Ambassador Oakley and Dr. Clawson testified, satellite photo evidence, obtained by the U.S. Government, of the Lebanese headquarters of the Iranian Revolutionary Guard showed that the Revolutionary Guard had helped build a replica of the approach to the U.S. Embassy Annex to use as a training course for the suicide bomber, and that there had actually been training runs conducted as practice for the 1984 bombing. SOF ¶¶ 50-59; Ex. 21, *Wagner* Tr. 33:17-34:18, 36:5-21, 37:25-38:25 (Oakley Test.), 47:24-48:5 (Clawson Test.). In short, Iran had directly funded and prepared the perpetrators of the 1984 Attack.

Evidence further showed that the 1984 attack was too sophisticated to have been carried out without significant Iranian Government involvement and support, and also that, like the 1983 Attack, the 1984 Attack was consistent with Iranian tactics in Lebanon and around the world. SOF ¶¶ 54-59. Ambassador Oakley and Dr. Clawson once again testified that the 1984 Attack had been carried out by Hezbollah, and that Hezbollah was directly supported, funded, and

trained by Iran.  *See, e.g.*, SOF ¶¶ 55-59; Ex. 21, *Wagner* Tr. at 27:9-15, 36:5-10 (Oakley Test.);

52:16-54:14 (Clawson Test.); *Wagner*, 172 F. Supp. 2d at 132.

A February 1985 CIA Report specifically noted that Iran "employs radical Lebanese . . .

Shia groups in its terrorist operations," including Hezbollah, which was "behind the attacks on

the US Embassy."  Ex. 33, Directorate of Intelligence *Middle East Terrorism: the Threat and*

*Possible Response*, Feb. 15, 1985.  A number of U.S. Department of State documents also

confirmed the "close and continuing ties between Iran and . . . Hizbollah . . . who bombed the

American [E]mbassy in Beirut last September [1984]," Ex. 31, Cables re: "Islamic Jihad Threat

Against American Hostages" and "Iranian Linkages to Terrorism in Lebanon," Jan. 14, 1985

(*Wagner* Ex. 21), and  noted that Iran's involvement included "providing funds[,] supplying

political ideology, international support, and military and political training,"  Ex. 36, Cable re:

"A Private View of Lebanese Terrorism," Apr. 17, 1987 (*Wagner* Ex. 30); SOF ¶¶ 60, 70.

Without a doubt, Iran clearly "played an intimate and significant role in sponsoring terrorist

activities directed at Americans in Lebanon from 1979 forward, including the bombing of the

U.S. Embassy in September, 1984."  *Wagner*, 172 F. Supp. 2d at 133.

As a result of this and other evidence presented, this Court previously found that the

involvement of Iran and MOIS in the 1984 Embassy Annex Attack justified stripping Iran of its

sovereign immunity in suits related to that Attack.  Judge Jackson concluded that "Hizballah, a

terrorist organization substantially funded and supported by Iran and MOIS since 1979,

perpetrated the September 20, 1984 terrorist bombing of the U.S. embassy in Beirut."  *Wagner*,

172 F. Supp. 2d at 134.  In fact, Iran's responsibility for Hezbollah's actions was such that Judge

Jackson determined that "Hizballah . . . has been shown to be an agency or instrumentality of the

Iranian MOIS, employed . . . by the MOIS" to expel the American presence from Lebanon,

establish an Islamic state, and establish Iranian ascendancy in Lebanon, "by terrorist means when necessary." *Id.* at 132.

Based on this evidence and related testimony, official U.S. Government records, and other documents, this Court should find that Iran and MOIS directed, funded, and otherwise materially supported the 1983 and 1984 attacks on the U.S. Embassy and Embassy Annex in Beirut, causing the deaths and injuries which form the bases of Plaintiffs' claims.

### C.    Plaintiffs' Claims Meet the Requirements of § 1605A(a)(2)(A)(ii)

As noted above, immunity is waived pursuant to § 1605A(a)(2)(A)(ii) where the claim involves a "claimant or victim" who was at the time of the attack 1) a national of the United States; 2) a member of the armed forces; or 3) an employee of the U.S. government acting within the scope of employment.  28 U.S.C. § 1605A(a)(2)(A)(ii).  Plaintiffs here include individuals who, themselves, were "employees of the U.S. Government acting within the scope of [that] employment" at the time of the attack.  *Id.*  Additionally, some Plaintiffs here are immediate relatives of such individuals whose claims are derived from the claims of such U.S. employee "victims."  Because both the U.S. employees injured or killed in the attack *and* their immediate family members meet the requirements of § 1605A(a)(2)(A)(ii), Iran's immunity is waived and this Court may assert jurisdiction over their claims.

### 1.    The U.S. Government Employee Plaintiffs Meet the Requirements of § 1605A(a)(2)(A)(ii)

As set forth in the Complaint, each of the Plaintiffs killed or injured in the 1983 and 1984 Attacks was an employee of the U.S. Government,[14] working in the U.S. Embassy in Beirut, when the attack took place.  Plaintiffs submit as an Exhibit an official letter from the U.S.

---

[14]    One Plaintiff was a member of the armed services, and thus qualifies as a U.S. Government employee as well as a member of the armed services.

Embassy in Beirut, confirming that each of the victims was an employee of the U.S. Government at the time of the attack. *See* Ex. 3.[15] Those employees who were killed in the attack, or were injured and have since died, are represented by a "legal representative," and accordingly fall under § 1605A(c)(4).[16] To summarize, the breakdown of employees killed or injured in each attack is as follows[17]:

**1983 Attack on U.S. Embassy**

- 18 Plaintiff U.S. Government employees were injured
- 20 Plaintiff U.S. Government employees were killed[18]

**1984 Attack on the U.S. Embassy Annex**

- 21 Plaintiff U.S. Government employees were injured
- 6 Plaintiff U.S. Government employees were killed

Because these Plaintiffs fall directly within the terms of § 1605A(a)(2)(A)(ii), they satisfy this element of the jurisdictional requirements under § 1605A.

> **2.      The Immediate Family Members of the U.S. Employees Killed or Injured in the Attack Meet the Requirements of § 1605A(a)(2)(A)(ii)**

Section 1605A also waives immunity for claims by the immediate family members of these victims for compensation for emotional distress and/or solatium, *i.e.*, the mental suffering

---

[15]    At the hearing on causation and damages, these Plaintiffs and other witnesses will present evidence to further support their claim that they were U.S. Government employees acting within the scope of employment at the time of the attack and that their injuries were proximately caused by the attack.

[16]    The legal capacity of the "legal representative" to sue on behalf of a deceased victim in this Action is explained in section V, *infra.*

[17]    As noted earlier, the "Key Information Chart" submitted with this filing at Ex. 2 reflects which Plaintiffs were U.S. Government employees at the time of the attack/s, as confirmed by the U.S. Department of State.

[18]    Some of the employees injured in the attack have since died and are now represented by Legal Representatives.

and anguish resulting from the death or injury of a family member. *See, e.g., Murphy v. Islamic Republic of Iran*, No. 06-cv-596, 2010 WL 3732024, at *17-18 (D.D.C. Sept. 24, 2010) (awarding damages under § 1605A(c) to immediate family members of servicemen killed in the October 23, 1983, bombing of the United States Marine barracks); *Calderon-Cardona v. Democratic People's Republic of Korea*, Civil No. 08-1367(FAB), 2010 WL 2802209, at *17 (D.P.R. July 16, 2010) (awarding compensation to victims' immediate family members under § 1605A(c) for pain and suffering of loss of loved ones killed in Lod Airport attack).[19]

In this case, four of the immediate family members were U.S. citizens at the time of the attack. Immunity is waived as to their claims because they are "claimants" who are "U.S. nationals."

Jurisdiction under § 1605A, however, is not restricted to those immediate relatives who also happen themselves to be U.S. nationals. This Court also has jurisdiction over those 255

---

[19]    In *Bettis v. Islamic Republic of Iran,* the D.C. Circuit held that immediate family members, *i.e.,* parents, siblings, spouses, and children or other "close relatives," have standing to bring solatium claims against state sponsors of terrorism under § 1605(a)(7). 315 F.3d 325, 336-338 (D.C. Cir. 2003). As this Court explained in *Salazar*, "[a] terrorist attack – by its nature – is directed not only at the victims but also at the victims' families . . . . [D]efendants' campaign of attacks . . . was intended not only to harm the victims, but to instill terror in their loved ones." *Salazar*, 370 F. Supp. 2d at 115 n.12; *Fisher v. Socialist People's Libyan Arab Jamahiriya,* 541 F. Supp. 2d 46, 55 (D.D.C. 2008) (Section 1605(a)(7) "contemplates recovery by family members precisely because 'a terrorist attack – by its nature – is directed not only at the victims but also at the victims' families.'"). Thus, courts consistently have permitted immediate family members to recover damages for emotional distress due to either the death or injury of an immediate relative. *See Salazar,* 370 F. Supp. 2d at 115 n. 12 (awarding $5 million to daughter of deceased victim of September 1984 Embassy bombing for intentional infliction of emotional distress and loss of consortium); *Kirschenbaum v. Islamic Republic of Iraq*, 572 F. Supp. 2d 200 (D.D.C. 2008) (awarding parents of injured U.S. citizen $2.5 million, where parents suffered anxiety after hearing of the attack, endured the sight of their son with multiple open wounds, watched him suffer, and thereafter had to deal with the strain on their relationship with their son); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) (awarding pain and suffering to mother for loss of solatium and severe mental anguish from the physical and emotional changes to daughter); *Peterson*, 515 F. Supp. 2d 25 ($2.5 million for pain and suffering to parents of United States servicemen injured in the 1983 Beirut bombing).

immediate relatives who, at the time of the attack, were foreign nationals.[20]  That is because, pursuant to § 1605A(a)(2)(A)(ii), jurisdiction lies over claims where the *victim* was an employee of the U.S. Government acting within the scope of employment.  In this case, the claims of immediate relatives, whether foreign or U.S. citizens, arise from wrongful death and personal injury to U.S. Government employee "victims."

Although there is no case on point under § 1605A, courts have expressly addressed the issue of jurisdiction over the claims of foreign national immediate family members under virtually identical language in the predecessor statute, § 1605(a)(7), and have held that jurisdiction may be exercised over such claims.  *Peterson v. Islamic Republic of Iran* is directly on point.  515 F. Supp. 2d at 41 n.8.  In *Peterson*, a victim of the terrorist attack on the Marine Barracks in Beirut was a U.S. national, but his surviving immediate family members were not U.S. nationals.  *Id.*  The court nonetheless held that immunity was waived as to the solatium claims of the foreign national family members based on the language of § 1605(a)(7)(b)(ii), which provided that the "court shall decline to hear a claim . . . . [if] neither the claimant nor the victim was a national of the United States . . . when the act upon which the claim is based occurred."  *Id.*  The court found that "[t]he 'state sponsored terrorism' exception to the FSIA requires only that *either the plaintiffs or the victim* be a United States national at the time of the attack."  *Id.*  Accordingly, the court held that, because the *victim* was a U.S. citizen, immunity

---

[20]    Since the Attacks, 36 of these foreign national immediate family members have become U.S. citizens through naturalization.

was stripped with respect to the claim of the victim and the related claim brought by the foreign national immediate family member.[21]

Likewise, in *Anderson v. Islamic Republic of Iran*, the court asserted subject matter jurisdiction over the claim of a foreign national (Lebanese) wife of an American victim of state-sponsored terrorism. 90 F. Supp. 2d 107, 113 (D.D.C. 2000). The court explained that "the FSIA confers subject matter jurisdiction over a claim under 28 U.S.C. § 1605(a)(7) if '*either* the plaintiff *or* the victim [is] a United States national at the time of the incident,'" thus held that immunity was waived as to the claims of the victim's Lebanese wife. *Id.* (citation omitted).

The district court in *La Réunion Aérienne v. Socialist People's Libyan Arab Jamahiriya* followed the same reasoning and held that LRA, a French organization representing the interests of the insurers that made payments on behalf of the victims, had standing to pursue claims against Libya related to the victims' injuries. 477 F. Supp. 2d 131, 134-35 (D.D.C. 2007). The court explained:

> Defendants' first argument – that because LRA is not a "national of the United States" it cannot sue Libya – is contradicted by the statute's plain language. The immunity waiver provision only requires that the *victim* (or the claimant) [be] a U.S. national at the time of the terrorist act, and there is no dispute that the victim decedents so qualified. Indeed, Congress specifically amended the state-sponsored-terrorism exception shortly after its first enactment to reject the very position advocated by defendants here. *See* Jurisdiction for Lawsuits Against Terrorist States: Technical Correction, Pub. L. No. 105-11, 111 Stat. 22 (1997) (amending the 1996 amendment by replacing the phrase "the claimant or victim was not" with "neither the claimant nor the victim was"); *see also* H.R. Rep. No. 105-48, at 2 (1997) ("The intent of the drafters was that a family should have the benefit of these provisions if either the victim of the act or the survivor who brings the claim is an American national.").

---

[21]    *Cf. Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 26 (D.D.C. 2008) (finding jurisdiction over family member claims where victim was not U.S. national, but family members were U.S. nationals, holding that *either* the victim or the claimant must have been a U.S. national at the time of the attack).

*Id.* (underlined emphasis added; italics in original).

Thus, as with § 1605(a)(7), Congress, in enacting § 1605A, carefully preserved the jurisdiction of the federal courts over all cases where the victim is a U.S. Government employee. In its most usual application, the new provision ensures that foreign national claimants, who owe their claim to the death of a victim who is a U.S. Government employee, will be assured of their ability to vindicate their claim, along with the claim of the victim, in federal court, as part of a single case.

In sum, to deny the claims of the foreign national immediate family members of the U.S. Government employees killed or injured in the attack would conflict with the broad purpose of the 2008 amendments, which, as expressly stated by Congress, was to "fix[] the inequity" between the rights of U.S. citizen victims of the Embassy attacks to bring claims pursuant to the FSIA and the rights of their foreign national colleagues in the Embassies. 154 Cong. Rec. S54-55 (daily ed. Jan. 22, 2008) (statement of Sen. Lautenberg). As with the U.S. family members of victims, each of these foreign national immediate family members has suffered horrific losses as a result of the injury or death of his or her loved ones who were dutifully serving as foreign national employees at the U.S. Embassy in Beirut. Accordingly, they too have a right to seek justice against Iran.

      **D.**     **Plaintiffs' Claims Are Timely**

          **1.**     **Plaintiffs Have Complied With the 60-day Filing Deadline Under § 1083(c)(3) of the 2008 NDAA**

The 2008 Amendments also set forth specific requirements for bringing a case as a "Related Action." Subsection 1083(c)(3) provides:

     **Related Actions**. – If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code . . . , any other action arising out of the same act or incident may be brought under section

1605A of title 28, United States Code [this section], if the action is commenced
not later than the latter of 60 days after

> (A) the date of the entry of judgment in the original action; or

> (B) the date of the enactment of this Act [Jan. 29, 2008].

28 U.S.C. 1605A note, § 1083(c)(3) of the NDAA.

Here, Plaintiffs have filed this action as a "Related Action" to *Dammarell, Wagner,*

*Salazar,* and *Welch,* because the claims in this case arise out of the same acts that were the bases

of those prior actions – *i.e.,* the 1983 and 1984 bombings of the U.S. Embassy in Beirut,

Lebanon.  As required by § 1083(c) of the 2008 NDAA, each of those related cases was timely

commenced under section 1605(a)(7),[22] and Plaintiffs filed this action on March 28, 2008, within

the 60-day statutory window for filing "related" claims.  *See* Complaint (March 28, 2008).

Accordingly, this action has been properly and timely filed as a Related Action under section

1083(c)(3) of the NDAA.

For the same reasons, this action meets the statute of limitations requirements set forth in

28 U.S.C. § 1605A(b), which provides that an action is timely "if the action is commenced, or a

related action was commenced under section 1605(a)(7) (before the date of the enactment of this

section) . . . not later than the later of (1) 10 years after April 24, 1996; or (2) 10 years after the

date on which the cause of action arose."  Because the related actions were commenced before

April 24, 2006, this action is timely.

---

[22]    All the prior related cases were filed within 10 years of the enactment of the state
sponsorship of terrorism exception on April 25, 1996:  *Dammarell* was filed on October 29,
2001; *Wagner* was filed on July 27, 2000; *Welch* was filed on April 19, 2001; and *Salazar* was
filed on March 22, 2002.

> **2.     The Claims of the Plaintiffs Added in the First and Second Amended Complaints "Relate Back" to the Initial Complaint Under Fed. R. Civ. P. 15(c)**

After filing the initial Complaint, additional victims and their immediate family members came forward, indicating their desire to participate in this Action.[23]  Accordingly, Plaintiffs filed an Amended Complaint on May 22, 2009, incorporating the claims of these previously-unknown Plaintiffs.  *See* First Amended Complaint (May 22, 2009).  Since filing the First Amended Complaint, three more immediate family members of victims have requested to participate in this case.  Their claims have been added to the Second Amended Complaint, submitted on November 19, 2010.  *See* Plaintiffs' Motion for Leave to File a Second Amended Complaint (Nov. 19, 2010).  These claims by these newly-added Plaintiffs are timely because they relate back to the initial, timely-filed Complaint under Federal Rule of Civil Procedure 15(c).

Rule 15(c) of the Federal Rules of Civil Procedure provides that claims of additional plaintiffs in an amended complaint relate back to the date of the original pleading where (1) the new claims arise from the same conduct, transaction or occurrence set forth in the original pleading; and (2) the defendants had notice of the existence and involvement of the new plaintiffs.  *See* Fed. R. Civ. P. 15(c); *Leachman v. Beech Aircraft Corp.*, 694 F.2d 1301, 1308-09 (D.C. Cir. 1982) (examining application of Rule 15(c) to newly added plaintiffs and citing *Williams v. United States*, 405 F.2d 234 (5th Cir. 1968)).  As explained by the D.C. Circuit in *Leachman*, claims by newly added plaintiffs may relate back to the original complaint where a defendant had notice about the operational facts of the claim, the new plaintiffs' interests are identical to those plaintiffs already in the action, and the defendant was put on notice that the

---

[23]     The Key Information Chart attached as Ex. 2 highlights those Plaintiffs who were added in the First and Second Amended Complaints.

plaintiffs' claims were reasonably likely to be involved.  *Id.; see also Peterson v. Islamic Republic of Iran,* Civil Action Nos. 01-2094 (RCL), 01-2684 (RCL), 2007 WL 950080, at *1 (D.D.C. Mar. 28, 2007).

Here, the claims by the new Plaintiffs arise from the same conduct, transaction or occurrence set forth in the original pleading – the 1983 and/or 1984 bombings of the U.S. Embassy in Beirut.  Indeed, the claims are identical to those by the Plaintiffs in the initial Complaint.  *See Leachman*, 694 F.2d at 1308-09; *Fleck v. Cablevision VII, Inc.*, 799 F. Supp. 187, 191 (D.D.C. 1992) (holding that claim by new plaintiff in amended complaint related back to earlier complaint because it was "identical in nature to the claim asserted" by original plaintiffs); *Stoppelman v. Owens*, 580 F. Supp. 944, 947 (D.D.C. 1983) (finding that the claims of new plaintiffs related back to original complaint because the new complaint did not add any new claims).  Further, the Defendants in this case had adequate notice that additional Plaintiffs likely would be identified, given the dozens of employees killed and/or injured in the two bombings, each of whom, in turn, had relatives who suffered as a result of the physical impact of the bombing on their family members.  *See, e.g., Peterson*, 2007 WL 950080, at *1 (notice requirement of Rule 15 satisfied where Second Amended Complaint added claims only by family members of deceased or injured servicemen whose estates or claims already were listed in the First Amended Complaint, but who had not yet been located or indicated an interest in joining the suit at the time the First Amended Complaint was filed); *Page v. Pension Ben. Guar. Corp.*, 130 F.R.D. 510, 512-13 (D.D.C. 1990) (notice to a defendant is accomplished if "the original complaint on its face reveals the existence of additional claimants, and possibly in combination with some conduct by plaintiffs or the defendant" that "justifies an inference that the new claimants were in fact 'involved' in the action" or is accomplished if "the relationship

35

between the original and new plaintiffs forms an 'identity of interest' adequate to support a

finding of notice"). Further, the original Complaint asserted class allegations brought on behalf

of all foreign national victims who worked for the U.S. Government and their immediate family

members.[24] Thus, the Complaint put Defendants on sufficient notice of the additional Plaintiffs

and their claims. Accordingly, the claims of the newly added Plaintiffs relate back to the original

Complaint and are timely.[25]

## III.    PLAINTIFFS ARE ENTITLED TO JUDGMENT AGAINST DEFENDANTS ON THEIR CLAIMS

### A.    Claims of All Plaintiffs Under § 1605A(c)

Once jurisdiction has been established over Plaintiffs' claims against Iran and MOIS,

liability in a default judgment case is established by the same evidence if "satisfactory to the

---

[24]    Plaintiffs' claims are timely for the additional reason that the filing of class allegations tolls the limitations period for members of the class. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("We are convinced that the rule most consistent with federal class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."). Because the newly-added Plaintiffs were putative class members, the limitations period was tolled with respect to their claims.

[25]    While Plaintiffs filed these claims as a "Related Action," they also could have filed these claims as new claims under § 1605A, independent of the earlier action to which their claims are "related," and therefore not subject to the 60-day window for filing. Although the terrorist acts underlying their claims took place in 1983 and 1984, the limitations period on these claims would have been tolled because Plaintiffs could not have sued Iran and MOIS before January 2008. Non-U.S. nationals (including those working for the U.S. government) were barred by the FSIA from suing foreign sovereign for acts of terrorism under the state sponsors of terrorism exception. *Compare* 28 U.S.C. § 1605(a)(7), *with* § 1605A(a). Because the limitations period is equitably tolled during the period in which a state or entity is immune from suit, Plaintiffs filed their claims within a reasonable period of time after the enactment of the 2008 NDAA, the newly-added Plaintiffs' claims are timely. *See Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 60 (D.D.C. 2003) (Lamberth, J.) (finding 2001 suit for extrajudicial killings in 1983 timely; "Iran was immune from suit until passage of Pub. L. No. 104-132, which was made effective on April 24, 1996. Accordingly, the Court concludes that the statute of limitations contained in 28 U.S.C. § 1605(f) does not bar these actions.").

Court." 28 U.S.C. § 1608(e). Plaintiffs' claims are brought under section 1605A(c), the newly-created federal cause of action. That provision authorizes claims against state sponsors of terrorism for compensatory and punitive damages, for personal injury or death caused by acts described in § 1605A(a)(1), for the following categories of plaintiffs:

 (1)  United States nationals;

 (2)  members of the armed forces;

 (3)  employees and contractors of the Government of the United States; acting within the scope of their employment or contract; and

 (4)  legal representatives of persons described in paragraph (1), (2), or (3).

*See* 28 U.S.C. § 1605A(c)(1)-(4).

 Sixty-four of the 314 Plaintiffs in this case were employed by the U.S. Government or were U.S. nationals at the time of the Attacks, or were legal representatives of such individuals, and thus fit within the categories described in § 1605A(c)(1)-(4). The remaining Plaintiffs are immediate relatives of those employees, most of whom are foreign nationals. They, too, are entitled to assert claims pursuant to § 1605A(c). Although they do not fit expressly within the four categories listed in § 1605A(c)(1)-(4), once the immunity of Iran and MOIS has been waived as to their claims,[26] the intent of Congress makes clear that the immediate family members of the U.S. Government employees, notwithstanding their status as foreign nationals, are entitled to bring claims under the federal statutory cause of action and seek damages for their losses, including solatium/consortium and pain and suffering. Given the purposes behind the new statute to "fix[] the inequality," *infra* p. 13, of rights between U.S. citizens and those non-U.S. citizens, stripping the immunity and then excluding this class of Plaintiffs from seeking

---

[26]  *See* section II.C, *supra.*

relief under the federal private right action would wholly undermine the purposes of this litigation.

Indeed, it was the disparity among the various state laws regarding the recovery of emotional distress by immediate family members that prompted Congress to create a federal statutory cause of action that would provide equality and uniformity in the recovery of compensatory damages regardless of a Plaintiffs' domicile. *See* 154 Cong. Rec. S54 (daily ed. Jan. 22, 2008) (statement by Sen. Lautenberg) (expressly stating that the amendments intended to fix the problem of "judges hav[ing] been prevented from applying a uniform damages standard to all victims in a single case because a victim's right to pursue an action against a foreign government depends upon State law").

In short, having met the requirements of §1605A(c), all Plaintiffs are entitled to judgment under the federal private right of action, holding that Iran and MOIS are liable for any injuries caused by the 1983 and 1984 Attacks.[27]  Indeed, because the elements of a claim under §1605A(c) incorporate the elements required to waive the foreign state's immunity and vest the court with subject matter jurisdiction under section 1605A, "liability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met." *Calderon-Cardona*, 2010 WL 2802209, at *16.  *See also Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (explaining that the elements of immunity and liability are "essentially the same [under the new amendments] in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action" under § 1605A(c)); *Murphy*, 2010 WL 3732024, at *17-18 (analyzing liability and jurisdiction together); *Brewer*, 664 F. Supp. 2d at 52 ("[I]f immunity is

---

[27]    Plaintiffs will brief the elements of causation and damages for the Court in Phase II of the proceedings.

waived, the Act provides for economic damages, solatium, pain and suffering, and punitive

damages."); *Gates,* 580 F. Supp. 2d at 64-69 (analyzing liability under same elements of

jurisdiction and finding liability where extrajudicial killing and material support elements

satisfied).[28]

### B.    Alternative Claims of Foreign National Immediate Family Members Under State and/or Foreign Law

Even if this Court were to conclude that immediate family members who are not

themselves U.S. nationals cannot avail themselves of a *federal* cause of action, the foreign

national immediate family members may pursue claims under applicable state and/or foreign

law.  Section 1605A did nothing to disturb the principle, well-established in the case law of this

Circuit, that the waiver of sovereign immunity, in the absence of a federal cause of action, allows

a claimant to pursue claims under applicable state or foreign law.  *See, e.g., Dammarell II,* 2005

WL 756090, at *8, 11-12.  As the D.C. Circuit made clear in *Simon v. Republic of Iraq,* the new

federal statutory cause of action is not the exclusive source of law for terrorism-related claims.

529 F.3d at 1192 (finding that plaintiff may pursue claims under the predecessor statute,

§ 1605(a)(7)).  Indeed, plaintiffs injured or killed as a result of state sponsored terrorist attacks

have pursued claims under both the federal private right of action and applicable state law, and

are precluded only from seeking a double recovery.  *See, e.g., Belkin v. Islamic Republic of Iran*,

---

[28]    The court in *Calderon-Cardona* further noted that

[t]he fact that liability arises once sponsorship of terrorist activities is
demonstrated for jurisdictional purposes is not surprising because "[s]ponsorship
of terrorist activities inherently involves a conspiracy to commit terrorist attacks.
As a co-conspirator, both with its own agents, such as the terrorist organization
and the ultimate perpetrators, the foreign state is also a joint tortfeasor."

2010 WL 2802209, at *16 n.25 (quoting *Flatow*, 999 F. Supp. at 27, *rev'd by Cicippio-
Puleo*, 353 F.3d at 1027).

667 F. Supp. 2d 8, 22-23 (D.D.C. 2009) (plaintiffs brought claims for wrongful death under both 1605A(c) and Israeli law, but court awarded damages under § 1605A(c) only in order to avoid a duplicative damages award).

In determining whether a cause of action is available under state or foreign law, and which law to apply in the absence of a federal cause of action, federal courts addressing FSIA claims in the District of Columbia apply the choice of law rules of the forum state, *i.e.,* the District of Columbia. *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 840 (D.C. Cir. 2009); *Dammarell II*, 2005 WL 756090, at *18.

First, the court must determine if there actually is a conflict between the law of the forum and the law of the alternative forums. If there is no true conflict, the court should apply the law of the forum. *See USA Waste of Maryland, Inc. v. Love,* 954 A.2d 1027, 1032 (D.C. Ct. App. 2008) ("A conflict of laws does not exist when the laws of the different jurisdictions are identical or would produce the identical result on the facts presented.").

Second, if there is a conflict, the District of Columbia employs a "'constructive blending' of the 'government interests' analysis and the 'most significant relationship' test" to determine which law to apply. *Oveissi,* 573 F.3d at 842; *Dammarell II*, 2005 WL 756090, at *18 (citation omitted). In *Dammarell*, this Court explained that approach:

> "Under the governmental interests analysis as so refined, we must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules & Co.,* 566 A.2d at 40. As for the "most significant relationship" component of the analysis, the D.C. Court of Appeals directs courts to section 145 of the Restatement of the Conflicts of Laws, which identifies four relevant factors: (i) 'the place where the injury occurred'; (ii) "the place where the conduct causing the injury occurred"; (iii) "the place where the relationship, if any, between the parties is centered" and (iv) "the place where the relationship, if any, is centered." Restatement (Second) of Conflicts § 145 (1971). Section 145 also references the factors in Section 6 of the Restatement, which include the needs of the interstate and international systems, the relevant policies

40

of the forums, the relevant policies of other interested states, certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied. *Id.*

*Dammarell II*, 2005 WL 756090, at *18*; see also Oveissi,* 573 F.3d at 842; *Heiser*, 466 F. Supp. 2d at 266.

Third, it bears noting that as a general rule, the law of the forum governs, "unless the foreign state has a greater interest in the controversy." *Kaiser-Georgetown Cmty. Health Plan v. Stutsman,* 491 A.2d 502, 509 (D.C. 1985). Moreover, when the interests of both jurisdictions are "equally weighty," courts consider the "substantial savings that can accrue to the State's judicial system when its judges are able to apply law with which they are thoroughly familiar or can easily discover . . . ." *Id.* at 509 n.10 (citations and internal quotation marks omitted).

Fourth, in a mass tort or accident case, uniformity – if fully justifiable and consistent with underlying conflict of law principles – is itself a virtue. It simplifies the process. And it also ensures equality of treatment between victims where differential results between victims would appear to any lay person to be arbitrary and unjust.

In this case, the laws of the following jurisdictions potentially apply: the law of the forum (D.C. law), the *lex loci* or law of the place of injury (Lebanon, which also happens to be the domicile of most of the Plaintiffs), or the law of the domicile of each Plaintiff (includes Lebanon, France, Saudi Arabia, Canada, Tunisia, California, Florida, Kentucky, New Jersey, and Texas).

### 1.    District of Columbia Law – The Law of the Forum

In this case, the governmental interests strongly favor the application of some type of U.S. law over Lebanese and other foreign law. Courts have repeatedly recognized that "[t]he United States has a unique interest in having its domestic law – rather than the law of a foreign nation – used in the determination of damages in a suit involving such an attack." *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 22 (D.D.C. 2005) (citing Restatement (Third) of

41

Foreign Relations Law § 402(3) (1987)).  As this Court noted in *Dammarell,* this is particularly

true when the attack is targeted on a U.S. embassy and its employees:

> The injuries in this case are the result of a state-sponsored terrorist attack on a
> United States embassy and diplomatic personnel.  The United States has a unique
> interest in its domestic law, rather than the law of a foreign nation, determining
> damages in a suit involving such an attack.  *See* Restatement (Third) of Foreign
> Relations Law § 402(3) (1987) (recognizing that the United States has an interest
> in projecting its laws overseas for "certain conduct outside its territory by persons
> not its nationals that is directed against the security of the state or against a
> limited class of other state interests").  [These considerations] elevate the interests
> of the United States to nearly its highest point.

*Dammarell II,* 2005 WL 756090, at *20.  This is a case where the interests of the United States

of America were intended to be threatened and harmed by an action directed against the

property, the nationals, and (most important here) the employees of the U.S. Government.  Here,

while the Plaintiffs in this case are U.S. Embassy employees and their families, the U.S. interests

in guaranteeing redress are equally powerful and are elevated to their highest point.  *All* the

claims derive from employment with a federal agency headquartered in the District of Columbia,

the seat of the federal government.

Congress's recent amendments to the FSIA were intended to strengthen enforcement of

U.S. terrorism laws and extend their protections to foreign nationals who are employees of U.S.

embassies targeted by terrorists, and their immediate family members, to the same extent as

made available to U.S. citizens.  U.S. Government employment is the central and determinative

nexus.  The application of D.C. law would promote uniformity of relief among immediate family

members of U.S. employees – whether they are U.S. nationals or not – which is not only a

relevant consideration for the choice of law analysis,[29] but a key purpose of the amendments to

---

[29]      For example, the elements required for relief for claims for damages for intentional
infliction of emotional distress under D.C. law and under the federal private right of action are

(continued…)

the FSIA terrorism exception and the creation of a statutory cause of action for victims of

terrorism.  The same standards for emotional distress and solatium/consortium claims would

apply under D.C. law and under the federal private right of action, as courts look to the law of

the District of Columbia, the dedicated venue for actions for foreign states, *see* 28 U.S.C.

§ 1391(f)(4), as the "model for the development of a federal standard with respect to liability in

actions against state sponsors of terrorism."  *See In re Islamic Republic of Iran Terrorism Litig.,*

659 F. Supp. 2d at 100 (citing *Flatow I,* 999 F. Supp. at 15 n.6).  Thus, the application of D.C.

law – the presumptive law as the law of the forum – promotes the interests of both efficiency and

fairness, consistent with Congress's stated interests in enacting the recent terrorism legislation.

Moreover, the interest of the forum here is at the very least equal to, and in fact greater

than, that of Lebanon, the *lex loci*, or the domiciles of the Plaintiff immediate family members at

the time of the attack, and thus D.C. law should apply to all of the claims of the immediate

family members.  *See Kaiser-Georgetown Cmty. Health Plan, Inc.,* 491 A.2d at 509 (the law of

the forum is the presumptive law); *In re Air Crash Disaster Near Saigon, South Vietnam on*

*April 4, 1975*, 476 F. Supp. 21 (D.D.C. 1979) (applying D.C. law, the law of the forum, to claims

arising out of air crash in Vietnam, killing and injuring Vietnamese orphans that were en route to

the U.S.).

Finally, District of Columbia law parallels Lebanese law (*lex loci*), in any event,

regarding the availability of a claim for emotional distress, solatium and/or consortium related to

---

(continued…)

identical.  *Compare Murphy¸* 2010 WL 3732024, at *20 (analyzing § 1605A emotional distress claims as requiring (1) "extreme and outrageous conduct which (2) was directed at persons other than plaintiffs which (3) intentionally or reckless caused severe emotional distress"), *with Dammarell IV*, 404 F. Supp. 2d at 275 (requiring (1) "extreme and outrageous conduct which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress").

the wrongful death or tortious injury of an immediate relative, and thus it is entirely appropriate

to apply the law of the forum.  Indeed, it appears (as discussed below) that the basic claim at

issue is widely accepted.  There is no real conflict of law between the law of the forum and the

*lex loci*.  Like D.C. law, Lebanese law allows for the award of compensation for "moral

damages," *i.e.,* emotional distress, suffered as the result of the wrongful death or tortious injury

of an immediate relative.  *See* Ex. 1, Lebanese Law Opinion §§ 3.1-3.2 (Nov. 19, 2010).

Likewise, under Lebanese law, an heir of a decedent may bring the equivalent of a "Survival

Act" claim under D.C. law on behalf of the heirs to recover damages for emotional distress

suffered by a decedent before death.  *Id.* § 3.1.  Thus, there is no class of conflicting interests,

with one set of laws pointing one way, and another set of laws the other way, that suggests that

the forum ought to defer to the overriding interest of some alien state or nation.  Accordingly,

because there is no actual conflict between Lebanese law and D.C. law with respect to the claims

of those immediate family members, and the interests of the United States in the uniform

protection of its employees, there is no reason not to apply D.C. law here.

## 2.    Lebanese Law – *Lex Loci*

If the Court declines to apply federal law and D.C. law, the *lex loci*, Lebanese law, also

would provide a cause of action for these immediate family members who are not U.S. nationals.

The attack took place in Lebanon and that central fact provides a unified and common

denominator linking all of the claims in the case.  Given the Congressional desire for uniformity,

the significance of the common denominator in the form of the *lex loci* – where all the active

events and the most immediate injuries took place – provides a particularly reasonable source of

law.

Moreover, most of the Plaintiff immediate family members were actually domiciled in

Lebanon at the time of the attack.  As explained above, Lebanese law recognizes a cause of

44

action for moral damages, *i.e.* emotional distress, suffered by the immediate family members as a result of the wrongful death or tortious injury of a loved one, and it also recognizes the right of the heirs of a decedent to bring a moral damages claim on behalf of the decedent relative for those damages suffered prior to death. Ex. 1, Lebanese Law Opinion §§ 2.1-2.2, 3.1. Lebanon has a significant interest in protecting victims of terrorism within its borders, and the application of Lebanese law, the *lex loci,* to all of the Plaintiffs' claims, would promote the interests of uniformity, efficiency, cost-effectiveness, and substantial justice, in resolution of these claims.

### 3.    Law of the Domicile of Each Plaintiff

Finally, if the Court were to reject all of those alternatives, the parties would be put to the burden and expense of showing that the law of their particular domicile would provide a cause of action for emotional distress. While most of the foreign national immediate relative Plaintiffs in this case were domiciled in Lebanon – and we have shown that Lebanon does provide such an action – the fact remains that a small number of others resided in France, Saudi Arabia, Canada, Tunisia, California, Florida, Kentucky, New Jersey, and Texas at the time of the attack. Should the Court make the determination that the law of the domicile must be applied, we request that the Court provide early notice of that fact, and Plaintiffs' counsel will endeavor to provide the Court with a memorandum regarding the law of intentional infliction of emotional distress, solatium, and consortium claims with respect to each of these jurisdictions.

## IV.    THE HEIRS AT LAW OF THE DECEASED PLAINTIFFS ARE PROPER LEGAL REPRESENTATIVES OF THE DECEDENTS

The federal statutory private cause of action permits the "legal representative" of a decedent victim to claim compensation for personal injury or death on behalf of the decedent. 28

U.S.C. § 1605A(c)(4).[30]  In this case, 71 of the Plaintiffs are proceedings as Legal

Representatives of decedents.  Because these individuals may no longer assert their own claims,

a "legal representative" has been identified to assert the claims on their behalf.

Courts have not yet addressed the issue of capacity to sue as a "legal representative"

under 28 U.S.C. § 1605A(c), however, D.C. courts have addressed a representative's capacity to

sue under similar language in the D.C. Survival Act, D.C. Code § 12-101.[31]  The Survival Act

provides, in relevant part that:

> On the death of a person in whose favor or against whom a right of action has
> accrued for any cause prior to his death, the right of action survives in favor of or
> against the *legal representative* of the deceased.

D.C. Code § 12-101 (emphasis added).  Courts have held that the term "legal representative" in

the Act applies to "any person who, whether by virtue of testamentary act or (by) operation of

law, stands in the place of the decedent with respect to his property . . . ."  *In re Air Crash*

*Disaster Near Saigon, South Vietnam on April 4, 1975*, 476 F. Supp. at 525 (quoting *Strother v.*

*Dist. of Columbia*, 372 A.2d 1291, 1296 (D.C. 1977)); *see also Thomas v. Doyle*, 187 F.2d 207,

210 (D.C. Cir. 1951).

---

[30]    To the extent the Court holds that the foreign national family members may only proceed
with claims exclusively under state law, the D.C. Survival Act, D.C. Code § 12-101, provides a
cause of action to be brought by a "legal representative" on behalf of the deceased family
members to recover compensation for solatium and/or intentional infliction of emotional distress
(*see* discussion *supra*).

[31]    Reference to D.C. law is appropriate where a federal statute provides a cause of action,
but omits particular details.  *In re Islamic Republic of Iran Terrorism Litig.,* 659 F. Supp. 2d at
100, *supra* p. 45; *see also Agency Holding Corp. v. Malley-Duff & Assoc.,* 483 U.S. 143 (1987)
("Given our longstanding practice of borrowing state law, and the congressional awareness of
this practice, we can generally assume that Congress intends by its silence that we borrow state
law.").

In particular, courts have held that the term "legal representative" "is *not* restricted to duly appointed personal representatives, *i.e.,* executors or administrators." *See In re Air Crash Disaster Near Saigon*, 476 F. Supp. at 526 (citing *Thomas*, 187 F.2d 207 and *Strother*, 372 A.2d 1291) (emphasis added).  As explained in *Thomas v. Doyle*:

> The term "legal representatives" is not necessarily restricted to the personal representative of one's deceased, but is sufficiently broad to *cover all persons who, with respect to his property, stand in his place and represent his interests*, whether transferred to them by his act or by operation of law.  Reference to Words and Phrases also discloses the wide gamut of persons encompassed by the term, among the most common of which are "heirs" . . . .

187 F.2d at 210 (emphasis added; quotation omitted). [32]  *See also Young v. Fireman's Ins. Co. of Washington, D.C.,*  463 A.2d 675, 676 (D.C. 1983) (a legal representative is "anyone who succeeds to the rights of another, such as heirs, next of kin, assignee by contract or operation of law, a trustee, receiver, etc., such a meaning being determined by the intention of the parties as manifested by the surrounding facts and circumstances."  (citing *Mutual Life Ins. Co. v. Armstrong*, 117 U.S. 591, 597 (1886) ("The term 'legal representatives' is not necessarily restricted to the personal representatives of one deceased, but is sufficiently broad to cover all persons who, with respect to his property, stand in his place and represent his interests, whether transferred to them by his act or by operation of law")).  Thus, under District of Columbia law,

---

[32]    As one court noted, while claims under the Wrongful Death Act may be brought by the "personal representative," *i.e.,* a qualified executor and administrator, "a personal representative who brings an action under the Wrongful Death Act is a nominal party only and does not act in his capacity as executor or administrator."  The court explained:

> Damages recovered for wrongful death are not assets of the decedent's estate and (except for expenses of last illness and burial) may not be appropriated to payments of debts and liabilities of the decedent.  Rather any amount recovered inures to the benefit of the decedent's next of kin, and the personal representative acts only as a trustee on behalf of the decedent's family.

*Strother*, 372 A.2d at 1296 n. 10 (citation omitted).

heirs at law are entitled to recognition as legal representatives in a survival action on behalf of a decedent's estate. *See In re Air Crash Disaster Near Saigon*, 476 F. Supp. at 526 n.10; *Strother*, 372 A.2d at 1296.[33]

In this suit, each of the "legal representatives" designated in the Second Amended Complaint is an heir at law of the deceased victim or family member. The "Key Information Chart" attached at Exhibit 2 lists each of the decedent Plaintiffs in this case, the decedent's domicile at the time of death, and the legal representative for the decedent. Plaintiffs have available for submission to the Court relevant documentation and/or applicable law based on which the heirs at law may be identified for each of the decedent Plaintiffs should the Court so require.[34]

## CONCLUSION

For the reasons set forth above, this Court should enter judgment on liability against Iran and MOIS in favor of Plaintiffs and find Defendants liable for the personal injuries and wrongful deaths of the victims of the 1983 and 1984 terrorist attacks on the U.S. Embassy in Beirut and their immediate family members. As this Court has observed, no amount of monetary or other relief can ever bring back those who were killed or restore the lives of those who have been injured and suffered. Yet, Iran and MOIS must be held accountable for their horrific acts, and, thus, this litigation is necessary to provide Plaintiffs justice.

---

[33] Similarly, the federal regulations governing payment of awards by the Foreign Claims Settlement Commission provides that a decedent's award will be paid to his "legal representative," 31 C.F.R. § 250.4(b), and defines "legal representative" to include "successors in interest of the decedent, e.g., his legatees or heirs as determined by an appropriate court or by the law of his residence." *See* 31 C.F.R. § 250.4(b)(4).

[34] For example, the Lebanese Law Opinion explains the law of succession under Lebanese law and describes the documentation that supports the identification of the heirs-at-law. *See* Ex. 1.

Respectfully submitted,


  /s/ Stuart Newberger
Stuart H. Newberger, D.C. Bar No. 294793
Michael L. Martinez, D.C. Bar No. 347310
Laurel Pyke Malson, D.C. Bar No. 317776
Katherine J. Nesbitt, D.C. Bar No. 474681
Timothy L. Foden, D.C. Bar. No. 979947
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
Facsimile: (202) 628-5116
Attorneys for Plaintiffs

November 19, 2010

49