# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ESTATE OF JOHN DOE, et al.,**

  **Plaintiffs,**

   **v.**          Civil Action No.  08-540 (JDB)

**ISLAMIC REPUBLIC OF IRAN, et al.,**

  **Defendants.**

## <u>MEMORANDUM OPINION</u>

Twenty-eight years ago, on April 18, 1983, Shi'ite Muslim militants attacked the United States Embassy in Beirut, Lebanon, killing sixty-three people and injuring scores of others in an unprecedented assault on a U.S. diplomatic compound.  On September 20, 1984, another attack targeted the new location of Embassy operations ("Embassy Annex") in another area of Beirut, killing at least eleven people and injuring over fifty individuals.  These tragic facts have been recounted in several mass-tort lawsuits brought by the victims of this terrorism against the Islamic Republic of Iran ("Iran") and its Ministry of Information and Security ("MOIS"), as permitted by a 1996 amendment to the Foreign Sovereign Immunities Act ("FSIA") that revoked jurisdictional protection for terrorist-sponsoring governments.  This area of law continues to evolve.  Most recently, and relevant here, the National Defense Authorization Act for Fiscal Year 2008 amended the FSIA to permit foreign national employees of the United States government killed or injured while acting within the scope of their employment and their family members to sue a state sponsor of terrorism for injuries and damages resulting from an act of terrorism.  Here, almost all plaintiffs are foreign national employees of the U.S. Government and their immediate

family members.  This Court is the first to address the claims of foreign national immediate family members of U.S. government employees under the 2008 FSIA amendments.

**Background**

Plaintiffs bring this case pursuant to section 1083 of the National Defense Authorization Act for Fiscal Year 2008 ("2008 NDAA" or "Act"), Pub. L. No. 110-181, § 1083, 122 Stat. 341 (2008) (codified at 28 U.S.C. §1605A (2009)), as a "Related Action" to <u>Dammarell v. Islamic Republic of Iran</u>, No. 01-2224, 2006 WL 2583043 (D.D.C. Sept. 7, 2006)[1];  <u>Salazar v. Islamic Republic of Iran</u>, 370 F. Supp. 2d 105 (D.D.C. 2005), <u>Wagner v. Islamic Republic of Iran</u>, 172 F. Supp. 2d 128 (D.D.C. 2001), and <u>Welch v. Islamic Republic of Iran</u>, Civ. A. No. 01-863, 2007 U.S. Dist. LEXIS 99191 (D.D.C. Sept. 20, 2007), <u>adopted by the district court in</u> 2007 U.S. Dist. LEXIS 99192 (D.D.C. Oct. 15, 2007).

Plaintiffs are 58 foreign national employees of the U.S. Government and one U.S. national employee of the U.S. Government, who were working in the U.S. Embassy in Beirut, Lebanon, and were killed or injured as a result of the 1983 or 1984 terrorist attacks, and 255 of their immediate family members.  Pl.'s Mot. for Summ. Judg. on Liability ("Pl.'s Mot.") [Docket Entry #31] at 1-2.  Plaintiffs bring their claims against Iran and MOIS (collectively "Defendants") pursuant to the 2008 NDAA, which amended the FSIA to permit foreign national employees of the United States Government killed or injured while acting within the scope of

---

[1]The findings this Court entered over the course of the <u>Dammarell</u> case are found at 281 F. Supp. 2d 105 (D.D.C. 2003) ("<u>Dammarell I</u>"); No. 01-2224, 2005 WL 756090 (D.D.C. Mar. 29, 2005) ("<u>Dammarell II</u>"); 370 F. Supp. 2d 218 (D.D.C. 2005) ("<u>Dammarell III</u>"); 404 F. Supp. 2d 261 (D.D.C. 2005) ("<u>Dammarell IV</u>") (containing factual findings expressly incorporated into the final judgment); and 2006 WL 2583043 (D.D.C. Sept. 7, 2006) ("<u>Dammarell V</u>") (final judgment).

their employment, members of the armed services, and their family members, to sue a state sponsor of terrorism for injuries and damages resulting from an act of terrorism. See 28 U.S.C. § 1605A(a)(2)(A)(ii)(II)&(III) (2009).

The U.S. government employee plaintiffs assert claims for wrongful death and/or personal injury pursuant to 28 U.S.C. § 1605A(c) and seek damages for economic loss, pain and suffering, and emotional distress. See Third Am. Comp. [Docket Entry #32] ¶¶ 363-67. Plaintiffs who are the immediate family members of these U.S. government employees assert claims for emotional distress and solatium or consortium pursuant to 28 U.S.C. § 1605A(c) or, in the alternative, pursuant to D.C. law (the law of the forum), Lebanese law (lex loci), or the law of the domicile of the Plaintiff at the time of the attack. Id. ¶¶ 368-76. The U.S. Government employees and family members who are deceased are each represented by a legal representative, who is an heir-at-law for the decedent and who seeks survival damages. Id. ¶¶ 377-80.

This Court and other courts in this district have held in several cases that defendants Iran and MOIS directed and facilitated the 1983 and 1984 attacks on the U.S. Embassy and therefore proximately caused the injuries sustained by the victims of those attacks. In each case, Iran and MOIS were held liable to the victims of these attacks and their immediate family members for compensatory damages. See Brewer v. Islamic Republic of Iran, 664 F. Supp. 2d 43, 47 (D.D.C. 2009) (1984 attack); Welch, 2007 U.S. Dist. LEXIS 99191, at *12-20. (1984 attack); Salazar, 370 F. Supp. 2d at 107-08 (1983 attack); Dammarell V, 2006 WL 2583043, at *1-2 (1983 attack); Wagner, 172 F. Supp. 2d at 133 (1984 attack). Here, the Court must again determine defendant's liability to this new class of plaintiffs, which requires an analysis of the jurisdictional grant and cause of action provided by the 2008 NDAA as it amended the FSIA.

Plaintiffs initiated this action on March 28, 2008, and effected service on November 18, 2009, in accordance with 28 U.S.C. § 1608(a)(4). Defendants failed to respond, and the Clerk of Court entered a default on January 29, 2010. Before plaintiffs can be awarded any relief, this Court must determine whether plaintiffs have established their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e); see also Roeder v. Islamic Republic of Iran, 333 F.3d 228, 232 (D.C. Cir. 2003). In evaluating plaintiffs' claims, the Court "may accept [plaintiffs'] uncontroverted evidence as true and may rely on sworn affidavits." Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 268 (D.D.C. 2003). The Court is not required to hold an evidentiary hearing, see Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 78 (D.D.C. 2006), and "may take judicial notice of related proceedings and records in cases before the same court." Salazar, 370 F. Supp. 2d at 109 n.6. Based on the record herein, and relying upon related cases involving the same incident and defendants, this Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

On April 18, 1983, at approximately 1:05 p.m., an unidentified driver crashed a vehicle laden with hundreds of pounds of explosives into the main entrance of the United States Embassy in Beirut. See Exs. 4-9 [2]; Dammarell IV, 404 F. Supp. 2d at 271. Upon crashing into the Embassy, the vehicle exploded with a force so powerful that seven floors in the center section of the crescent-shaped building collapsed, or "pancaked." Id. Portions of the Embassy, including

_____

[2] Exhibit ("Ex. __") references are to the exhibits attached to plaintiffs' motion for summary judgment on liability, which differ from the exhibit numbers cited in prior Dammarell cases that referred to the evidence admitted at the April 2003 hearing regarding the 1983 bombing.

the Marine security guard post, the cafeteria, the United States Information Service library, the personnel section, and the consular section, were completely destroyed by the blast. Id.; Exs. 16, 54. Other parts of the building were severely damaged. Id. As a result of the blast, at least fifty-two people were killed and more than thirty-four others were injured.[3] See Ex. 4.

Following the 1983 Attack, embassy operations were temporarily transferred to the Embassy Annex, in what was believed to be a safer part of the city. See Exs. 20, 52. Despite this precaution, on September 20, 1984, shortly before noon, another vehicle loaded with thousands of pounds of explosives was denoated just outside of the Annex ("the 1984 Attack," and together with the 1983 Attack, "the Attacks"). See, e.g., Ex. 20, 53, 11. The bomb severely damaged the Annex. See Exs. 20, 28. At least eleven people were killed, including several Lebanese citizens, and at least fifty-eight others were injured.[4] See Ex. 4, 5, 20.

The 1983 bombing was the first large-scale attack against a U.S. Embassy anywhere in the world. See Ex. 15 (Oakley Dep. Tr.) at 22; see also Ex. 16 (Tr. Vol. I at 121-22). At the time, it was not immediately clear who was responsible for the bombing. See, e.g., Ex. 17 (Tr. Vol. II at 27-28); Ex. 15 (Tr. Vol. I at 121). But by 1984, the U.S. State Department, in its annual publication "Patterns of Global Terrorism: 1983," noted that "radical Lebanese Shi'a using the nom-de-guerre Islamic Jihad" and "operat[ing] with Iranian support and encouragement" were "responsible for the suicide attack[s] against the U.S. Embassy." See Ex. 27; Ex. 15

---

[3] Various sources have reported larger numbers for the casualties of the 1983 Embassy Attack, but there is no question that at least fifty-two people were killed and at least thirty-four others were injured. See, e.g. Exs. 16, 22; Dammarell IV, 404 F. Supp. 2d at 271.

[4] As with the 1983 bombing, various sources have reported different numbers of casualties. See, e.g., Ex. 5. But there is no question that at least eleven people were killed and at least fifty-eight others were injured.

(Oakley Dep. Tr.) at 21:15-22:6 ("I am confident that the government of Iran was involved directly [in the 1983 bombing] by the Hisballah organization . . . I don't think there is any doubt.").  The terrorist group Islamic Jihad has been known by various names, including Right Against Wrong, the Revolutionary Justice Organization and, perhaps most commonly, Hizbollah.[5]  See Ex. 15 (Oakley Depo. Tr.) at 46.  Ambassador Robert Oakley -- who, as the coordinator of the State Department's counterterrorism efforts, was tasked with assessing who was behind the 1983 Beirut Embassy bombing, see Ex. 15 (Oakley Dep. Tr.) at 9 -- testified that it ultimately became "very clear that Islamic Jihad [Hizbollah] was behind the bombing in 1983." Id. at 21.  Ambassador Oakley further expressed "confiden[ce] that the government of Iran was involved directly in the Hisballah organization, which was created, armed, trained, protected, provided technical assistance by the Iranian Revolutionary Guards."  Id. at 21.

Within about two weeks of the 1984 Attack, the investigation had uncovered satellite photo evidence indicating Iranian direction and planning of the Attack.  Ex. 21; See Wagner, 172 F. Supp. 2d at 132.  Both Attacks were consistent with Iran's pattern of targeting U.S. interests in the region, and the complexity of the attack upon the U.S. Embassy in Beirut evidenced Iran's central role in the attack.  See Exs. 15, 17, 21, 26; Dammarell I, 281 F. Supp. 2d at 112.  At the Dammarell evidentiary hearing, Dr. Patrick Clawson, Deputy Director of the Washington Institute for Near East Policy, see Ex. 17 (Tr. Vol. II at 3), and an expert in Iranian politics, the Iranian economy, and Iranian sponsorship of terrorism, testified:

---

[5] Transliteration of the organization's name has produced various spellings, including "Hizbollah," "Hizballah," and "Hezbollah."  For ease of reference, Hizbollah is used herein, except where an alternate spelling is reflected in exhibits or the official transcript of proceedings.

[T]here's no question that Iran was responsible for the selection of the target, provided much of the information for how to carry out the bombing, the expertise for how to build the bomb, the political direction that said that this was an important target to bomb, provided financial support for the bombers. It has the Iranians' fingerprints all over it. . . .

[T]his was quite a sophisticated and large bomb against a well-guarded target. And at the time, the people from the Shi'a community who claimed responsibility for this were just getting into the business of having a militia and having -- and engaging in some kinds of bombings. They hadn't done a whole lot. They didn't have established expertise; they didn't have a group of people locally whom they could draw upon to do this.

And furthermore, at this time they were so dependant upon financial support from Iran, they had no independent means of financial support, and furthermore, they were so dependant upon political guidance from Iran, Iran was quite directly ordering what targets to do, what not to do.

Id. (Tr. Vol. II at 20-21).

The bombing of the U.S. Embassy in Beirut in April 1983 represented a turning point with respect to Iran-sponsored terrorism conducted in Lebanon by Hizbollah. As Ambassador Oakley testified at the Dammarell evidentiary hearing:

I think it was a seminal event in anti-U.S. terrorism[,] and Lebanon seems to be the easiest place for the Iranians to operate. As I've said before, they had several purposes, one was to drive the United States out of Lebanon, its military forces and also . . . cultural influence. Same thing is true of the French who were supporting universities there and also had military forces there as part of the Multinational Force. The Iranians wanted to drive us out so they could put in an Iranian Shìia revolutionary state. The second thing they wanted to do is to punish the United States for its support of Iraq, against Iran in the Iraq/Iran war, which at that stage was at its peak and the Iranians were at the losing end of it at that stage so they wanted to make it very, very clear they were going after us. The third thing they wanted to do was -- all of these were helped by blowing up our embassy, was to show the power which Iran and its supporters could generate. And here you have something that's not quite as powerful, but almost as the removal of the Shah as supported by the United States and indirectly by Israel. And finally they wanted to cement their relationship within the entire Middle East by showing what they could do against us, which made them a force throughout the [Muslim] world, if you will. . . . So it serve[d] several different purposes for the government of Iran and did so with a degree of success. [Although] we stood our ground, we weren't driven out of Lebanon at this stage. It was only later on when they blew up the [Marine] barracks, which was a huge shock to

the American people that finally public and political pressure convinced the Reagan administration they should pull the U.S. forces out of Lebanon.

Ex. 15 (Oakley Dep. Tr.) at 50-52.

The 1979 Iranian revolution and the 1982 Israeli invasion of Lebanon led to a radicalization of Lebanon's Shi'ite community, and ultimately to the formation, by Iran, of Hizbollah. See Ex. 26; see also Ex. 17 (Dammarell Tr. Vol. II 9:16-19, Clawson Test.) ("Iran encourage[d] the formation of Hisballah to fight the Western presence in Lebanon, to engage in armed struggle against the Israelis, and also to agitate for Islamic law.") Iran provided Hizbollah with military arms, training, and other supplies, and issued propaganda to encourage Lebanese Shi'ites to join the organization. Dammarell IV, 404 F. Supp. 2d at 273. In fact, soldiers from Iran's elite military unit, the Revolutionary Guard, set up headquarters in Lebanon's Bekka Valley to train Hizbollah recruits. Id.; see also Ex. 15. By early 1985, the United States had "fresh and convincing evidence that radical elements highly placed within . . . the government of Iran [were] giving operational policy advice to terrorists in Lebanon, specifically terrorists operating under the name 'Islamic Jihad' or Hizbollah." Dammarell IV, 404 F. Supp. 2d at 273 (citing Oakley testimony).

Iran also provided Hizbollah with financial support. Id. Indeed, while support of Hizbollah was not specifically provided for in Iran's annual budget, "the supreme religious leader and the president openly acknowledged that Iran was providing financial support, in fact proudly acknowledged that Iran was providing the financial support" for Hizbollah. Id. (quoting Pl.'s Ex. 17 at 30). Dr. Clawson estimated that in 1983, the year of the Beirut Embassy bombing, Iran spent in the range of $50 million to $150 million on its terrorist efforts. See Ex. 17 at 31.

Hizbollah accomplished its terrorist acts not just with the support of the Iranian government generally, but with the specific assistance of MOIS.  Id.;  see also Ex. 17.  An Iranian government ministry, MOIS was formally established by law in 1983 or 1984, although it had previously existed as an offshoot of the secret police under the regime of the former Shah of Iran. Id.  As part of its operations, MOIS acted, and continues to act, as "a prime conduit to terrorist and extremist groups."  Ex. 40;  see also Exs. 39, 17.  In Lebanon in particular, MOIS supported Hizbollah, nurturing it with "financial assistance, arms and training."  Dammarell IV, 404 F. Supp. 2d at 273;  see also Ex. 17 at 12.  With this support, Hizbollah evolved into "one of the most capable and professional terrorist organizations in the world."  Dammarell IV, 404 F. Supp. 2d at 273.

On January 19, 1984, President Reagan designated Iran as a state sponsor of terrorism. Id. This designation was in response to Iran's role in sponsoring a number of terrorist acts in Lebanon, including the Attacks at issue here.  See id.  Iran has ever since remained on the State Department list of state sponsors of terrorism.  Id.;  see also 22 C.F.R. § 126.1(d) (2011); 31 C.F.R. § 596.201 (2009).  In fact, according to the Department of Defense, "[f]or over two decades, Iran's involvement in international terrorism has been unmatched by any other state. Iran remains the world's most capable and persistent state sponsor of terrorism."  Dammarell IV, 404 F. Supp. 2d at 274;  see also Ex. 40 (noting that "[t]he deep ties between Iran and the Lebanese Shia . . . indicate that Iran will not -- in the near term -- reduce its level of support to Hizballah . . . and other groups that engage in terrorism").

## CONCLUSIONS OF LAW

I.     LEGAL BACKGROUND

The "terrorism exception" to the FSIA was first enacted as part of the Mandatory Victims Restitution Act of 1996, which was itself part of the larger Antiterrorism and Effective Death Penalty Act of 1996. See Pub. L. No. 104-132, § 221(a)(1)(C), 110 Stat. 1214, 1241 (formerly codified at 28 U.S.C. § 1605(a)(7)). The exception permitted claims against foreign state sponsors of terrorism for acts of terrorism that resulted in personal injury or death, where either the claimant or victim was a United States citizen at the time of the terrorist act. See 28 U.S.C. § 1605(a)(7) (2007).  Shortly thereafter, Congress passed the so-called "Flatow Amendment" in the Omnibus Consolidated Appropriations Act of 1996. See Pub. L. 104-208, § 589, 110 Stat. 3009-1, 3009-172 (codified at 28 U.S.C. § 1605 note).  Initially, some courts construed § 1605(a)(7) and the Flatow Amendment, read in tandem, as creating a federal cause of action against the foreign state sponsor of terrorism. See, e.g., Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 27 (D.D.C. 1998).

In Cicippio-Puleo v. Islamic Republic of Iran, the D.C. Circuit concluded that neither § 1605(a)(7) nor the Flatow Amendment itself created a cause of action against the foreign state. 353 F.3d 1024, 1027 (D.C. Cir. 2004).   Instead of a federal cause of action, the D.C. Circuit directed plaintiffs to assert causes of action using "some other source of law, including state law." Id. at 1036; see, e.g., Dammarell II, 2005 WL 756090, at *33 (requiring plaintiffs post-Cicippio-Puleo to amend their complaint to state causes of action under the law of the state in which they were domiciled at the time of their injuries).  Hence, following Cicippio-Puleo, the

FSIA "terrorism exception" began to serve as "a 'pass-through' to substantive causes of action against private individuals that may exist in federal, state or international law." Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 83 (D.D.C. 2006).

In some cases, applying relevant state law created "practical problems for litigants and the courts." Pl.'s Mot. at 10. Under applicable choice of law principles, district courts applied the state tort law of each individual plaintiff's domicile, which in many cases would involve several different states for the same terrorist incident. See, e.g., Dammarell IV, 404 F. Supp. 2d at 275-324 (applying the law of six states and the District of Columbia). This analysis resulted in different awards for similarly-situated plaintiffs, based on the substantive tort law distinctions between states for intentional infliction of emotional distress claims. See, e.g., Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 44-45 (D.D.C. 2007) (denying and dismissing intentional infliction of emotional distress claims of those family members domiciled in Pennsylvania and Louisiana, whose laws required the claimant to be present at the site of the event causing emotional distress).

To address these issues, Congress enacted section 1083 of the 2008 NDAA, which amended the "terrorism exception" and other related FSIA provisions. The Act repealed § 1605(a)(7) of Title 28 and replaced it with a separate section, § 1605A, which, among other things: (1) broadened the jurisdiction of federal courts to include claims by members of the U.S. armed forces and employees or contractors of the U.S. Government injured while performing their duties on behalf of the U.S. Government; and (2) created a federal statutory cause of action for those victims and their legal representatives against state sponsors of terrorism for terrorist acts committed by the State, its agents, or employees, thereby abrogating Cicippio-Puleo. See

Simon v. Republic of Iraq, 529 F.3d 1187, 1190 (D.C. Cir. 2008), rev'd on other grounds, 129 S. Ct. 2183 (2009).

This case is the first to apply § 1605A to non-U.S. national plaintiffs who worked for the U.S. Government (and their non-U.S. national family members), who may now be entitled to compensation for personal injury and wrongful death suffered as the result of the terrorist attacks on the U.S. Embassy and Embassy Annex in Beirut in 1983 and 1984.

II.    JURISDICTION UNDER THE FSIA

The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611, is the sole basis for obtaining jurisdiction over a foreign state in the United States.  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989); Brewer, 664 F. Supp. 2d at 50. Although it provides that foreign states are generally immune from jurisdiction in U.S. courts, see 28 U.S.C. § 1604, a federal district court can obtain personal and subject matter jurisdiction over a foreign entity in the following circumstances.  First, a court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608.  See 28 U.S.C. § 1330(b).  Second, subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity.  See 28 U.S.C. § 1330(a) and 28 U.S.C. § 1604.   Here, this Court has jurisdiction because service was proper and defendants' conduct falls within the "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A.

A.  Service of Process

Courts may exercise personal jurisdiction over a foreign state where the defendant is properly served in accordance with 28 U.S.C. § 1608. See 28 U.S.C. § 1330(b); TMR Energy Ltd. v. State Property Fund of Ukraine, 411 F.3d 196, 199 (D.C. Cir. 2005).  "A foreign state or

its political subdivision, agency, or instrumentality must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1). "The FSIA prescribes four methods of service, in descending order of preference. Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." Ben-Rafael v. Islamic Republic of Iran, 540 F. Supp. 2d 39, 52 (D.D.C. 2008); see also 28 U.S.C. § 1608(a). As described in Ben-Rafael:

> The preferred method of service is delivery of the summons and complaint "in accordance with any special arrangement for service between the plaintiff and the foreign state." 28 U.S.C. § 1608(a)(1). If no such arrangement exists, then delivery is to be made "in accordance with an applicable international convention on service of judicial documents." Id. 1608(a)(2). If neither of the first two methods is available, plaintiffs may send the summons, complaint, and a notice of suit (together with a translation of each into the official language of the foreign state) "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." Id. 1608(a)(3). Finally, if mailed service cannot be accomplished within thirty days, then the statute permits plaintiffs to request that the clerk of the court dispatch two copies of the summons, complaint, and notice of suit (together with a translation of each into the foreign state's official language) to the Secretary of State, who then "shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." Id. 1608(a)(4). "Strict adherence to the terms of 1608(a) is required." Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 154 (D.C. Cir.1994).

540 F. Supp. 2d at 52. The first two methods of service are inapplicable to this case because there is no "special arrangement for service" between the U.S. and Iran, § 1608(a)(1), and Iran is not a party to any "international convention on service of judicial documents," § 1608(a)(2).

On June 23, 2009, plaintiffs requested the Clerk of the Court to effect service upon defendants pursuant to § 1608(a)(3), and the Clerk certified that she performed the requested mailing on June 24, 2009. See Docket Entries #15, 16, 17. However, as no certification of service was received within 30 days, plaintiffs, on July 31, 2009, requested the Clerk to transmit

the proper documents to the U.S. Department of State for diplomatic service pursuant to §

1608(a)(4). See Docket Entries #18, 19. On August 5, 2009, the Clerk certified that she had

complied with plaintiffs' request by mailing the proper documents to the U.S. Department of

State and requesting that they attempt service upon defendants through diplomatic channels. See

Docket Entry #20. On December 31, 2009, the U.S. Department of State informed the Court that

service had been properly effected upon both defendants, effective November 18, 2009. See

Docket Entry #23. Defendants did not respond or make an appearance within sixty days, and

thus, pursuant to § 1608(d), the Clerk entered default on January 29, 2010. See  Docket Entry

#25.  Hence, as defendants were properly served in accordance with § 1608, this Court has

personal jurisdiction over them.

    B.  Subject Matter Jurisdiction

The provisions relating to the waiver of immunity for claims alleging state-sponsored

terrorism, as amended, are set forth at 28 U.S.C. § 1605A(a). Section 1605A(a)(1) provides that

a foreign state shall not be immune from the jurisdiction of U.S. courts in cases where

> money damages are sought against [it] for personal injury or death that was caused
> by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the
> provision of material support or resources for such an act if such act or provision of
> material support or resources is engaged in by an official, employee, or agent of
> such foreign state while acting within the scope of his or her office, employment,
> or agency.

For a claim to be heard in a case such as this -- filed as a "Related Action" under § 1605A(b) --

the foreign state defendants must have been designated by the U.S. Department of

State as a "state sponsor of terrorism" when the original action under § 1605(a)(7) was filed. See

28 U.S.C. § 1605A(a)(2)(A)(i)(II)).  Finally, subsection (a)(2)(A)(ii) requires that the "claimant

14

or the victim was, at the time the act . . . occurred --

   (I) a national of the United States;

   (II) a member of the armed forces; or

   (III) otherwise an employee of the Government of the United States . . . acting
   within the scope of the employee's employment . . . .

28 U.S.C. § 1605A(a)(2)(A)(ii)(I)-(III) (emphasis added).

Plaintiffs satisfy each of the requirements for subject matter jurisdiction. First, defendant Iran was designated as a state sponsor of terrorism at the time the Dammarell and Wagner cases were filed. Second, plaintiffs' injuries were caused by defendants' acts of "extrajudicial killing" and provision of "material support" for such acts to their agents. Third, all plaintiffs were either themselves U.S. Government employees at the time of the attacks or their claims are derived from claims where the victims were U.S. Government employees at the time of the attack as required by § 1605A(a)(2)(A)(ii)(I)-(III).

### i.      Iran Designated As a State Sponsor of Terrorism

In a case filed as a "related action" under § 1605A(b), the foreign state defendant must have been designated as a state sponsor of terrorism when original actions were filed pursuant to 28 U.S.C. § 1605(a)(7). 28 U.S.C. § 1605A(a)(2)(A)(i)(II). Iran was formally declared a "state sponsor of terrorism" on January 19, 1984, by U.S. Secretary of State George P. Schultz in accordance with section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. 2405(j), see also 49 Fed. Reg. 2836-02 (statement of Secretary of State George P. Schultz), and remains designated as a state sponsor of terrorism. All of the related cases were filed after 1984. Thus, the requirements set forth in § 1605A(a)(2)(A)(i)(II) are satisfied.

### ii.     Extrajudicial Killing

The FSIA, as amended, strips immunity "in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act if such an act or provision of material support or resources is engaged in by an official, employee, or agent or such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). The FSIA refers to the Torture Victim Protection Act of 1991 ("TVPA") for the definition of "extrajudicial killing." See 28 U.S.C. § 1605A(h)(7).  The TVPA provides that

> the term "extrajudicial killing" means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all of the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note; see also Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 74 (D.D.C. 2010) (adopting the TVPA definition of "extrajudicial killing" in bombing of U.S. Marine barracks in Beirut, Lebanon).

Here, as in Dammarell, Wagner, and the other related cases, the 1983 and 1984 bombings were acts of "extrajudicial killing." Dammarell I, 281 F. Supp. 2d at 192 ("[T]he evidence is conclusive that [the victims of the 1983 bombing] were deliberately targeted for death and injury without authorization by a previous court judgment . . . and [the 1983 bombing] constitutes an act of 'extrajudicial killing'"); Wagner, 172 F. Supp. 2d at 134 (finding the September 1984 bombing was a "deliberate and premeditated act" that killed 14 people and "[t]here is no evidence that it was judicially sanctioned by any lawfully constituted tribunal"); Brewer, 664 F. Supp. 2d

at 52-53 (same); <u>Welch</u>, 2007 U.S. Dist. LEXIS 99191, at *26 (finding that the attack "clearly qualifies as an extrajudicial killing"). Iran and MOIS, through Hizballah, killed and attempted to kill individuals on site in both the 1983 U.S. Embassy bombing and the 1984 U.S. Embassy Annex bombing. Such acts of terrorism are contrary to those guarantees "recognized as indispensable by civilized persons." <u>See</u> <u>Dammarell I</u>, 281 F. Supp. 2d at 192. Hence, the 1983 and 1984 Embassy bombings both qualify as an "extrajudicial killing."

### iii.   Material Support

Similarly, several courts have ruled that Iran and MOIS directed and facilitated the 1983 and 1984 Attacks on the U.S. Embassy and its Annex and provided "material support" to their agent Hizbollah in carrying out the attacks. <u>See, e.g.</u>, <u>Wagner</u>, 172 F. Supp. 2d at 133; <u>Dammarell I</u>, 281 F. Supp. 2d at 191. "Material support" is defined as follows:

> "[M]aterial support or resources" means any property, tangible or intangible, or service including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. §§ 2339A(b)(1); 28 U.S.C. § 1605(h)(3).

Iran's involvement in both the establishment of Hizbollah as a terrorist organization and the on-going terrorist activities of Hizbollah is well-established. <u>See, e.g.</u>, <u>Wagner</u>, 172 F. Supp. 2d at 133; <u>Dammarell I</u>, 281 F. Supp. 2d at 191; Exs. 17, 27. The United States government identified Hizbollah as the perpetrator of the 1983 Attack, and further noted that Hizbollah was operating with direct Iranian government support. <u>See</u> Ex. 27 at 11 ("[R]adical Lebanese Shi'a using the nom-de-guerre Islamic Jihad, operat[ing] with Iranian support . . . were responsible for the suicide bombing attacks against the U.S. Embassy [in Lebanon]."). Indeed, Iran's designation

as a state sponsor of terrorism was based, in part, on its participation in the 1983 bombing. Dammarell I, 281 F. Supp. 2d at 191; Ex. 23. And this Court concluded that the evidence presented at the Dammarell evidentiary trial "show[ed] unquestionably that Iran and MOIS provided material support to Hezbollah, and that this support was the proximate cause of the 1983 Beirut embassy bombing and the deaths and injuries that resulted." Dammarell II, 2005 WL 756090, at *6 (emphasis added).

Evidence produced in the Wagner trial demonstrated that the 1984 attack on the U.S. Embassy Annex was also directed by Iran. See 172 F. Supp. 2d at 133. The court in Wagner described Iran's support of Hizbollah and made findings about Iran's and MOIS's "material support" for the attack:

> The testimony of retired U.S. Ambassador Robert B. Oakley and Dr. Patrick L. Clawson, Director of Research at the Washington Institute for Near East Policy, together with declassified intelligence materials from the U.S. Department of State and the Central Intelligence Agency admitted into evidence by the Court, conclusively establish the identity of the perpetrators of the September 20, 1984, bombing of the U.S. Embassy in Beirut . . . to be the militant Islamic fundamentalist Shi'ite organization known as Hizballah, the Lebanese organization publicly committed to the expulsion of the American presence in Lebanon by terrorist means, as well as to the post-war reincarnation of Lebanon as an Islamic fundamentalist state. Hizballah, in turn, has been shown to be an agency or instrumentality of the Iranian MOIS, employed (somewhat less publicly) by the MOIS to achieve similar ends -- by terrorist means when necessary -- as well to establish Iranian ascendancy as the premier Islamic patron of the Shi'a population in Lebanon.

Id.; see also Welch, 2007 U.S. Dist. LEXIS 99191 at *27 (concluding that Iran and MOIS provided material support to Hizbollah in the 1984 attack); Brewer, 664 F. Supp. 2d at 53-54 (same).

The FSIA does not require this Court to relitigate issues that have already been settled, and this Court may "take judicial notice of related proceedings and records in cases before the

same court." <u>See</u> <u>Estate of Heiser v. Islamic Republic of Iran</u>, 466 F. Supp. 2d 229, 263 (D.D.C. 2006). Defendants' connections to Hizbollah have been explored at length in this jurisdiction, and it has uniformly been agreed that, in the relevant time period, Hizbollah received substantial funds and support from Iran via its Ministry of Information and Security and the Iranian Revolutionary Guard Corps. <u>See, e.g.</u>, <u>Ben-Rafael</u>, 540 F. Supp. 2d at 47; <u>Dammarell IV</u>, 404 F. Supp. 2d at 270-71. The <u>Wagner</u> and <u>Welch</u> opinions not only illustrate the general connection between Hizbollah and Iran, but also justify a specific finding that defendants provided support for the 1984 attack on the U.S. Embassy Annex in Lebanon. <u>See also</u> <u>Brewer</u>, 664 F. Supp. 2d at 54. Relying on the pleadings and the above findings of other judges in this jurisdiction, this Court concludes that defendants provided "material support and resources" to Hizbollah in carrying out both the April 18, 1983 and the September 20, 1984 attacks on the U.S. Embassy and Embassy Annex in Beirut, Lebanon.

  **iv. Causation**

  The next question is whether defendants' support of Hizbollah caused plaintiffs' injuries. <u>See</u> 28 U.S.C. § 1605A(c). The causation requirement under the FSIA is satisfied by a showing of proximate cause. <u>Kilburn v. Socialist People's Libyan Arab Jamahiriya</u>, 376 F.3d 1123, 1128-29 (D.C. Cir. 2004) (interpreting similar "caused by" language in the previous "state sponsor of terrorism" exception, § 1605(a)(7)). Proximate cause exists so long as there is "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." <u>Id.</u> (citations omitted). From defendants' actions of supplying resources and training to Hizbollah for this attack, it was entirely foreseeable that innocent people would be killed or injured by the detonation of a van filled with explosives. <u>See</u> <u>Ben-Rafael</u>, 540 F. Supp. 2d at 54.

The proximate cause test is easily satisfied here.

*    *    *    *    *

Hence, this Court has jurisdiction because service on defendants was proper and the Court has subject matter jurisdiction under § 1605A.

III.    <u>TIMELINESS</u>

    A.  <u>Plaintiffs Have Complied With the 60-day Filing Deadline</u>

The 2008 Amendments also set forth specific requirements for bringing a case as a "Related Action." Subsection 1083(c)(3) provides:

> **Related Actions**. – If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code . . . , any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code [this section], if the action is commenced not later than the latter of 60 days after
>
> (A) the date of the entry of judgment in the original action; or
>
> (B) the date of the enactment of this Act [Jan. 29, 2008].

28 U.S.C. 1605A note, § 1083(c)(3) of the 2008 NDAA.

Here, plaintiffs have filed this action as a "Related Action" to <u>Dammarell</u>, <u>Wagner</u>, <u>Salazar</u>, and <u>Welch</u>, because the claims in this case arise out of the same acts that were the bases of those prior actions -- the 1983 and 1984 bombings of the U.S. Embassy and the Embassy Annex in Beirut, Lebanon. As required by § 1083(c) of the 2008 NDAA, each of those related cases was timely commenced under section 1605(a)(7),[6] and plaintiffs filed this action on March

---

[6]All the prior related cases were filed within 10 years of the enactment of the state sponsorship of terrorism exception on April 25, 1996: <u>Dammarell</u> was filed on October 29, 2001; <u>Wagner</u> was filed on July 27, 2000; <u>Welch</u> was filed on April 19, 2001; and <u>Salazar</u> was filed on March 22, 2002.

28, 2008, within the 60-day statutory window for filing "related" claims. Hence, this action has been properly and timely filed as a Related Action under section 1083(c)(3) of the 2008 NDAA.

For the same reasons, this action meets the statute of limitations requirements set forth in 28 U.S.C. § 1605A(b), which provides that an action is timely "if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) . . . not later than the later of (1) 10 years after April 24, 1996; or (2) 10 years after the date on which the cause of action arose." Because the related actions were commenced before April 24, 2006, this action is timely.

B.  Plaintiffs' Claims Comply with Fed. R. Civ. P. 15(c)

Rule 15(c) of the Federal Rules of Civil Procedure provides that claims of additional plaintiffs in an amended complaint relate back to the date of the original pleading where (1) the new claims arise from the same conduct, transaction or occurrence set forth in the original pleading; and (2) the defendants had notice of the existence and involvement of the new plaintiffs. See Fed. R. Civ. P. 15(c); Leachman v. Beech Aircraft Corp., 694 F.2d 1301, 1308-09 (D.C. Cir. 1982) (examining application of Rule 15(c) to newly added plaintiffs and citing Williams v. United States, 405 F.2d 234 (5th Cir. 1968)). As explained by the D.C. Circuit in Leachman, claims by newly added plaintiffs may relate back to the original complaint where a defendant had notice about the operational facts of the claim, the new plaintiffs' interests are identical to those of the plaintiffs already in the action, and the defendant was put on notice that the plaintiffs' claims were reasonably likely to be involved. Id.; see also Peterson v. Islamic Republic of Iran, Civil Action Nos. 01-2094 (RCL), 01-2684 (RCL), 2007 WL 950080, at *1 (D.D.C. Mar. 28, 2007).

Here, the claims by the new plaintiffs raised in the third amended complaint arise from the same conduct, transaction or occurrence set forth in the original pleadings -- the 1983 and/or 1984 bombings of the U.S. Embassy in Beirut. See Leachman, 694 F.2d at 1308-09; Fleck v. Cablevision VII, Inc., 799 F. Supp. 187, 191 (D.D.C. 1992) (holding that claim by new plaintiff in amended complaint related back to earlier complaint because it was "identical in nature to the claim asserted" by original plaintiffs); Stoppelman v. Owens, 580 F. Supp. 944, 947 (D.D.C. 1983) (finding that the claims of new plaintiffs related back to original complaint because the new complaint did not add any new claims). Further, the defendants in this case had adequate notice that additional plaintiffs likely would be identified, given the dozens of employees killed and/or injured in the two bombings, each of whom, in turn, had relatives who suffered as a result of the physical impact of the bombing on family members. See, e.g., Peterson, 2007 WL 950080, at *1 (notice requirement of Rule 15 satisfied where second amended complaint added claims only by family members of deceased or injured servicemen whose estates or claims already were listed in the first amended complaint, but who had not yet been located or indicated an interest in joining the suit at the time the first amended complaint was filed). Hence, the claims of the newly added plaintiffs relate back to the original complaint and are timely under Fed. R. Civ. P. 15(c).

IV.     FEDERAL CAUSE OF ACTION

Once jurisdiction has been established over plaintiffs' claims against Iran and MOIS, liability in a default judgment case is established by the same evidence if "satisfactory to the Court." 28 U.S.C. § 1608(e). Plaintiffs' claims are brought under section 1605A(c), the newly created federal cause of action, or, in the alternative, under applicable state or foreign law.

Section 1605A(c) authorizes claims against state sponsors of terrorism for compensatory and punitive damages, for personal injury or death caused by acts described as follows.

> **(c) Private right of action.**--A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--
>
> > (1) a national of the United States,
> >
> > (2) a member of the armed forces,
> >
> > (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
> >
> > (4) the legal representative of a person described in paragraph (1), (2), or (3),
>
> for personal injury or death caused by acts described in subsection (a) (1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

28 U.S.C. §1605A(c).

The plain meaning approach to statutory construction is well established. Indeed, "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" United States v. Ron Pair Enterp., Inc., 489 U.S. 235, 242 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982)); see also Qi-Zhuo v. Meissner, 70 F.3d 136, 140 (D.C. Cir.1995) ("Where ... the plain language of the statute is clear, the court generally will not inquire further into its meaning."). Only if the "plain language compels an 'odd result'" may the court "refer to evidence of legislative intent other than the text itself." Engine Mfrs. Ass'n v.

EPA, 88 F.3d 1075, 1088 (D.C. Cir. 1996). "[R]ebutting the presumption created by clear language is onerous" and the proponent "must 'show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it.'" Nat'l Public Radio, Inc. v. FCC, 254 F.3d 226, 230 (D.C. Cir. 2001)(quoting Engine Mfrs. Ass'n, 88 F.3d at 1089).

A straightforward reading of § 1605A(c) creates a cause of action for four categories of individuals: a national of the United States, a member of the armed forces, a U.S. Government employee or contractor, or a legal representative of such a person. See §1605A(c). Absent from these four categories are non-U.S. national family members of the victims of terrorist attacks.

The statutory language that follows the listing of the four categories of individuals in § 1605A(c) does not expand the private right of action beyond those four categories. The cause of action is further described as "for personal injury or death caused by acts described in subsection (a) (1) of that foreign state, or of an official employee or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages." Id. Plaintiffs do not argue (correctly) that the statutory language creates a cause of action for any individual victim or claimant "for which the courts of the United States may maintain jurisdiction." Indeed, the text refers back to the waiver of sovereign immunity as to a foreign state for terrorist acts as provided in section (a)(1).

Nonetheless, the family member plaintiffs contend that, "[a]lthough they do not fit expressly within the four categories listed in § 1605A(c)(1)-(4), once the immunity of Iran and MOIS has been waived as to their claims, the intent of Congress makes clear that the immediate family members of the U.S. Government employees, notwithstanding their status as foreign

24

nationals, are entitled to bring claims under the federal statutory cause of action and seek damages for their losses, including solatium/consortium and pain and suffering." Pl.'s Mot. at 37. Plaintiffs explain that the legislative history reveals that a purpose of the 2008 amendments to the FSIA was to "fix[] the inequality" of rights between U.S. citizens and non-U.S. citizens to seek relief from the perpetrators of terrorist acts. See Pl.'s Mot. at 11; 154 Cong. Rec. S54 (daily ed. Jan. 22, 2008) (statement by Sen. Lautenberg). And, plaintiffs continue, "the disparity among the various state laws regarding the recovery of emotional distress by immediate family members [] prompted Congress to create a federal statutory cause of action that would provide equality and uniformity in the recovery of compensatory damages regardless of [a plaintiff's] domicile." See Pl.'s Mot. at 38; 154 Cong. Rec. S54 (daily ed. Jan. 22, 2008) (statement by Sen. Lautenberg) (noting that the amendments would fix the problem of "judges hav[ing] been prevented from applying a uniform damages standard to all victims in a single case because a victim's right to pursue an action against a foreign government depends upon State law"). Indeed, if foreign national immediate family members of victims do not have a cause of action under § 1605A(c), then Senator Lautenberg did not "fix" the problem of disparate damages standards for this particular category of claimants. But it is not the court's role to fix a problem that Congress failed to address. As Cicippio-Puleo instructed, "the Supreme Court has declined to construe statutes to imply a cause of action where Congress has not expressly provided one." 353 F.3d at 1033.

Plaintiffs cite to several cases where courts have found jurisdiction and a cause of action under §1605A and, in so doing, have noted that because §1605A(c) incorporates the elements required to waive the foreign state's immunity and vest the court with subject matter jurisdiction under section 1605A, "liability under section 1605A(c) will exist whenever the jurisdictional

requirements of section 1605A are met." Calderon-Cardona v. Democratic People's Republic of Korea, 723 F. Supp. 2d 441, 460 (D.P.R. 2010); see also Kilburn v. Islamic Republic of Iran, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (explaining that the elements of immunity and liability are "essentially the same [under the new amendments] in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action" under § 1605A(c)); Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 72 (analyzing liability and jurisdiction together); Brewer, 664 F. Supp. 2d at 52 ("[I]f immunity is waived, the Act provides for economic damages, solatium, pain and suffering, and punitive damages."); Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 64-69 (D.D.C. 2008) (analyzing liability under the same elements for jurisdiction and finding liability where extrajudicial killing and material support elements satisfied). Not so here. In each case cited by plaintiffs, the claimants fit within the four categories of individuals who are explicitly provided a cause of action under the statute. In those instances, the elements for a waiver of immunity and for liability may indeed be the same, but that is not true for individuals who do not fit within the four categories listed in § 1605A(c) as possessing a cause of action.

Hence, those plaintiffs who are foreign national family members of victims of the terrorist attacks in Beirut lack a federal cause of action. But they may continue to pursue claims under applicable state and/or foreign law. Although § 1605A created a new cause of action, it did not displace a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity. See Simon, 529 F.3d at 1192 (ruling that § 1605A is not the exclusive source of law for terrorism-related claims and finding that plaintiff may pursue claims under the predecessor statute, § 1605(a)(7)); see also Dammarell II, 2005 WL 756090, at *8, 11-

12. Indeed, plaintiffs injured or killed as a result of state-sponsored terrorist attacks have pursued claims under both the federal cause of action and applicable state law, and are precluded only from seeking a double recovery. <u>See, e.g.</u>, <u>Belkin v. Islamic Republic of Iran</u>, 667 F. Supp. 2d 8, 22-23 (D.D.C. 2009) (plaintiffs brought claims for wrongful death under both 1605A(c) and Israeli law and court awarded damages only under § 1605A(c) to avoid duplicative damages).

V.   <u>CHOICE OF LAW</u>

In circumstances where the federal cause of action is not available, courts must determine whether a cause of action is available under state or foreign law and engage in a choice of law analysis. Federal courts addressing FSIA claims in the District of Columbia apply the choice of law rules of the forum state. <u>Oveissi v. Islamic Republic of Iran</u>, 573 F.3d 835, 840 (D.C. Cir. 2009); <u>Dammarell II</u>, 2005 WL 756090, at *18. This Court will therefore look to the choice of law rules of the District of Columbia in this case.

Under District of Columbia choice of law rules, the court must first determine if a conflict exists between the law of the forum and the law of the alternative jurisdictions. If there is no true conflict, the court should apply the law of the forum. <u>See</u> <u>USA Waste of Md, Inc. v. Love</u>, 954 A.2d 1027, 1032 (D.C. 2008) ("A conflict of laws does not exist when the laws of the different jurisdictions are identical or would produce the identical result on the facts presented."). If a conflict is present, the District of Columbia employs a "'constructive blending' of the 'government interests' analysis and the 'most significant relationship' test" to determine which law to apply. <u>Oveissi</u>, 573 F.3d at 842; <u>Dammarell II</u>, 2005 WL 756090, at *18 (citation omitted).

In <u>Dammarell II</u>, this Court explained that "under the governmental interests analysis as so refined, we must evaluate the governmental policies underlying the applicable laws and

determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." 2005 WL 756090, at *18. For the "'most significant relationship' component of the analysis, the D.C. Court of Appeals directs courts to section 145 of the Restatement of the Conflict of Laws, which identifies four relevant factors: (i) 'the place where the injury occurred'; (ii) 'the place where the conduct causing the injury occurred'; (iii) 'the domicile, residence, nationality, place of incorporation and place of business of the parties'; and (iv) 'the place where the relationship, if any, between the parties is centered.'" Id. (citing Restatement (Second) of Conflict of Laws § 145 (1971)). The Restatement also references the "needs of the interstate and the international systems, the relevant policies of the forum, the relevant policies of other interested states, certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied." Id.; see also Oveissi, 573 F.3d at 842; Heiser, 466 F. Supp. 2d at 266. As a general rule, the law of the forum governs, "unless the foreign state has a greater interest in the controversy." Kaiser-Georgetown Cmty. Health Plan v. Stutsman, 491 A.2d 502, 509 (D.C. 1985).

Three conceivable choices of law are presented in this case: the law of the forum state (the District of Columbia), the law of the place of the tort (Lebanon), or the law of the domicile state or country of each plaintiff (including domestic and foreign locations). See Dammarell II, 2005 WL 756090, at *18. In previous Dammarell decisions involving U.S. citizen plaintiffs, this Court ruled that the law of the domicile state of each plaintiff should provide the rule of decision, noting each state's interest in the welfare and compensation of the surviving family members of individuals killed in the 1983 attack. See id. at *21 (citing cases). Here, the choice of law analysis pertains only to non-U.S. national family members of victims of the terrorist attacks

(who lack a federal cause of action), and the balance of interests points in another direction.

Consistent with Dammarell and other FSIA cases, United States domestic law remains more

appropriate in state-sponsored terrorism cases than foreign law. Furthermore, in light of the 2008

amendments to FSIA that seek to promote uniformity and extend access to U.S. federal courts to

foreign national immediate family members of victims of terrorism, the law of the forum state,

the District of Columbia, should provide the rule of decision.

A. Domestic Law

As in Dammarell, the choice of law analysis points away from Lebanon, the place of the

injury, and toward applying the laws of a United States forum. First, no clear conflict of law is

present between the forum (District of Columbia) and Lebanon. District of Columbia law

parallels Lebanese law regarding the availability of a claim for emotional distress, solatium,

and/or consortium related to the wrongful death or tortious injury of an immediate relative. Like

District of Columbia law, Lebanese law allows for the award of compensation for "moral

damages," such as emotional distress, suffered as the result of the wrongful death or tortious

injury of an immediate relative. See Pl.'s Ex. 1, Lebanese Law Opinion §§ 3.1-3.2 (Nov. 19,

2010). Likewise, under Lebanese law, an heir of a decedent may bring the equivalent of a

"Survival Act" claim under District of Columbia law on behalf of the heirs to recover damages

for emotional distress suffered by a decedent before death. Id. § 3.1; see also D.C. Code § 12-

101. Based on these key similarities, it is likely that "the laws of the different jurisdictions . . .

would produce the identical result on the facts presented," USA Waste, 954 A.2d at 1032, which

tilts the balance of this Court's choice of law analysis towards domestic law.

Second, to the extent that United States law and the laws of Lebanon (or another foreign jurisdiction) conflict, the District of Columbia's "governmental interests" choice of law test in state-sponsored terrorism cases strongly favors the application of United States law over Lebanese or other foreign law. Although "[t]he law of a foreign country has provided the cause of action in some cases arising out of mass disasters that occurred on foreign soil," Dammarell II, 2005 WL 756090, at *19 (citing Harris v. Polskie Linie Lotnicze, 820 F.2d 1000, 1004 (9th Cir. 1987) (applying Polish law to airplane crash occurring in Poland), and Barkanic v. Gen. Admin. of Civil Aviation of the People's Republic of China, 923 F.2d 957, 962-64 (2d Cir. 1991) (applying Chinese law to airplane crash occurring in China)), such a result is less appropriate in state-sponsored terrorism-related cases. In terrorism cases, "[t]he United States has a unique interest in having its domestic law -- rather than the law of a foreign nation -- used in the determination of damages in a suit involving such an attack." Holland v. Islamic Republic of Iran, 496 F. Supp. 2d 1, 22 (D.D.C. 2005) (citing Restatement (Third) of Foreign Relations Law § 402(3) (1987)).

Here, just as in Dammarell, "the particular characteristics of this case heighten the interests of a domestic forum and diminish the interest of the foreign state. The injuries in this case are the result of a state-sponsored terrorist attack on a United States embassy and diplomatic personnel. The United States has a unique interest in its domestic law, rather than the law of a foreign nation, determining damages in a suit involving such an attack." Dammarell II, 2005 WL 756090, at *20; see also Restatement (Third) of Foreign Relations Law § 402(3) (1987) (recognizing that the United States has an interest in projecting its laws overseas for "certain conduct outside its territory by persons not its nationals that is directed against the security of the

state or against a limited class of other state interests").  These considerations "elevate the interests of the United States to nearly its highest point." Dammarell II, 2005 WL 756090, at *20; see also Kaiser-Georgetown Cmty. Health Plan, 491 A.2d at 509 n.10 (suggesting that unless a foreign state has a *greater* interest in the application of its law than the forum state, the interests of efficiency only serve to further "tilt the balance in favor of applying the law of the forum state").  Hence, the "governmental interest" prong of the District of Columbia choice of law analysis counsels against applying the law of Lebanon, or other foreign laws, and suggests that domestic law should control.

B.  District of Columbia Law

In addition to the strong governmental interest in applying United States law in this case, the interests of uniformity of decision among the foreign national family members points to the application of the law of the forum.  Most of these plaintiffs are domiciled in Lebanon, although some are domiciled in France, Saudi Arabia, Canada, Tunisia, California, Florida, Kentucky, New Jersey, and Florida.  See Pl.'s Mot. at 41.  In previous decisions, this Court has applied the laws of the several domiciliary states. See, e.g., Dammarell II, 2005 WL 756090, at *21.  Here, however, the interests of uniformity provided by the law of the forum state, which also has a significant interest in the underlying events, provides the most appropriate choice of law for all foreign national family members who lack a federal cause of action.  See Kaiser-Georgetown Cmty. Health Plan, 491 A.2d at 509 n.10 ("'The forum State's interest in the fair and efficient administration of justice' together with the 'substantial savings [that] can accrue to the State's judicial system' when its judges are 'able to apply law with which [t]he[y are] thoroughly familiar or can easily discover,' tilt the balance in favor of applying the law of the forum.").

In the six years since the <u>Dammarell</u> decision, Congress -- through significant amendments to the FSIA -- has sought to strengthen enforcement of United States terrorism laws and to extend their protections to foreign nationals who are employees of United States embassies targeted by terrorists and their immediate family members. <u>See, e.g.</u>, Pl.'s Mot. at 11 (citing Sen. Lautenberg's statement that the FSIA "legislation is essential to providing justice to those who have suffered at the hands of terrorists and is an important tool designed to deter future state-sponsored terrorism," 154 Cong. Rec. S54 (daily ed. Jan. 2, 2008)). Moreover, the 2008 FSIA amendments were directed, in part, to correct the problem of "disparity among the various state laws regarding the recovery of emotional distress by immediate family members." <u>See</u> Pl.'s Mot. at 39; 154 Cong. Rec. S54 (daily ed. Jan. 22, 2008) (statement by Sen. Lautenberg) (noting that the amendments would fix the problem of "judges hav[ing] been prevented from applying a uniform damages standard to all victims in a single case because a victim's right to pursue an action against a foreign government depends upon State law").

As discussed above, Congressional desire to promote uniformity does not, by itself, create a federal cause of action for non-United States national family members where the statutory text fails to do so. But efficiency and uniformity are appropriate and meaningful factors in a choice of law analysis. Without doubt, applying District of Columbia law will provide greater uniformity of result, as individual plaintiffs domiciled in different states and foreign nations will all be subject to the same substantive law. Although "the D.C. Court of Appeals has emphasized that concerns of uniformity and familiarity cannot prevail when another location otherwise has 'a significantly greater interest than does the District' in the cause of action," <u>Dammarell II</u>, 2005 WL 756090, at *20 (citing <u>Mims v. Mims</u>, 635 A.2d 320, 324-25 (D.C. 1993)), the 2008 FSIA

32

amendments -- and the stated goal of those amendments to promote uniformity -- serve to increase the interest in applying District of Columbia substantive law to this case.

The District of Columbia's connection to the terrorist attacks in this case further supports this choice of law conclusion. To be sure, the 1983 and 1984 embassy bombings took place in Lebanon, the nationalities and domiciles of the various victims and plaintiffs are disparate and varied, and the defendants have no connection to the United States. But a unifying factor in this case is that all of plaintiffs' claims derive from employment with a federal agency headquartered in the District of Columbia, the seat of the federal government. The application of District of Columbia substantive law best promotes the United States' interest in applying domestic law rather than the law of a foreign nation, Congress's intent to promote uniformity of result, and the District of Columbia's real connection to the attacks in this case. Hence, this Court will apply the law of the District of Columbia to plaintiffs' claims that do not arise under the federal cause of action at § 1605A(c).

## CONCLUSION

For the foregoing reasons, final judgment on liability will be entered in favor of plaintiffs and against defendants. Plaintiffs' claims, under federal[7] or state law, will be referred to

---

[7] For plaintiffs' federal claims under § 1605A(c), "[t]he Court is presented with the difficulty of evaluating these claims under the FSIA-created cause of action, which does not spell out the elements of these claims that the Court should apply." Valore, 700 F. Supp. 2d at 75. Hence, the Court "is forced . . . to apply general principles of tort law -- an approach that in effect looks no different from one that explicitly applies federal common law"; but "because these actions arise solely from statutory rights, they are not in theory matters of federal common law." Heiser, 659 F. Supp. 2d at 24; see also Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C. Cir. 2003) (discussing that the term "federal common law" under the FSIA "seems to us to be a misnomer" because "these actions are based on statutory rights"). District courts thus look to Restatements, legal treatises, and state decisional law "to find and apply what are generally considered to be the well-established standards of state common law, a method of evaluation which mirrors -- but is distinct from -- the 'federal common law' approach." Heiser, 659 F. Supp.

Magistrate Judge Facciola, who will receive evidence and prepare proposed findings and recommendations for the disposition of those claims in a manner consistent with this opinion. A separate order will be issued on this date.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated:    August 16, 2011

_____

2d at 24.