**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ESTATE OF JOHN DOE, et al.,** | |
| **Plaintiffs,** | |
| v. | **Civil Action No.  08-540 (JDB)** |
| **ISLAMIC REPUBLIC OF IRAN, et al.,** | |
| **Defendants.** | |

**<u>MEMORANDUM OPINION</u>**

Shortly after 1 p.m. on April 18, 1983, an unidentified driver rammed a vehicle laden with more than a ton of explosives into the United States Embassy in Beirut, Lebanon. Sixty-three people perished and scores of others were injured in the resulting explosion. In the aftermath of the attack, the Embassy moved its operations to a new location, the Embassy Annex. On September 20, 1984, another bomb detonated at the Annex. At least eleven people were killed and over fifty others were injured. Many of the victims had themselves survived the 1983 bombing; most had family members and friends who had been injured or killed in the first attack.

The 1983 Embassy bombing was the first large-scale attack against a United States embassy anywhere in the world, and it marked the onset of decades of terrorism against the United States. <u>See</u> <u>Dammarell v. Islamic Republic of Iran</u>, No. 01-2224, 2005 WL 756090, *1 (D.D.C. Mar. 29, 2005). Evidence emerging shortly after the attacks and mounting in the years since has shown that the attacks were carried out by the terrorist group Islamic Jihad, known most commonly as Hezbollah, operating with Iranian support and encouragement. Testifying in

1

Dammarell, one of the related cases that support this action, expert Patrick Clawson explained that "there's no question that Iran was responsible for the selection of the target, provided much of the information for how to carry out the bombing, the expertise for how to build the bomb, the political direction that said that this was an important target to bomb, [and] provided financial support for the bombers.'" See Estate of Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1, 8-9 (D.D.C. 2011) (quoting Ex. 17 (Tr. Vol. II at 20-21)). In an earlier ruling in this case, the Court found, consistent with several other cases in this district, that Iran and its Ministry of Information and Security ("MOIS") directed and facilitated the 1983 and 1984 attacks. See id. at 14-16.

Plaintiffs bring this case pursuant to the Foreign Sovereign Immunities Act ("FSIA"). A 1996 amendment to the FSIA revoked sovereign immunity protection for terrorist-sponsoring governments. Using this provision, the victims of such attacks have brought several mass-tort lawsuits against the Islamic Republic of Iran and its Ministry of Information and Security ("MOIS"). Although the waiver of sovereign immunity initially applied only where a victim or claimant was a United States citizen, see 28 U.S.C. § 1605(a)(7)(B)(ii) (2007) (repealed), a 2008 amendment to the FSIA has expanded jurisdiction to cases where the victims were foreign national employees of the United States government, killed or injured while acting within the scope of their employment. See National Defense Authorization Act for Fiscal Year 2008, § 1083, Pub. L. No. 110-181, 122 Stat. 3, 338 (codified at 28 U.S.C. § 1605A). Here, plaintiffs are one U.S. national and 58 foreign national employees of the U.S. Embassy killed or injured in either of the two attacks, and 255 immediate family members of the victims.

In a prior ruling in this case, the Court found that it has jurisdiction over Iran and other defendants and held that the U.S. government employees have a federal cause of action, while their family members may pursue their claims under District of Columbia law. The Court entered

a final judgment of liability in favor of plaintiffs and referred plaintiffs' claims to Magistrate Judge John Facciola to prepare proposed findings and recommendations for a determination of damages. See Estate of Doe, 808 F. Supp. 2d at 23-24.

After receiving evidence, Judge Facciola has filed a thorough 220-page Report & Recommendation. See Report and Recommendation [Docket Entry 105] (Apr. 30, 2013). The Report & Recommendation extensively describes the key facts relevant to each of the more than 300 plaintiffs' claims and carefully analyzes their claims under the framework established in prior mass tort cases related to terrorism. The Court commends Judge Facciola for his excellent work and thoughtful analysis. The Court will adopt the Report and Recommendation in substantial part, with a few adjustments as described below. As a result, the Court will award plaintiffs a total judgment in the amount of over $8.4 billion.

## I.   **Prejudgment Interest**

Magistrate Judge Facciola recommends an award of prejudgment interest. The Court agrees that an award of prejudgment interest at the prime rate is appropriate in this case. See Oldham v. Korean Air Lines Co., Ltd., 127 F.3d 43, 54 (D.C. Cir. 1997); Forman v. Korean Air Lines Co., Ltd., 84 F.3d 446, 450-51 (D.C. Cir. 1996).[1]

Unlike the Report & Recommendation, however, the Court will calculate the interest using the prime rate for each year rather than the average prime rate from 1984 to 2013. In

---

[1] The Court also agrees with the Report & Recommendation that prejudgment interest is appropriate on the whole award, including pain and suffering and solatium. See Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 214-15 (D.D.C. 2012) (awarding prejudgment interest on the full award). But see Oveissi v. Islamic Republic of Iran, 768 F. Supp. 2d 16, 30 n.12 (D.D.C. 2011) (declining to award prejudgment interest on solatium damages). These awards, such as a $5 million baseline for pain and suffering, are calibrated to compensate plaintiffs for their physical injuries and emotional distress without considering the length of time elapsed since the attack; the Court would use a $5 million baseline without adding interest had this litigation taken place in the months after the attacks. But plaintiffs were unable to bring their claims immediately after the attacks, and have hence lost use of the money to which they were entitled upon incurring their injuries. Denying prejudgment interest on these damages would allow defendants to profit from the use of the money over the last three decades. Awarding prejudgment interest, on the other hand, reimburses plaintiffs for the time value of money, treating the awards as if they were awarded promptly and invested by plaintiffs.

Forman, the leading case to assess prejudgment interest, the D.C. Circuit explained that the prime rate—the rate banks charge for short-term unsecured loans to creditworthy customers—is the most appropriate measure of prejudgment interest, one "more appropriate" than more conservative measures such as the Treasury Bill rate, which represents the return on a risk-free loan. See 84 F.3d at 450 (emphasis omitted). In reaching this conclusion, the D.C. Circuit did not expressly consider the best measure of the prime rate, although it approved the "district court's award of prejudgment interest at the prime rate for each year between the accident and the entry of judgment." See id. at 450 (emphasis added).

Using the average prime rate over the entire period might well be a permissible estimate. Some courts have used the average prime rate for the relevant decade in calculating prejudgment interest. See Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978, 954 F.2d 1279, 1335 (7th Cir. 1992) ("The French parties say that the average prime rate during the 1980s was 11.9%. . . . Because Amoco has not challenged the proposed rate of 11.9%, we adopt it."). But using the rate for each year is more precise. It measures how much the award would have grown between 1983 and 1984 using the 1984 interest rate, then measures how much that total would have grown between 1984 and 1985 using the 1985 interest rate, and so on. The difference is substantial where, as here, prime rates were vastly higher longer ago. Because prime rates in the 1980s and 1990s were several times higher than they are today, using the average rate for the whole period does not reflect the rapid initial growth of an amount received in 1983 or 1984, growth that itself would have been compounded. Just as the prime rate is a more accurate measure of the true cost to plaintiffs than is the more conservative Treasury Bill rate, employing the prime rate for each year is more accurate than using the average prime rate for the whole period. In this case, then, using the prime rate for each year offers a substantially more

accurate "market-based estimate" of the costs a plaintiff incurred by being unable to use the owed amount in the pre-judgment period. See Forman, 84 F.3d at 451 (internal quotation marks omitted).

Although using the average prime rate might nonetheless be desirable where it would substantially simplify calculations, in this case using the prime rate for each year is both substantially more accurate and nearly as simple to calculate. Using the prime rate for each year results in a multiplier of 7.6418 for damages incurred in 1983 and a multiplier of 6.8206 for damages incurred in 1984.[2] Accordingly, the Court will use these multipliers to calculate prejudgment interest.

## II.   Economic Losses

In determining plaintiffs' economic losses, the Report & Recommendation relied on an expert report submitted by Steven Wolf. See Steven A. Wolf Report [Docket Entry 65] (Feb. 15, 2012). The Wolf report calculated economic loss figures by converting each deceased victim's expected stream of income into 2012 terms, using the Treasury Bill rate to compound losses before 2012 "to accommodate for the [e]ffect of the time value of money." See id. at 7. Because the figure is already in 2012 dollars, no further award of prejudgment interest is appropriate. See Oldham, 127 F.3d at 54 (holding that the district court did not abuse its discretion in awarding prejudgment interest only because the jury relied on calculations made in 1983 dollars rather than calculations made in 1993 dollars). Plaintiffs themselves recognize this, stating that "[b]ecause Plaintiffs' proposed economic damages for the victims' Estates already have been adjusted by Mr. Wolf to reflect present value, Plaintiffs seek prejudgment interest only on their damages against Defendants for personal injuries." See Pls.' Proposed Findings of Fact &

---

[2] The Court calculated the multiplier using the Federal Reserve's data for the average annual prime rate in each year between 1984 and 2013. See Bd. of Governors of the Fed. Reserve Sys. Historical Data, http://www.federalreserve.gov/releases/h15/data.htm (last visited May 7, 2013).

Conclusions of Law [Docket Entry 89] at 363 n.319 (Aug. 31, 2012) ("Pls.' Proposed Findings"). The Court will therefore remove the award of prejudgment interest on economic loss amounts.

The Court will otherwise adopt Judge Facciola's recommendation as to economic losses. One aspect of this warrants further comment. The Wolf report declined to factor in payments families received from the United States government. The expert stated that "actual death benefits that may have been received by certain individuals' families was [sic] not reliably known and thus not deducted to mitigate the projected lost income due to incomplete information available." See Wolf Report at 6. The Report & Recommendation cites some record evidence of such payments, but also declines to consider them. Although the Court is hesitant to ignore information in the record, several factors make it appropriate to disregard these figures.

First, the information is extremely sporadic. Only a handful of relatives mentioned benefits received from the U.S. government, and it appears that no systematic inquiry about these benefits took place. Even where the record reflects that some benefits were received, the affiants are uncertain about the amounts of the payments and the period of time over which they were made. Second, an accurate calculation is quite complex given that the expert did not take these payments into account, because the Court would need to match the Wolf report's assumptions in converting the stream of payments to 2012 terms. It is also substantively thorny because (again, due to limited information) Wolf considered only lost salary in calculating economic losses, see id., but the U.S. government payments reflect compensation for forgone benefits like a retirement pension and medical insurance. Finally, it is not at all clear that benefits paid by the U.S. government can be used to reduce Iran's responsibility. Indeed, the common law "collateral source rule," recognized by the D.C. Circuit, would preclude consideration of payments from a

source unrelated to defendants on the theory that the windfall of such a source should accrue to the victims rather than the tortfeasors. <u>See</u> <u>Bradshaw v. United States</u>, 443 F.2d 759, 771 (D.C. Cir. 1971); <u>see also</u> Restatement (Second) of Torts § 920A (1979). For all these reasons, the Court agrees that payments plaintiffs received from the U.S. government need not be considered in calculating their economic losses.

### III.   <u>Awards for Pain and Suffering Due to Injury</u>

Pain and suffering awards for surviving victims are determined based on factors including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." <u>See</u> <u>O'Brien v. Islamic Republic of Iran</u>, 853 F. Supp. 2d 44, 46 (D.D.C. 2012) (internal quotation marks omitted). In calculating the damages amount, "the Court must take pains to ensure that individuals with similar injuries receive similar awards." <u>Peterson v. Islamic Republic of Iran</u>, 515 F. Supp. 2d 25, 54 (D.D.C. 2007). In light of the need for uniformity, Courts in this district have developed a general framework for assessing pain and suffering damages for victims of terrorist attacks, awarding a baseline of $5 million to individuals suffering severe physical injuries, such as compound fractures, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain. <u>See</u> <u>Valore v. Islamic Republic of Iran</u>, 700 F. Supp. 2d 52, 84 (D.D.C. 2010). Where physical and psychological pain is more dire—such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead (as was a soldier who was placed in a body bag in the morgue and left there for four days until someone heard him moaning in pain)—courts have departed upward from this baseline to $7 million and above. <u>See</u> <u>O'Brien</u>, 853 F. Supp. 2d at 47. At the other end of the spectrum, downward

departures to a range of $1.5 to $3 million are warranted where the victim suffers severe emotional injury accompanied by relatively minor physical injuries. See Valore, 700 F. Supp. 2d at 84-85.

The Report and Recommendation suggests an award of $5 million in pain and suffering for most plaintiffs, and recommends an award of $7 million for a small number of plaintiffs. The Court will adopt these recommendations with four adjustments to ensure consistency with prior cases and between plaintiffs in this case.

The Court will remove the upward departure, thereby reducing to $5 million, the award to John Child2 KDoe (13). During the 1984 bombing, a ceiling fell on John Child2 KDoe's head. He rushed to help those wounded in the attack, and at some point recognized that he could not hear out of one ear. Two weeks later, he went to a doctor to have his hearing checked. The doctors confirmed that he lost hearing in his left ear, and despite several attempts to restore his hearing, he remains deaf in that ear to this day. See Affidavits 1-107 [Docket Entry 66] at 307-09 ¶¶ 6-11 (Feb. 15, 2012); see also Pls.' Proposed Findings ¶¶ 372-74, 383, 395. Permanent hearing loss in one ear is a serious injury. But it is John Child2 KDoe's sole significant injury, and the record does not indicate that the reduced hearing capacity had a particularly severe effect, limiting his ability to work or his relationships. His injury is hence comparable to many other plaintiffs in this case who received the baseline $5 million despite months spent in the hospital and lifelong pain from their injuries. It is also consistent with the Report & Recommendation's treatment of other individuals who suffered a serious vision or hearing impairment. For instance the Report & Recommendation awarded $5 million to Jane Victim CCDoe (30) for the 1983 bombing despite severe hearing loss in both ears requiring hearing aids, compare Report & Recommendation at 210, with id. at 93; and awarded $5 million to John

Victim NNDoe (42), who lost 95% of vision in one eye, had trouble with the other eye, and suffered other severe physical injuries, compare id. at 215, with id. at 129.

Judge Facciola recommended a $5 million pain and suffering award for most victim plaintiffs. For two of them, Jane Victim RDoe (20) and John Victim YDoe (26), the Court will depart upward. Jane Victim RDoe was mistaken for dead, and rescue workers threw her body from the building to an ambulance waiting below. See id. at 63. She remained in the hospital for eight months and underwent several surgeries for severe head injuries. The crown of her head had been split open, the roof of her mouth was cracked, her vision and hearing were damaged, all of her teeth were broken, and her hair was burnt off. See id.; see also Pls.' Proposed Findings ¶¶ 601-06, 609. Due to glass pieces stuck in her lips and cheeks, Jane Victim RDoe required surgery to reconstruct her face. She continues to be profoundly affected by her injuries: she is unable to eat certain foods because the roof of her mouth didn't heal correctly, has eye pain, and relies on other people to take care of her in certain ways. She experiences constant dizziness and cannot tolerate loud noises. Because these injuries and their lasting effects are significantly more serious than those of most plaintiffs receiving the baseline award, but instead are comparable to those of other plaintiffs receiving a $7 million award, the Court will award $7 million to Jane Victim RDoe.

Similarly, John Victim YDoe suffered particularly horrific injuries. During the 1983 bombing, the building collapsed on top of him. John Victim YDoe was trapped for eleven hours before being rescued, his arm and leg crushed by the debris. See Report & Recommendation at 83; see also Pls.' Proposed Findings ¶¶ 800-02. He underwent several surgeries in the months after the bombing. As a result of these injuries, John Victim YDoe had his leg amputated. His arm never fully healed, and he never regained his physical strength. The extreme pain and

suffering in the eleven hours during which John Victim YDoe was trapped combined with the loss of a limb warrants an upward departure.

For one plaintiff, by contrast, the Court believes a downward departure is appropriate. Where physical injuries are relatively minor and the primary injury is emotional, courts adjust the award downward. See, e.g., Valore, 700 F. Supp. 2d at 84-85. That is the situation here. John Victim TTDoe (48) was injured in both the 1983 and 1984 attacks, and Judge Facciola recommended a $5 million award for each one. In the 1983 attack, John Victim TTDoe was thrown in the air, had pain in his back and foot, and lost several teeth, but never sought medical attention. In the bombing's aftermath, John Victim TTDoe made his way to the first floor to help others evacuate. He lost several friends in the attack and returned home covered with other people's blood. See Report & Recommendation at 148; see also Pls.' Proposed Findings ¶¶ 1403-11, 1420. At the moment of the 1984 attack, John Victim TTDoe was in his car. The car roof collapsed and the windshield shattered and he felt some pain in his back. That day, he helped transport victims and saw a particularly close friend among the dead. Again, the record does not indicate that he sought medical attention. John Victim TTDoe became depressed after the attacks, and drank heavily.

The record reflects lasting and severe psychological pain for John Victim TTDoe. But in light of his fairly light physical injuries—injuries that required no medical attention—a downward departure from the baseline is appropriate. For instance, in Valore, another judge in this district awarded $1.5 million where a plaintiff was knocked to the ground during the attack, and suffered emotional turmoil from helping survivors. See 700 F. Supp. 2d at 84-85. In that case, too, the emotional toil was severe: One man begged the plaintiff not to leave him, and the plaintiff assured the man he would return, but when he did the man was dead. The plaintiff

pulled a person's legs to free him from the rubble only to have the legs come off in his hands; he saw a man who appeared to be smiling but realized that the entire back of the man's head was gone—he was dead.[3]

John Victim TTDoe's physical injuries from the 1983 bombing are somewhat more severe than those of the plaintiff in <u>Valore</u>. Accordingly, the Court will award $2 million in pain and suffering for that bombing. <u>See</u> <u>Peterson</u>, 515 F. Supp. 2d at 55 (departing downward to $2 million where plaintiff experienced "nerve pain and foot numbness" as well as "lasting and severe psychological problems" from the attack). The Court will award $1.5 million for the 1984 bombing where the severe emotional turmoil and absence of any serious physical injury is virtually indistinguishable from the situation in <u>Valore</u>.

## IV.   <u>Awards for Pain and Suffering Prior to Death</u>

Damages for extreme pain and suffering are warranted for those individuals who initially survive the attack but then succumb to their injuries. "When the victim endured extreme pain and suffering for a period of several hours or less, courts in these [terrorism] cases have rather uniformly awarded $1 million." <u>Haim v. Islamic Republic of Iran</u>, 425 F. Supp. 2d 56, 71 (D.D.C. 2006). When the period of the victim's pain is longer, the award increases. <u>Id.</u> at 72. And when the period is particularly brief, courts award less. For instance, where an individual "survived a terrorist attack for 15 minutes, and was in conscious pain for 10 minutes," a Court in this district awarded $500,000. <u>See</u> <u>Peterson</u>, 515 F. Supp. 2d at 53.

Judge Facciola recommended a $1 million pain and suffering award for four plaintiffs who died as a result of the attack. The record, however, is insufficient for the Court to conclude

---

[3] A downward departure is especially appropriate because John Victim TTDoe's psychological pain is on par with that of other plaintiffs, several of whom were affected by both attacks, and many of whom saw friends or relatives among those killed. The record is replete with awful examples, such as a victim who discovered his best friend with "his brains . . . splattered on the desk in front of him" and who "reached over and put [the friend's] brain back into his head and tried to call people to take him out of the building." <u>See</u> Sealed Affidavits 1-107 [Docket Entry 66] at 307 ¶ 7.

that three of them experienced extreme pain and suffering before death. For John Victim IIDoe (37), the victim's wife provided an affidavit stating that part of a fence "nearly decapitated him. He was taken to the hospital, but they called me about one hour after the bombing and told me to come to the hospital because he was dead." See Affidavits 108-215 [Docket Entry 67] at 424 ¶ 6 (Feb. 15, 2012). From this statement, the sole record evidence of the circumstances of John Victim IIDoe's death, it is unclear when he died or whether he was conscious for any portion of that time. See Oldham, 127 F.3d at 56 (in pre-death suffering cases, "the key factual dispute turns on whether the [victims] were immediately rendered unconscious" (internal quotation marks omitted)); see also Forman, 84 F.3d at 449 (allowing award for pre-death suffering because jury could have disbelieved testimony that the victims were rendered "unconscious— and thus anesthetized to pain—in a matter of seconds").

For Jane Victim DDDDoe (57), the evidence about that awful day is similarly scant. Doctors told one daughter that Jane Victim DDDDoe "died quickly." See Pls.' Proposed Findings ¶ 1761. Another daughter stated that she "heard that [Jane Victim DDDDoe] was initially alive and died en route to the hospital." See Affidavits 216-321 [Docket Entry 68] at 486 ¶ 6. From this, the Court cannot—without speculating—determine whether Jane Victim DDDDoe was ever conscious after the blast, nor whether she was alive for a few minutes or longer.

As for the third victim, John Victim JJDoe (38), the record establishes that after the bombing, John Victim JJDoe responded to a friend, saying that he was alive, but then something fell on his head, killing him instantly. See Pls.' Proposed Findings ¶ 1145; see also Affidavits 108-215 [Docket Entry 67] at 452 ¶ 7. This sketch of his death provides no indication that John Victim JJDoe was injured until the lethal blow to his head, nor that he had any sense that death

was imminent. And it is clear that when the lethal injury was inflicted, he died instantly. Accordingly, the Court cannot conclude that John Victim JJDoe experienced the extreme pain and suffering associated with a lethal injury before dying.[4]

## V.   Punitive Damages

Turning finally to punitive damages, the Report & Recommendation found $600 million in punitive damages warranted, recommending an award of $300 million per attack. This Court agrees that punitive damages are appropriate in this case, but will reduce the total award to $300 million.

Dr. Clawson's expert testimony, adopted by this Court, established that Iran's material support to Hezbollah in the relevant time period was between $50 and $150 million dollars, and that an award of three times that amount is necessary to deter Iran from such conduct. See Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 110 (D.D.C. 2003) (citing (Ex. 17 Tr. Vol. II at 31)); see also Estate of Doe, 808 F. Supp. 2d at 8-9 (crediting this expert's testimony). Courts have relied on Dr. Clawson's testimony to award $300 million in punitive damages in a number of cases against Iran or its instrumentalities. See, e.g., Brewer v. Islamic Republic of Iran, 664 F. Supp. 2d 43, 59 (D.D.C. 2009); Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 31 (D.D.C. 2008); Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 89 (D.D.C. 2006); Wagner v. Islamic Republic of Iran, 172 F. Supp. 2d 128, 138 (D.D.C. 2001).

The reduction to a total award of $300 million is warranted here for several reasons. First, plaintiffs seek $300 million. See Pls.' Proposed Findings ¶ 1821 ("Consistent with prior cases, this Court should award $300 million in punitive damages against the Defendants."). Second,

---

[4] The fourth victim, John Victim HHDoe (36), suffered grave arm and head injuries in the attack. Before dying, he spent several days in a coma; during that time, he underwent several surgeries and procedures. See Affidavits 108-215 [Docket Entry 67] at 385 ¶ 6. Judge Facciola awarded him $1 million, and the Court concludes that this award is appropriate.

Courts have already awarded a total of $600 million in punitive damages against Iran and its instrumentalities for these very embassy bombings. See Wagner, 172 F. Supp. 2d at 138 ($300 million award against MOIS for the 1984 embassy bombing); Brewer, 664 F. Supp. 2d 43 ($300 million award against Iran, MOIS, and the Iranian Revolutionary Guard for the 1984 embassy bombing). Other judges in this district have noted that caution is required when punitive damages have been previously awarded against the same defendant for the same conduct. See Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 81 (D.D.C. 2010). Finally, the theory of punitive damages against Iran embraced by courts in this district—that the damages are based on the amount of Iran's financial support of Hezbollah in the relevant time period—does not lend itself perfectly to awarding damages based on each incidence of terrorism. Rather, the award aims primarily to deter the underlying conduct of providing a certain amount of support.

Given these considerations, an award below $300 million could be deemed appropriate. But given the large number of plaintiffs in this case—indeed, far greater than the number in either of the prior cases awarding punitive damages for these attacks—the $300 million award that has become standard for these cases is warranted. See id. at 81-82 (substantially reducing a second award against Iran and MOIS where only two plaintiffs requested punitive damages in second action arising out of same conduct). In a future case, however, especially one with a small number of plaintiffs, an additional award of punitive damages might not be proper; after all, if each of these plaintiffs brought his or her claims in a separate action, a separate award of $300 million in scores of cases arising out of the same conduct would clearly be over-punitive.

Although punitive damages are addressed at the defendants' conduct, once a punitive damages award is made, it should be distributed equitably. The Report & Recommendation concluded that punitive damages are only available for individuals who have a federal cause of

action under 28 U.S.C. § 1605A(c), and so divided the punitive damages award among only the injured and deceased victims, but not their family members. See Report & Recommendation at 199-200. This Court disagrees.

It is true that, as the Court previously ruled, only the U.S. government employee victims have a federal cause of action, but the sovereign immunity waiver reaches more broadly. Section 1605A(a)(1) waives Iran's sovereign immunity "in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by . . . extrajudicial killing." 28 U.S.C. § 1605A(a)(1). The waiver applies to cases where "the claimant or the victim" was an employee of the United States government, see 28 U.S.C. § 1605A(a)(2)(A)(ii); this includes family member plaintiffs—indeed, that is why the Court may hear these cases and award damages to family member plaintiffs. See Estate of Doe, 808 F. Supp. 2d at 13.

This leads, then, to the question of whether the waiver of immunity encompasses an award of punitive damages. Another FSIA provision, 28 U.S.C § 1606, provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state . . . shall not be liable for punitive damages." But section 1606 applies only "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter." See 28 U.S.C § 1606. The operative sovereign immunity waiver in this case is in section 1605A, rather than in section 1605, so it is not governed by section 1606's bar on punitive damages. And, indeed, section 1605A contemplates an award of punitive damages at least in certain circumstances. See 28 U.S.C. § 1605A(c) (where plaintiff has private right of action under the statute, "damages may include .

. . punitive damages"). Accordingly, there is no sovereign immunity bar on awarding family member plaintiffs punitive damages.

Besides waiving sovereign immunity, section 1605A creates a federal cause of action for some individuals. In delineating the federal cause of action, the statute provides that "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). This provision does not apply to family member plaintiffs; rather, as the Court previously ruled, they can pursue their claims under District of Columbia law. See Estate of Doe, 808 F. Supp. 2d at 20, 23. But that does not mean that punitive damages are unavailable; it simply means that D.C. law, which supplies the cause of action, dictates the answer. Looking then, to District of Columbia law, the Judge Facciola properly recommended a damages award for family member plaintiffs under the D.C. tort of intentional infliction of emotional distress. See Report & Recommendation at 192; see also Peterson, 515 F. Supp. 2d at 44 (under D.C. law family members of terror victims have cognizable claims for intentional infliction of emotional distress regardless of their presence at the site of the attack). The D.C. Court of Appeals has held that intentional infliction of emotional distress claims support punitive damages awards. See Sere v. Grp. Hospitalization, Inc., 443 A.2d 33, 37-38 (D.C. 1982) (a tort of intentional infliction of severe emotional distress, "if proved, would provide an appropriate basis for an award of punitive damages, since it is by definition willful and outrageous conduct which society finds intolerable, and seeks to deter"). Accordingly, family member plaintiffs' claims also support an award of punitive damages. See Valore, 700 F. Supp. 2d at 83 ("all plaintiffs"—including "family members" who brought their claims under D.C. law—"can recover punitive damages"). The punitive damages award will hence be divided among all

plaintiffs, including family members, rather than solely among the plaintiffs who have a federal cause of action.

## **CONCLUSION**

The record in this case is filled with horrors; the suffering of the plaintiffs and the shattered lives left in the wake of the attacks are apparent on every page. Cases like this vividly illustrate the faint approximation of full compensation the law offers where human lives, family relationships, and physical health have been destroyed. The Court hopes that, despite their inherent inadequacy, the compensatory damages awarded here will help alleviate plaintiffs' physical, emotional, and financial injuries. So, too, the Court hopes that the punitive damages award will help deter Iran and MOIS from again inflicting such suffering on innocent people.

A separate Order will be issued consistent with these findings.

/s/
JOHN D. BATES
United States District Judge

Dated:  May 9, 2013